# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**JOHN DOE,**

*Plaintiff-Appellee,*

v.

**CATHOLIC RELIEF SERVICES,**

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland,
No. 1:20-cv-01815-JRR
(The Honorable Julie R. Rubin)

## CORRECTED
## OPENING BRIEF OF APPELLANT CATHOLIC RELIEF SERVICES–
## UNITED STATES CONFERENCE OF CATHOLIC BISHOPS

Joe Dugan
Brandon K. Wharton
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
jdugan@gejlaw.com
bwharton@gejlaw.com
(410) 727-7702

*Counsel for Defendant-Appellant Catholic
Relief Services–United States Conference of
Catholic Bishops*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1569</u>        Caption: <u>John Doe v. Catholic Relief Services</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Catholic Relief Services</u>
(name of party/amicus)

who is _____<u>appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☑YES☐NO
    If yes, identify entity and nature of interest:

    National Union Fire Insurance Company of Pittsburgh, Pa, a subsidiary of American International Group, Inc. (AIG), has provided liability insurance coverage to Catholic Relief Services in connection with this litigation.

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Joe Dugan                    Date:  09/13/2025

Counsel for: Catholic Relief Services

Print to PDF for Filing

# TABLE OF CONTENTS

Page

Fed. R. App. P. 26.1 Disclosure Statement ................................................................ i

Table of Authorities ........................................................................................... iv

Introduction ......................................................................................................... 1

Jurisdictional Statement ....................................................................................... 3

Statement of the Issues ......................................................................................... 4

Statement of the Case ........................................................................................... 5

    Catholic Relief Services' Religious Mission ..................................................... 5

    John Doe Joins Catholic Relief Services and Furthers the Agency's
        Mission ................................................................................................ 6

    The Benefits Quandary ................................................................................. 10

    Procedural History ........................................................................................ 11

Summary of the Argument .................................................................................... 13

Argument ............................................................................................................. 16

    I.    The First Amendment forecloses judicial review of Catholic
        Relief Services' implementation of Catholic social teaching
        through its employee benefits programming ........................................ 16

    II.   Title VII exempts religious employers like Catholic Relief
        Services "with respect to the employment of individuals of a
        particular religion," that is, "all aspects of religious observance
        and practice, as well as belief." ........................................................... 20

    III.  Enforcement of Title VII and the federal Equal Pay Act against
        Catholic Relief Services would substantially burden the
        agency's religious exercise in violation of RFRA. ............................... 26

952001

A. Because RFRA was enacted to "guarantee" application of the compelling interest test in "all cases where free exercise of religion is substantially burdened," RFRA provides a defense to religious employers regardless of government participation in the case. ...................................................................................26

B. Punishing Catholic Relief Services for administering its employee benefits programming pursuant to its sincere Catholic beliefs would substantially burden the agency's religious exercise. ...................................................................................30

C. Punishing Catholic Relief Services for administering its employee benefits programming pursuant to its sincere Catholic beliefs is not the least restrictive means of furthering a compelling governmental interest. ............................................37

IV. The district court's narrow reading of the MFEPA religious employer exemption is contrary to *Doe III* and incompatible with the statutory text and legislative history. ....................................40

V. Enforcement of Title VII, the federal Equal Pay Act, or MFEPA to punish Catholic Relief Services for administering employee benefits in a manner consonant with its religious beliefs violates the agency's First Amendment rights. .......................49

Conclusion ..................................................................................56

Statutory Addendum ........................................................... Add.i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) .......................................................37

*Bates v. Pakseresht*,
   146 F. 4th 772 (9th Cir. 2025) ........................................36

*Billard v. Charlotte Cath. High Sch.*,
   101 F.4th 316 (4th Cir. 2024) ...................................*passim*

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ..............................................*passim*

*Braidwood Mgmt., Inc. v. EEOC*,
   70 F.4th 914 (5th Cir. 2023) ....................................30, 37

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ...............................................30, 33

*Butler v. Drive Automated Indus. of Am., Inc.*,
   793 F.3d 404 (4th Cir. 2015) ..........................................20

*Canaan Christian Church v. Montgomery Cnty.*,
   29 F.4th 182 (4th Cir. 2022) ..........................................51

*Carter v. Fleming*,
   879 F.3d 132 (4th Cir. 2018) ..........................................36

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Review Comm'n*,
   605 U.S. 238 (2025) ...............................................18, 42

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ...............................................39, 49

*Colo. Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC*,
   60 F.4th 148 (4th Cir. 2023) ......................................26, 49

952001

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
  100 F.4th 1251 (10th Cir. 2024) ...................................................51

*EEOC v. Cath. Univ. of Am.*,
  83 F.3d 455 (D.C. Cir. 1996) ......................................................26

*Employment Division v. Smith*,
  494 U.S. 872 (1990) ..............................................................27, 28

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ......................................................52

*Fitzgerald v. Roncalli High Sch., Inc.*,
  73 F.4th 529 (7th Cir. 2023) ...................................................23, 25

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ..........................................................*passim*

*Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, — F. 4th —, 2025 WL 2447757 (10th Cir. 2025) ...............18, 19

*Gen. Conf. of Seventh-Day Adventists v. Horton*,
  — F. Supp. 3d —, 2025 WL 1703806 (D. Md. June 18, 2025) ...............41

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
  617 F.3d 402 (6th Cir. 2010) ......................................................27

*Green v. Miss U.S. of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) ......................................................38

*Hankins v. Lyght*,
  441 F.3d 96 (2d Cir. 2006) .....................................................15, 26

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988) ................................................................28

*In re Young*,
  141 F.3d 854 (8th Cir. 1998) .....................................................26

952001

*Jones v. Wolf*,
    443 U.S. 595 (1979) ........................................................................18

*Kane v. De Blasio*,
    19 F.4th 152 (2d Cir. 2021) ......................................................34

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
    344 U.S. 94 (1952) ........................................................13, 17

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ......................................................36

*Kennedy v. St. Joseph's Ministries, Inc.*,
    657 F.3d 189 (4th Cir. 2011) ........................................21, 22, 23, 40

*Kim v. Bd. of Educ.*,
    93 F.4th 733 (4th Cir. 2024) ......................................................53

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ......................................................31

*Liberty Univ., Inc. v. Lew*,
    733 F.3d 72 (4th Cir. 2013) ......................................................30, 55

*Little v. Wuerl*,
    929 F.2d 944 (3d Cir. 1991) ......................................................22, 23

*McDaniel v. Paty*,
    435 U.S. 618 (1978) ......................................................28

*McMahon v. World Vision Inc.*,
    — F. 4th —, 2025 WL 2217629 (9th Cir. 2025) ......................................................22

*Mahmoud v. Taylor*,
    606 U.S. —, 145 S. Ct. 2332 (2025) ......................................................38, 55

*Molesworth v. Brandon*,
    341 Md. 621 (1996) ......................................................40

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................28

952001

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) ........................................................28

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
    819 F.2d 875 (9th Cir. 1987) .........................................31

*Raleigh Wake Citizens Ass'n v. Wake Cnty.. Bd. of Elections*,
    827 F.3d 333 (4th Cir. 2016) ....................................40, 49

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ..................................21, 22

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ...............................................27, 28

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) .........................................55

*SmartSky Networks, LLC v. DAG Wireless, Ltd.*,
    93 F.4th 175 (4th Cir. 2024) .........................................16

*Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*,
    938 F.3d 113 (4th Cir. 2019) ...........................................4

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
    41 F.4th 931 (7th Cir. 2022) .........................................23

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ...............................................*passim*

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981) ...............................................30, 34

*Thorson v. Billy Graham Evangelistic Ass'n*,
    687 N.W.2d 652 (Minn. Ct. App. 2004) .......................45

*Union Gospel Mission of Yakima, Wash. v. Ferguson*,
    No. 23-CV-3027, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) ................53

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1871) .....................................4, 13, 17, 19

952001

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ..................................................................27, 28

**Statutes**

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1331 ...................................................................................3

28 U.S.C. § 1367 ...................................................................................3

29 U.S.C. § 213 ..............................................................................38, 51

42 U.S.C. § 12113 ...............................................................................24

42 U.S.C. § 2000bb .............................................................................28

42 U.S.C. § 2000bb-1 .......................................................14, 27, 30, 37

42 U.S.C. § 2000bb-3 ...................................................................14, 27

42 U.S.C. § 2000e ...........................................................14, 20, 38, 50

42 U.S.C. § 2000e-1 ............................................................................20

Md. Code Ann., Cts. & Jud. Proc. § 12-603 .......................................48

Md. Code Ann., State Gov't § 20-601 ................................................50

Md. Code Ann., State Gov't § 20-604 ....................................40, 47, 49

**Other Authorities**

Congregation for the Doctrine of the Faith, *Considerations Regarding
    Proposals to Give Legal Recognition to Unions Between Homosexual
    Persons*, Vatican (June 3, 2003), https://tinyurl.com/cdfstatement.................34

Deema Zein & Layla Quran, *Catholic Relief Services Faces Uncertain
    Future After Trump Cuts Aid Funding*, PBS (May 26, 2025, 6:38 p.m.),
    https://www.pbs.org/newshour/show/catholic-relief-services-faces-
    uncertain-future-after-trump-cuts-aid-funding ...................................7

952001

EEOC, *Fiscal Year 2024 Annual Performance Report* 37 (2025), https://tinyurl.com/5t52t67a................................................................29

U.S. Courts, *Table C-2—U.S. District Courts—Civil Federal Judicial Caseload Statistics* (2025), https://tinyurl.com/uscourtsdata............................................29

952001

## INTRODUCTION

This case concerns whether Defendant-Appellant Catholic Relief Services—United States Conference of Catholic Bishops ("Catholic Relief Services"), the international humanitarian agency of the Catholic community in the United States, was required under federal and Maryland law to provide spousal health benefits for the same-sex spouse of an employee, in violation of its sincerely held religious beliefs.

The district court concluded that it was. In reaching that conclusion, the district court adopted an outdated, atextual reading of the exemption for religious employers in Title VII of the Civil Rights Act of 1964, and found that Catholic Relief Services violated both Title VII and the federal Equal Pay Act. The court rejected Catholic Relief Services' defenses to the application of these statutes under the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment, despite unrebutted evidence that enforcement of these laws against Catholic Relief Services would substantially burden the agency's religious exercise and is not the least restrictive means of furthering a compelling governmental interest. And the court narrowly construed a new statutory test announced by the Maryland Supreme Court that itself narrowed the universe of employees covered by a religious employer exemption in the Maryland

Fair Employment Practices Act ("MFEPA"), and rejected Catholic Relief Services'

free exercise defense to the application of that statute.

Each of these rulings was in error, and inconsistent with U.S. Supreme Court

guidance in recent years that has emphasized the rights of individuals and

organizations to live out their religious traditions free from government

interference.  Even as the U.S. Supreme Court recognized in *Bostock v. Clayton

County*, 590 U.S. 644 (2020), that Title VII prohibits discrimination based on

sexual orientation and gender identity, the Court expressed its "deep[] concern[]

with preserving the promise of the free exercise of religion enshrined in our

Constitution," a guarantee that "lies at the heart of our pluralistic society."  *Id.* at

681.

The *Bostock* Court left for "future cases" protections for religious employers

from the types of claims that Mr. Doe brought—such as the "express statutory

exception for religious organizations" under Title VII, or such as RFRA, which

"operates as a kind of super statute, displacing the normal operation of other

federal laws."  *Id.* at 682.  Those defenses are squarely presented by this appeal.

The Court should uphold Catholic Relief Services' right to free exercise of its

religion, reverse the judgment of the district court, and remand for entry of

judgment in Catholic Relief Services' favor on all claims.

952001

# JURISDICTIONAL STATEMENT

Subject to Catholic Relief Services' challenge to the district court's subject matter jurisdiction pursuant to the ecclesiastical abstention doctrine (discussed in Part I of the argument section below), Catholic Relief Services acknowledges that the district court otherwise had subject matter jurisdiction over Mr. Doe's federal law claims under 28 U.S.C. § 1331. The district court had supplemental jurisdiction over Mr. Doe's state law claims under 28 U.S.C. § 1367, because those claims were part of the same case or controversy. Under 28 U.S.C. § 1291, this Court has jurisdiction to review the final decision of the district court.

Mr. Doe's complaint asserted ten counts. (JA11-32.) On March 26, 2021, the district court dismissed Counts IV through VII, which asserted state law claims. (JA153.) Through rulings on August 3, 2022 and January 11, 2023, the district court granted summary judgment in Catholic Relief Services' favor under Count X (a retaliation claim), and granted summary judgment in Mr. Doe's favor as to liability only under Counts VIII (Title VII) and IX (federal Equal Pay Act). (JA947, JA952-953.) The district court certified several questions of state law to the Maryland Supreme Court, and following that court's ruling, the parties stipulated to the dismissal of Counts II and III. (JA999-2002.) The district court then held a bench trial on Count I (MFEPA), Mr. Doe's sole remaining claim. On April 21, 2025, the district court entered judgment in Mr. Doe's favor under Count

I and awarded him $60,000 in damages pursuant to a prior stipulation of the parties. (JA1137.)[1]  That April 21, 2025 order constituted a final judgment disposing of all claims in this action.  Catholic Relief Services timely noted its appeal on May 16, 2025.  (JA1138-1139.)

## STATEMENT OF THE ISSUES

1.     Did the district court erroneously exercise subject matter jurisdiction over a "matter which concerns theological controversy," *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871), in violation of Catholic Relief Services' First Amendment right to church autonomy?

2.     Did the district court misconstrue Title VII's religious employer exemption by holding that it protects only the right of religious organizations to employ co-religionists?

3.     Did the district court err in rejecting Catholic Relief Services' defense to Mr. Doe's Title VII and federal Equal Pay Act claims under RFRA on the ground that this defense is not available in actions between private-party litigants?

_____

[1]  The stipulation, which obviated the need for a damages trial, was subject to Catholic Relief Services' "reservation of its right to seek appellate review of all adverse rulings regarding its liability to Plaintiff, to include the Court's summary judgment rulings as to Catholic Relief Services' liability under Counts VIII and IX and any potential ruling in Plaintiff's favor under Count I."  (JA1039-1040.)  *See Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 124 (4th Cir. 2019) ("Cases are legion where the parties stipulate to a set amount of damages *if* liability is established. . . . [T]he courts of appeals have never hesitated to review district court's rulings on liability in such cases.").

952001

4.      Did the district court adopt an overly restrictive view of those employees who directly further a religious organization's core mission and, accordingly, are within the scope of MFEPA's religious employer exemption as construed by the Maryland Supreme Court?

5.      Did the district court misapply *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), and *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam), in finding that Title VII, the federal Equal Pay Act, and MFEPA are neutral and generally applicable statutes and that enforcement of these statutes against Catholic Relief Services is reviewed for a rational basis only?

## STATEMENT OF THE CASE

### *Catholic Relief Services' Religious Mission*

Catholic Relief Services is a humanitarian agency founded and governed by the United States Conference of Catholic Bishops with a mission to "assist the poor and vulnerable overseas." (JA1847.) The agency is "motivated by the Gospel of Jesus Christ to cherish, preserve and uphold the sacredness and dignity of all human life, foster charity and justice, and embody Catholic social and moral teaching" as it (i) promotes human development and (ii) serves American Catholics who "live their faith in solidarity with their brothers and sisters around the world." (JA1847.) Among those Catholic social and moral teachings that Catholic Relief Services endeavors to uphold is the agency's sincere religious belief that "marriage

is between a man and a woman" and is "ordered to the procreation of children." (JA3492.)

Catholic Relief Services administers its employee benefits programs, like all agency initiatives, in a manner consonant with its religious beliefs. "This extends to the nature of the services provided and determining eligibility for dependent coverage, as well as the definition of marriage and spousal relationships." (JA352.) As relevant in this case, Catholic Relief Services sincerely believes that it is "never morally permissible to extend spousal benefits to an employee who has entered into a legally recognized same-sex union," as doing so would amount to "formal cooperation with the application of gravely unjust laws" and would "further[] practices that the Church has declared to be injurious to the social order." (JA390-391; JA332.)

### John Doe Joins Catholic Relief Services and Furthers the Agency's Mission

John Doe joined Catholic Relief Services in 2016. (JA1495.) The agency recently had launched an app-based knowledge management program known internally as "Gateway," and Mr. Doe was hired to help implement and improve that system (and specifically the "Pipeline and Projects" application, the "largest [Gateway] app in terms of consumption"). (JA1588; JA3013.)[2]

---

[2] References in this brief to Gateway, and Mr. Doe's work on Gateway, are to the Pipeline and Projects application specifically.

952001

As of the time of trial, over three-quarters of Catholic Relief Services'

annual revenue derived from public sources. (JA2498.) Those public funders

maintain strict requirements for information transparency and subrecipient

monitoring. (JA1244-1245, JA1419-1421, JA1423.) To accommodate those

requirements, Catholic Relief Services employs teams that "collect data around the

world," and has made a "big investment in . . . knowledge management."

(JA1242.)[3] The Gateway system that Mr. Doe helped to implement is, as the

district court found, an "important administrative tool for management and

facilitation of CRS operations," and has made the agency "much more efficient."

(JA1114 (citation omitted).) Gateway houses the agency's data relating to funding

awards, solicitations, and trends, as well as project-level data and information

relevant to program compliance and monitoring. (JA1300-1302.) The court found

that Gateway has "drastically improved" the ability of Catholic Relief Services'

donor engagement and advancement professionals to capture funding opportunity

data. (JA1114 (citation omitted).) According to Mr. Doe, Gateway also led to a

"drastic improvement" in the efficiency of Catholic Relief Services' subrecipient

---

[3] Public funding remains critical for Catholic Relief Services, though actions by
the current Administration to reduce foreign aid spending have impacted Catholic
Relief Services' operations. *See* Deema Zein & Layla Quran, *Catholic Relief
Services Faces Uncertain Future After Trump Cuts Aid Funding*, PBS (May 26,
2025, 6:38 p.m.), https://www.pbs.org/newshour/show/catholic-relief-services-
faces-uncertain-future-after-trump-cuts-aid-funding.

952001

compliance monitoring.  (JA1642.)  Additionally, the agency uses Gateway to determine its annual budget and its deployment of staff worldwide.  (JA1304.)

While employed at Catholic Relief Services, Mr. Doe held three positions of progressive responsibility pertaining to Gateway.  (JA1523-1525, JA1552-1553.)  By the time of his voluntary resignation in 2024 (JA1495), Mr. Doe was managing the Gateway team (JA1553).  As he described his work in a cover letter to one prospective employer, Mr. Doe "manage[d] a three-person team supporting an internal information management platform . . . utilized by over 1,500 global users based in 70+ countries."  (JA3008.)  Even before he assumed that managerial role, Mr. Doe advised his managers on "decision-making, strategy, and communication," and he played a "lead role" in hiring, onboarding, and training many of his colleagues and vendors.  (JA2992.)

Midstream during his employment at Catholic Relief Services, Mr. Doe stepped away from the Gateway system for a time to work as a Monitoring, Evaluation, Accountability, and Learning ("MEAL") advisor with a flagship Catholic Relief Services program called "Changing the Way We Care." (JA3014-3015, JA1509.)  The district court found that Catholic Relief Services uses MEAL "as a part of its adaptive management strategy and continuous improvement efforts."  (JA1115.)  As the court recognized, Catholic Relief Services "requires implementation of MEAL in all of its overseas projects," and

8

the "standardized monitoring and evaluation framework under MEAL is 'required by most donors.'" (JA1115 (citation omitted).)

The Changing the Way We Care program for which Mr. Doe performed his MEAL work focuses on ending the institutionalization of children and ensuring that they "grow up in family-based care." (JA1326.) Mr. Doe's MEAL work was critical to the success of Changing the Way We Care: in fact, MEAL is one of the "three objectives of the program," as Catholic Relief Services endeavors to "generate all of the evidence around how [the agency] did the program and then use that to influence larger bodies and effect change that would ripple beyond [the initial] countries." (JA1328.) As a MEAL advisor, Mr. Doe collaborated with colleagues in target countries to "establish frictionless processes and procedures to ensure the flow of quality data" into three databases that Mr. Doe created, enabling the "initiative to have, for the first time, easy access to data for decision making and as evidence for indicator results reported historically." (JA3002.) He also built the capacity of colleagues and partners to "leverage data for adaptation and learning, through participatory workshops," and synthesized, analyzed, and shared "routine monitoring data with colleagues, donors, and other stakeholders." (JA3004.)[4]

---

[4] Apart from his work on Gateway and Changing the Way We Care, Mr. Doe held three temporary positions in Nigeria. In the first such position, he was "instrumental in coordinating a five-INGO emergency response" to a cholera

952001

As reflected in his annual performance assessments (JA2626-2739), Mr. Doe's work at Catholic Relief Services was exemplary. The agency understood, as did Mr. Doe, that he was a vital part of the agency's success in carrying out its mission. As Mr. Doe himself put it in his final email to his colleagues in August 2024, he was "incredibly proud to have had the opportunity to contribute to CRS's mission to assist the poor and vulnerable overseas." (JA2741.)

### *The Benefits Quandary*

Before Mr. Doe joined Catholic Relief Services in 2016, he told a recruiter that he was married to a man and inquired about his eligibility for spousal health insurance. (JA3527-3528.) According to Mr. Doe, the recruiter replied: "All dependents are covered." (JA3528.) Mr. Doe took the job, and his spouse was initially, erroneously enrolled in Catholic Relief Services' spousal health benefits program. Catholic Relief Services discovered the error several months later, following an audit by its third-party health benefits administrator. (JA3608-3610, JA3616.)

Because of its sincere religious belief that marriage is a union between one man and one woman, and that a Catholic organization must not engage in acts that

---

outbreak. (JA3003.) In the second position, he supported a MEAL director who was the lead facilitator of a MEAL workshop. (JA1565.) In the third position, he served as program manager for an emergency cash assistance program supporting 85,000 individuals. (JA3006.)

constitute formal cooperation with a same-sex union or that could promote scandal within the Church (JA379), Catholic Relief Services could not look the other way after it discovered the mistake with Mr. Doe's spousal health benefits.  At the same time, the agency wanted to be fair to its new employee, as the mistake certainly was not Mr. Doe's fault.  Agency leadership met with Mr. Doe and collaborated to try to square the circle and reach a compromise that was consistent with Catholic teaching.  (JA3634-3646.)

Ultimately, the agency offered Mr. Doe a three-part solution:  (i) Mr. Doe's spouse could be transitioned to the agency's COBRA-like insurance alternative; (ii) the COBRA window would be extended to thirty-six months; and (iii) Mr. Doe would receive a raise that would cover most of his out-of-pocket expenses. (JA3425-3427.)  Mr. Doe declined the COBRA proposal, opting later to purchase private insurance.  (JA3687-3688.)  Catholic Relief Services granted Mr. Doe a $5,000 technical increase in his salary, and terminated his spousal health benefits effective October 1, 2017.  (JA3663; JA3671.)

### *Procedural History*

Mr. Doe brought a charge of discrimination before the EEOC in 2018. (JA3709.)  After the EEOC issued a right-to-sue letter, in 2020, Mr. Doe filed a ten-count complaint in the U.S. District Court for the District of Maryland.  The complaint alleges sexual orientation discrimination and sex discrimination in

11

violation of MFEPA (Counts I and II respectively); sex discrimination in violation of the Maryland Equal Pay for Equal Work Act (Count III); state common law and statutory wage claims (Counts IV through VII); sex discrimination in violation of Title VII (Count VIII) and the federal Equal Pay Act (Count IX); and retaliation in violation of federal and state law (Count X). (JA19-31.)

At the outset of the case, the district court dismissed Mr. Doe's state law claims in Counts IV through VII ("*Doe I*"). (JA153.) Later, on the parties' cross-motions for summary judgment,[5] the district court granted summary judgment to Catholic Relief Services on Mr. Doe's retaliation claim in Count X and his request for punitive damages, but granted summary judgment to Mr. Doe as to liability only on his federal discrimination claims (Counts VIII and IX) ("*Doe II*"). (JA947, JA952-953.) The district court initially granted summary judgment to Mr. Doe on Count III as well, but later vacated that ruling (JA952) and certified questions to the Maryland Supreme Court about the distinctions between sex discrimination and sexual orientation discrimination under Maryland law and the scope of the MFEPA religious employer exemption (JA954-961).

Following the Maryland Supreme Court's certified question rulings ("*Doe III*"), the parties stipulated to the dismissal with prejudice of Counts II and III.

---

[5] Catholic Relief Services moved for summary judgment in its favor on all counts, while Mr. Doe moved for partial summary judgment as to liability only under Counts I-III, VIII, and IX, and as to Catholic Relief Services' RFRA defense.

(JA999-1002.) That left Count I—sexual orientation discrimination under MFEPA—unresolved in the district court. In late 2024, the district court presided over a bench trial to determine whether Mr. Doe's positions at Catholic Relief Services brought him within the ambit of the MFEPA religious employer exemption in light of a new test announced by the *Doe III* court: specifically, whether his duties "directly further[ed] the core mission(s) – religious or secular, or both – of the religious entity." (JA994.) In an April 21, 2025 Memorandum Opinion, the district court held that "Doe did not, in any of his positions, directly further a CRS core mission," and also rejected Catholic Relief Services' constitutional defense to Count I ("*Doe IV*"). (JA1122, JA1136.) The court entered final judgment in Mr. Doe's favor and awarded him $60,000 in compensatory damages pursuant to a prior stipulation between the parties. (JA1137.)

## SUMMARY OF THE ARGUMENT

The Court should reverse the judgment of the district court and remand for a judgment of dismissal, as civil courts lack subject matter jurisdiction to resolve disputes, like this one, that involve "theological controversy." *Watson*, 80 U.S. (13 Wall.) at 733. Religious organizations are constitutionally entitled to "independence from secular control or manipulation, in short, power to decide for themselves . . . matters of . . . faith and doctrine." *Kedroff v. St. Nicholas*

13

*Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).  That

constitutional freedom extends to health benefits decisions resulting from the

sincere religious beliefs of a Catholic employer.

If the Court reaches the merits, the Court should reverse and remand for

entry of judgment in Catholic Relief Services' favor.  With respect to Mr. Doe's

Title VII claim, the district court misconstrued the statutory exemption for

religious employers to apply only to those employment decisions favoring

co-religionists.  The exemption certainly applies in that context; but it also applies

whenever a religious employer makes an employment decision because of the

employee's nonconformance to any "aspect[] of religious observance and practice,

as well as belief."  42 U.S.C. § 2000e(j).  A "'straightforward reading ' of § 702 of

Title VII bars [Mr. Doe's] discrimination claim."  *Billard v. Charlotte Catholic*

*High Sch.*, 101 F.4th 316, 335 (4th Cir. 2024) (King, J., dissenting in part and

concurring in the judgment) (citation omitted).

Regardless how the Court views the Title VII religious employer exemption,

the Court should reverse the district court's summary judgment ruling on Mr.

Doe's Title VII and Equal Pay Act claims because RFRA applies to "all Federal

law, and the implementation of that law," 42 U.S.C. § 2000bb-3(a), and a "person

whose religious exercise has been burdened . . . may assert that violation as a claim

or defense in a judicial proceeding," *id.* § 2000bb-1(c).  "This language easily

952001

covers the present action." *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006).

RFRA precludes enforcement of Title VII and the Equal Pay Act against Catholic

Relief Services on the facts of this case, as that enforcement would substantially

burden the agency's sincere religious exercise and is not the least restrictive means

of furthering any compelling governmental interest.

The Court also should reverse the district court's judgment, following a

bench trial, on Mr. Doe's MFEPA claim. Despite finding that Mr. Doe helped

develop and manage an "important administrative tool for management and

facilitation of CRS operations" that improved the agency's efficiency and capture

of data for funding opportunities (JA1114), the district court held that Mr. Doe

"did not directly further a CRS core mission" (JA1122). Yet the district court's

application of this test was far narrower than what the Maryland Supreme Court

already held to be the "narrowest reasonable reading" of the statutory language

(JA986), and would upend the careful balance the Maryland General Assembly

struck between expanding employee civil rights and protecting the sincere

religious exercise of employers.

Finally, if the Court were to find that any of Mr. Doe's statutory claims may

be viable, the Court nevertheless should reverse because Title VII, the Equal Pay

Act, and MFEPA are not neutral and generally applicable statutes, and

enforcement of these statutes against Catholic Relief Services cannot satisfy strict

scrutiny.  These statutes are riddled with exemptions that apply to secular

employers, yet "government regulations are not neutral and generally applicable,

and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they

treat *any* comparable secular activity more favorably than religious exercise,"

*Tandon*, 593 U.S. at 62.  And after *Doe III* construed the MFEPA religious

employer exemption to require a "fact-intensive inquiry that requires consideration

of the totality of the pertinent circumstances" before an employee may be deemed

inside or outside the scope of the exemption (JA994), the statute's new

"mechanism for individualized exemptions" renders it not generally applicable,

*Fulton*, 593 U.S. at 533.  For the same reason that RFRA provides a statutory

defense to Plaintiff's discrimination claims, the First Amendment's Free Exercise

Clause provides a constitutional defense.  The Court should reverse and remand for

entry of judgment in Catholic Relief Services' favor.

## ARGUMENT

I.    **The First Amendment forecloses judicial review of Catholic Relief Services' implementation of Catholic social teaching through its employee benefits programming.**

"Jurisdiction is a question of law subject to *de novo* review."  *SmartSky*

*Networks, LLC v. DAG Wireless, Ltd.*, 93 F.4th 175, 180 (4th Cir. 2024).

Fundamentally, this case juxtaposes Catholic Relief Services' sincere

religious beliefs about marriage, and the ramifications of those beliefs for

employee benefits programming, against Mr. Doe's understandable desire to receive the same benefits as other employees. Mr. Doe contends that other religious organizations have adopted alternative approaches to employee health benefits (like a "plus one" benefits model) that Mr. Doe believes to be compatible with a Catholic worldview. As discussed in Parts III and V below, whether the Court views the case through the lens of RFRA or the First Amendment's Free Exercise Clause, Mr. Doe essentially argues that his claims and the relief he has sought would not substantially burden Catholic Relief Services' religious exercise and that, in any event, these alternative approaches that other organizations have adopted should thread the needle.

The lines Catholic Relief Services has drawn in its benefits programming are supported by authoritative Catholic teaching, but the Court cannot wade into this dispute, as civil courts may "exercise no jurisdiction" over the subject matter of a "dispute, strictly and purely ecclesiastical in its character," including "a matter which concerns theological controversy." *Watson*, 80 U.S. (13 Wall.) at 733. Religious organizations are constitutionally entitled to "independence from secular control or manipulation, in short, power to decide for themselves . . . matters of . . . faith and doctrine." *Kedroff*, 344 U.S. at 116.

Sometimes, disputes involving religious organizations can be resolved pursuant to "neutral principles of law" that allow full and fair adjudication of the

disputes without consideration of church doctrine. *Jones v. Wolf*, 443 U.S. 595, 604 (1979). Church property disputes present a classic fact pattern where neutral principles may allow a court to determine ownership without delving into religion. But if "the alleged misconduct is rooted in religious belief, then the conduct has 'the protection of the Religion Clauses.' The church autonomy doctrine then kicks in as an affirmative defense to such a religiously rooted claim, and the claim fails." *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, — F. 4th —, 2025 WL 2447757, at *5 (10th Cir. 2025) (citations omitted).

At summary judgment, the district court addressed this threshold, jurisdictional issue in a paragraph, writing that "this case concerns a social service organization's employment benefit decisions regarding a data analyst and does not involve CRS's spiritual or ministerial functions," and that the court "need not question the sincerity or content of CRS's religious beliefs to assess the applicability of neutral and generally applicable statutes." (JA929-930.) It is perilous for a civil court to decide what does or does not constitute the "spiritual" functions of a religious organization. *See Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Review Comm'n*, 605 U.S. 238, 241-42 (2025) (reversing state court judgment excluding religious corporation from tax exemption reserved for nonprofits "operated primarily for religious purposes," where state court found corporation did not qualify because it did not proselytize or limit its services to co-

religionists). Moreover, the district court's observations presuppose (i) that RFRA provides no defense to Catholic Relief Services in this context and (ii) that the statutes at issue are neutral and generally applicable such that their application is reviewed under the First Amendment for a rational basis only. If either of those assumptions fails—and for the reasons discussed below, both are incorrect as a matter of law—then the Court is presented squarely with a religious question that it lacks constitutional authority to resolve. This is so because, to adjudicate the substantial burden on Catholic Relief Services' religious exercise, the Court would have to decide whether it agrees with Catholic Relief Services' understanding of Catholic doctrines such as the "principle of cooperation" and the doctrine of "scandal," discussed *infra* Part III.B.

Mr. Doe ran headlong into this theological debate, even retaining an "expert" counter-theologian to opine about why Catholic Relief Services gets Catholic teaching wrong. But Mr. Doe's litigation strategy only confirms that this is a "theological controversy" over which the Court may "exercise no jurisdiction." *Watson*, 80 U.S. (13 Wall.) at 733; *see Gaddy*, 2025 WL 2447757, at *6 ("Plaintiffs' theory hinges on the favorable resolution of "questions concerning the truth or falsity of [ ] religious beliefs," questions which civil courts and juries are incapable of, and precluded from, answering." (alteration in original) (citation

omitted)).  The Court should reverse and remand for entry of a judgment of dismissal for lack of subject matter jurisdiction.

## II.  Title VII exempts religious employers like Catholic Relief Services "with respect to the employment of individuals of a particular religion," that is, "all aspects of religious observance and practice, as well as belief."

The Court reviews *de novo* the district court's entry of summary judgment in Mr. Doe's favor under Count VIII (Title VII sex discrimination claim), as well as the district court's application of Title VII's religious employer exemption.  *See Butler v. Drive Automated Indus. of Am., Inc.*, 793 F.3d 404, 407 (4th Cir. 2015).

After *Bostock*, Title VII broadly prohibits sexual orientation and gender identity discrimination in the secular workplace.  But the *Bostock* Court left unresolved how "Title VII may intersect with religious liberties," though the Court signaled that the "express statutory exception for religious organizations" may provide an answer.  590 U.S. at 681-82.  That "express statutory exception" is codified at 42 U.S.C. § 2000e-1(a), and it provides that "[t]his subchapter"—that is, Title VII itself—"shall not apply to a . . . religious corporation . . . with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation . . . of its activities."  "Religion" in Title VII is defined broadly to encompass "all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j).

Thus, when a religious employer takes an adverse employment action because an employee's conduct is incompatible with some aspect of the employer's religion, the employer is exempt from liability that might otherwise attach under Title VII. Catholic Relief Services terminated Mr. Doe's spousal health benefits because of its sincere religious opposition to same-sex unions and its religious obligation to refrain from cooperating in such unions (JA379; JA332), and it is exempt from Title VII liability for that employment action.

The district court concluded otherwise, misreading this Court's precedents in *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985), and *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011), as limiting the exemption to circumstances in which religious employers show preference to co-religionists. Of course the exemption applies in those settings, but it extends further, and *Rayburn* and *Kennedy* do not hold otherwise. *Rayburn* correctly recognized that the exemption "does not confer upon religious organizations a license to make [employment] decisions on the basis of race, sex, or national origin," 772 F.2d at 1166, but the court did not consider whether the challenged decision (passing over one woman applicant for another woman applicant) was compelled by the employer's religion. Rather, having found the position at issue to be "significant in the expression and realization of Seventh-day Adventist beliefs," the court declined to "inquire whether the reason for Rayburn's

rejection had some explicit grounding in theological belief." *Id.* at 1168-69.  The

ministerial exception provided an obvious escape hatch in *Rayburn* (and more

recently in *Billard*).  Mr. Doe, though, may not have been a minister within the

meaning of that evolving doctrine.[6]  And while Title VII does not create a carte

blanche for religious employers to discriminate based on protected categories, it

does shield employment decisions made because of religion.  Put differently, an

employer like Catholic Relief Services may not take an adverse action (here,

termination of spousal health benefits) *because of sex*, but it may take such an

action *because of religion*.

Kennedy makes that clear.  In *Kennedy*, the court recognized that the

exemption "has been interpreted to include the decision to terminate an employee

whose conduct or religious beliefs are inconsistent with those of its employer."

657 F.3d at 192 (citation omitted).  The court cited with approval *Little v. Wuerl*,

929 F.2d 944 (3d Cir. 1991), in which "a Catholic school was permitted to decline

to renew a teacher's contract when she remarried."  *Kennedy*, 657 F.3d at 194.  The

*Little* court recognized that "the permission to employ persons 'of a particular

religion' includes permission to employ only persons whose beliefs and conduct

are consistent with the employer's religious precepts."  929 F.2d at 951.  The

---

[6]  *But see McMahon v. World Vision Inc.*, — F. 4th —, 2025 WL 2217629, at *12
(9th Cir. 2025) (remote customer service representative qualified for ministerial
exception).

district court in this case contrasted *Little* with what it understood to be binding circuit precedent (JA932), yet appears to have overlooked that *Kennedy* itself adopted the very language on which Catholic Relief Services relied in its briefing, *see* 657 F.3d at 194.

More recently, Judge King of this Court opined, in a case decided in a religious employer's favor on ministerial exception grounds, that a "'straightforward reading' of § 702 of Title VII" barred sexual orientation discrimination claims by a former teacher at a Catholic school. *Billard*, 101 F.4th at 335 (4th Cir. 2024) (King, J., dissenting in part and concurring in the judgment).[7] Judge King's reading of the exemption, which is consistent with *Kennedy*, aligns with Judge Easterbrook's reading in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring), another sexual orientation discrimination case; and Judge Brennan's opinion in *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529, 536 (7th Cir. 2023) (Brennan, J., concurring), yet another sexual orientation discrimination case. As Judge Easterbrook pointed out, the fact that "adherence to Roman Catholic doctrine produces a form of sex discrimination does not make the action less religiously based." *Starkey*, 41 F.4th at 947 (Easterbrook, J.,

---

[7] In dicta, the *Billard* majority seemingly read this Court's precedents more narrowly, 101 F.4th at 327-28, but that panel—like the district court in this case— did not address *Kennedy*'s express reliance on *Little*.

952001

concurring). If the law were otherwise, *Bostock*'s reference to the "express statutory exception for religious organizations" contained in Title VII, 590 U.S. at 682, would be cold comfort for those organizations, since an employee with a *Bostock*-type claim would avoid the exemption so long as the employee steered clear in its pleadings from any reference to "religious" discrimination. The Court should eschew an interpretation of the exemption that renders *Bostock*'s assurance nugatory and that allows the exemption to be defeated through artful, or even semiconscious, pleading.

While the definition of "religion" in Title VII unambiguously extends to conduct as well as belief, a similar exemption in the Americans with Disabilities Act ("ADA") provides further support for a plain-reading application of the exemption. The ADA allows a religious corporation to "giv[e] preference in employment to individuals of a particular religion to perform work connected with the carrying on by such corporation . . . of its activities." 42 U.S.C. § 12113(d)(1). It adds that a "religious organization may require that all applicants and employees conform to the religious tenets of such organization." *Id.* § 12113(d)(2). If the ADA's reference to "individuals of a particular religion" (identical to the phrasing in Title VII) encompassed only co-religionists, the exemption would be meaningless, because the ADA does not prohibit discrimination on the basis of religion as a category. The exemption has meaning only if one recognizes that an

24

employment action that might appear to constitute disability discrimination could nevertheless be motivated by sincere religious belief, and if so, the religious employer is exempt under the ADA.  The same reasoning applies to Title VII.

Applying the Title VII religious employer exemption as it is written would not, as the district court feared, "effectively exempt[] religious organizations wholesale."  (JA932.)  An adverse employment decision based on a protected class without a religious justification may expose a religious employer, like any other employer, to liability.  And a "pretext inquiry—akin to step three of the *McDonnell Douglas Corp. v. Green* framework—should apply to the employer's proffered religious rationale." *Fitzgerald*, 73 F.4th at 536 (Brennan, J., concurring).[8] Hornbook employment law recognizes that adverse actions that seem superficially to be because of a protected class may turn out to be because of legitimate, non-discriminatory reasons, with the pretext inquiry offering a check against abuse.  Likewise, a decision that seems superficially to be because of sexual orientation may turn out to be because of sincere religious belief, and if it is, Title VII exempts the religious employer from liability.

---

[8]  Mr. Doe has never questioned the sincerity of Catholic Relief Services' beliefs about marriage, and no record evidence contradicts Catholic Relief Services' assertion that Doe's benefits were terminated because of Catholic Relief Services' sincere religious beliefs.

**III.** **Enforcement of Title VII and the federal Equal Pay Act against Catholic Relief Services would substantially burden the agency's religious exercise in violation of RFRA.**

The district court's summary judgment ruling with respect to Catholic Relief Services' defense under RFRA, like the district court's ruling as to the Title VII religious employer exemption, is reviewed *de novo*. *Colo. Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC*, 60 F.4th 148, 151 (4th Cir. 2023).

**A.** **Because RFRA was enacted to "guarantee" application of the compelling interest test in "all cases where free exercise of religion is substantially burdened," RFRA provides a defense to religious employers regardless of government participation in the case.**

Courts have divided over whether RFRA provides a defense to private-party claims. The Second Circuit in *Hankins v. Lyght* said that it does, at least as to federal laws that are equally enforceable by private parties and federal agencies, because the "substance of [statutory] prohibitions cannot change depending on whether [they are] enforced by the EEOC or an aggrieved party." 441 F.3d at 103. The Eighth Circuit, by comparison, recognized that "RFRA . . . has effectively amended the Bankruptcy Code, and has engrafted the additional clause . . . that a recovery that places a substantial burden on a debtor's exercise of religion will not be allowed unless it is the least restrictive means to satisfy a compelling [governmental] interest." *In re Young*, 141 F.3d 854, 861 (8th Cir. 1998). The D.C. Circuit similarly held, in a case brought by the EEOC and a private party, that "the EEOC's and [the private party's] claims are barred by . . . RFRA." *EEOC v.*

*Catholic Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996).

Other courts have declined to apply RFRA in a suit between private parties, *e.g.*, *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010), and the Fourth Circuit has not weighed in on this circuit split, which the Supreme Court has left unresolved. Recently, in *Billard*, this Court declined to decide the defendant Catholic school's RFRA defense, reasoning that the school's ministerial exception defense would be more straightforward to address, and would prevent the Court from having "to resolve 'novel and complex statutory' questions." *Billard*, 101 F.4th at 323, 328 (citation omitted).

RFRA "by its terms purports to limit government action[.]" *Id.* at 323; *see* 42 U.S.C. § 2000bb-1. But RFRA leaves no doubt that it "applies to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a). Indeed, Congress took the unusual step of codifying its intent in enacting RFRA. Congress found that "in *Employment Division v. Smith*, 494 U.S. 872 (1990)[,] the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," and explained that RFRA was enacted to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application ***in all cases*** where

free exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(a)(4),

(b)(1) (emphasis added).

Congress's stated intent to restore the compelling interest test of *Sherbert*

and *Yoder* reveals that Congress meant RFRA to apply as a defense to the

implementation of federal law in cases litigated by government agencies and

private parties alike.  That test, which had been eroded by *Smith*, applied to

private-party litigation.  *See McDaniel v. Paty*, 435 U.S. 618, 621 (1978) (suit

brought by candidate for delegate to constitutional convention against candidate

who was ordained minister).  In other contexts, defendants routinely assert First

Amendment defenses against private plaintiffs.  *See, e.g.*, *N.Y. Times Co. v.

Sullivan*, 376 U.S. 254, 265 (1964); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56

(1988).  And, obviously, the First Amendment's ministerial exception to Title VII

provides a defense to private-party claims, including after *Smith*.  *See, e.g.*, *Our

Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 742, 745 (2020);

*Billard*, 101 F.4th at 329-33.

The Congress that sought to accomplish through statute what *Sherbert* and

*Yoder* once held as a matter of constitutional law likely would be surprised to

learn, as some courts incorrectly have held, that the statute it enacted applies only

as against government litigants.  Were that the case, Congress's stated intent would

be thwarted.  This interpretation would lead to the anomalous result that, in the tiny

fraction of employment discrimination cases litigated by the EEOC, employers'

religious exercise would be entitled to maximum statutory protection, whereas in

the vast majority of cases litigated by private parties who receive a right-to-sue

letter, employers' religious exercise would receive far less statutory protection.

During fiscal year 2024, the EEOC resolved over 87,000 charges of discrimination

but filed just over 100 lawsuits.  EEOC, *Fiscal Year 2024 Annual Performance

Report* 37, 39 (2025), https://tinyurl.com/eeocreport.  By comparison, data

published by the federal judiciary shows over 13,600 employment civil rights cases

filed during the twelve months ending March 31, 2025, of which the government

was a plaintiff in just 118 cases.  U.S. Courts, *Table C-2—U.S. District Courts—

Civil Federal Judicial Caseload Statistics* (2025), https://tinyurl.com/uscourtsdata.

     Given the Supreme Court's description of RFRA as a "super statute,

displacing the normal operation of other federal laws," *Bostock*, 590 U.S. at 682, it

cannot be that the statute's kryptonite is 99% of employment discrimination cases.

This consequence would be all the more bizarre because the EEOC generally

devotes its limited enforcement resources to the strongest cases.  *See id.* at 40

("The EEOC achieved a favorable result in 97% of all district court resolutions

. . . .").  It is not plausible that Congress intended, through RFRA, to give religious

employers a leg up only in those generally meritorious cases litigated by the

EEOC.

952001

**B.** **Punishing Catholic Relief Services for administering its employee benefits programming pursuant to its sincere Catholic beliefs would substantially burden the agency's religious exercise.**

RFRA prohibits the implementation of federal law in a manner that would "substantially burden a person's exercise of religion," unless the "application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). A substantial burden is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (free exercise case)).

A substantial burden arises where "[e]mployers are required to choose between two untenable alternatives: either (1) violate Title VII and obey their convictions or (2) obey Title VII and violate their convictions." *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 937 (5th Cir. 2023). Similarly, "a law that 'operates so as to make the practice of . . . religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014). Thus, a substantial burden may include a requirement to provide health coverage that would make the employer "complicit in a grave moral wrong and would undermine [its] ability to give

30

witness to the moral teachings of [its] church," on pain of significant financial pressure for noncompliance. *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013). The "imposition of tort damages" for engaging in religious exercise likewise "would constitute a direct burden on religion." *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 880 (9th Cir. 1987); *see id.* at 881 ("Were we to permit recovery, the pressure . . . to forego [*sic*] that practice [would be] unmistakeable [*sic*]." (alterations in original) (citations and internal quotation marks omitted)).

Because, at the summary judgment stage, the district court held that RFRA does not apply in litigation between private parties, it did not address Catholic Relief Services' arguments about substantial burden and strict scrutiny. Similarly, following trial on Mr. Doe's MFEPA claim, the district court rejected the application of strict scrutiny in reviewing Catholic Relief Services' free exercise defense (finding MFEPA neutral and generally applicable), and assumed but did not decide that "CRS has made the threshold showing of a burden on its free exercise rights by operation of MFEPA." (JA1129.) Yet unrebutted evidence in the summary judgment record establishes both that imposition of statutory liability against Catholic Relief Services in this case would substantially burden the

agency's religious exercise and that such imposition would not be the least restrictive means to further a compelling governmental interest.

Dr. John Haas, former president of the National Catholic Bioethics Center, authored a *Statement on the Immorality of Providing Spousal Benefits to Same-Sex Couples*, which Catholic Relief Services adopted as its statement of theological position. (JA332.) In his *Statement*, Dr. Haas explains why any requirement that Catholic Relief Services must provide spousal health benefits for employees in same-sex unions would substantially burden Catholic Relief Services' religious exercise. First, "provision of spousal health benefits . . . for the same-sex partners of employees would amount to formal cooperation with evil." (JA392.) Second, provision of these benefits could generate "scandal," that is, any "activity in which a Catholic may engage that would lead another into sin." (JA396.)

As Dr. Haas explains, the principle of cooperation was "developed by Catholic moralists to delineate the circumstances in which a Catholic might legitimately cooperate with someone doing evil in order to achieve a common good." (JA391.) "Formal cooperation," which "occurs when an action . . . can be defined as a direct participation in an [immoral] act . . . or a sharing in the immoral intention of the person committing it," is never morally licit. (JA392 (footnote omitted).) Material cooperation can be licit, but only if "a great good is being achieved or a significant evil avoided, and one does not directly contribute to the

32

immoral act of the Principal Agent." (JA392.) Scandal, by comparison, may occur even where the "actions of a cooperator with an 'evil-doer' . . . may be entirely licit according to the conditions of the Principle of Cooperation." (JA3757.) If the Catholic cooperator's actions would "lead a third party to believe that the Catholic's action implies that he or she agrees with the evil acts of the principal agent, so that the third party would engage in the evil act believing it to be morally licit, then scandal has occurred." (JA3757.)

Mr. Doe, who is agnostic about religion, disputes Catholic Relief Services' understanding of Catholic teaching. Throughout this litigation, Mr. Doe has argued that (i) other organizations that identify as Catholic have different benefits policies; (ii) Catholic Relief Services provides benefits to some employees whose lifestyles do not conform to Catholic values; and (iii) Catholic Relief Services could avoid any burden on religious exercise by implementing an alternative "plus one" benefits model.

As to Mr. Doe's argument about other Catholic organizations, these organizations' practices have no bearing on the religious exercise of Catholic Relief Services, an entity controlled by the United States Conference of Catholic Bishops. (JA3326.) Religious exercise involves "'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Burwell*, 573 U.S. at 710 (citation omitted). Moreover, denial

of a religious accommodation "based on someone else's publicly expressed religious views . . . runs afoul of the Supreme Court's teaching that '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those creeds.*'" *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (alterations added and in original) (citations omitted). Catholic Relief Services refrains from providing spousal health benefits to the same-sex spouses of its employees because of its religious beliefs.[9]

As to Mr. Doe's argument about other Catholic Relief Services employees who may qualify for benefits, civil courts have no role in adjudicating whether Catholic Relief Services has made the correct religious calls in its benefits administration. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection," *Thomas*, 450 U.S. at 714, or, as here, protection under RFRA. That said, Catholic Relief Services' approach to benefits administration is internally consistent. The agency

---

[9] Those beliefs are shared by the Vatican's chief doctrinal body, which teaches that where same-sex unions have been given the legal status and rights belonging to marriage, "clear and emphatic opposition is a duty. One must refrain from any kind of formal cooperation in the enactment or application of such gravely unjust laws and, as far as possible, from material cooperation on the level of their application." Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons*, Vatican (June 3, 2003), https://tinyurl.com/cdfstatement.

distinguishes between a public union between persons of the same sex, and nonpublic (or at least nonobvious) lifestyle choices, such as a remarriage without annulment or conception of a child through in vitro fertilization.  (JA3279; JA3495-3498.)  It is "giving public testimony or making a public statement to the fact that one believes in and encourages same-sex relationships to be on a par with God's plan for marriage [that] can't be acceptable."  (JA3279.)

As to Mr. Doe's argument about the potential permissibility of a "plus one" benefits model, Dr. Haas has explained that the model, while "potentially morally licit in the abstract, is largely unworkable and at the very least would substantially burden Catholic religious exercise rights, particularly at large institutions like Catholic Relief Services."  (JA395.)  The "plus one" model may erode the Church's witness to the "unique and irreplaceable role of marriage and family in society"; contribute to the "support of sexually illicit relationships on the part of some employees"; diminish support for true marriages; and perpetuate scandal, which turns not on the intent of the Catholic actor but rather on the perception of third parties who stumble into sin.  (JA395-396.)

Mr. Doe may not understand how Catholic Relief Services' extension of benefits to him would constitute an imprimatur on his marriage, but Mr. Doe is not a practicing Catholic; and even if he were, he does not get to decide what the doctrine of scandal means to Catholic Relief Services.  Neither, respectfully, does

the Court.  *See Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) ("When

deciding whether [a] practice substantially burdens a religious exercise, 'courts

must not judge the significance of the particular belief or practice in question.'"

(citation omitted)).  Much as Catholic **Social** Services concluded, as the U.S.

Supreme Court recognized in *Fulton*, that "certification" of foster parents in

same-sex relationships "is tantamount to endorsement," 593 U.S. at 532, Catholic

**Relief** Services has concluded that provision of spousal health benefits to the

same-sex spouses of employees "would indicate that CRS . . . did consider these

non-spouses to be spouses."  (JA3379.)  That signaling is incompatible with

Catholic Relief Services' sincerely held religious beliefs.  And because the free

exercise right that RFRA codifies "encompasses religious speech and practice as a

way of life and not merely as private thought," *Bates v. Pakseresht*, 146 F.4th 772,

790 (9th Cir. 2025) (free exercise case), laws that preclude Catholic Relief

Services from administering employee benefits in a manner consistent with

Catholic teaching substantially burden the agency's religious exercise.  As the

Supreme Court recognized in *Kennedy v. Bremerton School District*, 597 U.S. 507,

524 (2022), the Free Exercise Clause "does perhaps its most important work by

protecting the ability of those who hold religious beliefs of all kinds to live out

their faiths in daily life through 'the performance of (or abstention from) physical

acts.'" (citation omitted).

**C.    Punishing Catholic Relief Services for administering its employee benefits programming pursuant to its sincere Catholic beliefs is not the least restrictive means of furthering a compelling governmental interest.**

Because enforcement of Title VII and the federal Equal Pay Act as against Catholic Relief Services in this case would substantially burden the agency's religious exercise, any such enforcement must be "in furtherance of a compelling governmental interest," and must be the "least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

While the government undoubtedly has an interest in addressing discrimination in the workplace, it also has an interest in protecting free exercise of religion. Even as the U.S. Supreme Court construed Title VII to prohibit sexual orientation discrimination, the Court emphasized its "concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution." *Bostock*, 590 U.S. at 681; *see Braidwood Mgmt.*, 70 F.4th at 928 (referencing the *Bostock* Court's "siren call" as to religious liberty concerns in employment litigation). The Supreme Court has never found a government interest in eradicating sexual orientation discrimination to override other constitutional rights. *E.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 602-03 (2023); *Fulton*, 593 U.S. at 542-43.

Any compelling interest asserted by the government—or, here, by Mr. Doe, standing in the shoes of the government—cannot be articulated "at a high level of generality," as strict scrutiny "demands a more precise analysis." *Fulton*, 593 U.S.

at 541; *cf. Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 792 (9th Cir. 2022) (speech case) ("The state of Oregon has offered only 'eliminating discrimination against LGBTQ individuals' as a compelling interest, but this broad formulation alone cannot suffice."). "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton*, 593 U.S. at 541 (alteration in original) (citation omitted). The question is "not whether the [government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Catholic Relief Services. *Id.*

Mr. Doe never has explained how denial of an exemption to Catholic Relief Services could be the least restrictive means of furthering a compelling interest. Nor could he, because during his employment with Catholic Relief Services, the agency offered him a less restrictive alternative: it provided him with a technical increase in his compensation and offered to place his spouse on a COBRA-like alternative to employee benefits. (JA3426-3427.)

That accommodation aside, Title VII's general exclusion for businesses with fewer than fifteen employees, 42 U.S.C. § 2000e(b), and the Equal Pay Act's long list of exemptions, 29 U.S.C. § 213(a), "undermine[]" Mr. Doe's contention that the "non-discrimination policies" reflected in these statutes "can brook no departures." *Fulton*, 593 U.S. at 542; *see also Mahmoud v. Taylor*, 606 U.S. —,

38

145 S. Ct. 2332, 2362 (2025) ("Th[e] robust 'system of exceptions' undermines the Board's contention that the provision of opt outs to religious parents would be infeasible or unworkable."). "It is established in . . . strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (alteration in original) (citations omitted). Mr. Doe can offer "no compelling reason" why the government would have a "particular interest in denying an exception" to Catholic Relief Services "while making them available to others." *Fulton*, 593 U.S. at 542. Because Mr. Doe cannot establish that the substantial burden on Catholic Relief Services' religious exercise satisfies strict scrutiny, the Court should reverse the district court's entry of summary judgment and remand for entry of judgment in Catholic Relief Services' favor on his federal claims.[10]

---

[10] Although no further evidence should be necessary, if the Court finds an unresolved fact question as to the burden on Catholic Relief Services' religious exercise or as to Mr. Doe's case for strict scrutiny, the Court should reverse and remand for a trial on these issues.

**IV.    The district court's narrow reading of the MFEPA religious employer exemption is contrary to *Doe III* and incompatible with the statutory text and legislative history.**

The Court reviews the district court's factual findings at trial for clear error, but examines its conclusions of law *de novo*. *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016).

MFEPA prohibits various forms of workplace discrimination, but exempts religious employers from specified discrimination claims by persons employed "to perform work connected with the activities of the religious entity."  Md. Code Ann., State Gov't § 20-604.  That exemption language mirrors the language of the religious employer exemption in Title VII.  This is not surprising, because MFEPA (together with its religious employer exemption) was enacted soon after Title VII was enacted.  (JA988.)  Although the religious employer exemptions in both statutes initially applied only to those employees engaged in "religious" activities, Congress (in 1972) and the Maryland General Assembly (in 1973) expanded the exemptions by striking the "religious" qualifier.  (JA988-989.)  *Compare Kennedy*, 657 F.3d at 192 ("The revised provision [of Title VII] . . . broadens the exemption to include any activities of religious organizations, regardless of whether those activities are religious or secular in nature."), *with Molesworth v. Brandon*, 341 Md. 621, 632-33 (1996) (1973 act "was passed to 'generally conform the State Fair

Employment Practices Law to the 1972 Amendments of Title VII, Federal Civil Rights Act of 1964'" (citation omitted)).

In 2001, the Maryland General Assembly amended MFEPA to add sexual orientation as a protected class. At the same time that the legislature made sexual orientation discrimination generally illegal in the workplace, it expanded the religious employer exemption to shield religious employers from such claims. (JA1078-1089.)

Although the MFEPA religious employer exemption does not expressly exclude any categories of employees, the Maryland Supreme Court held in *Doe III* that the "narrowest reasonable reading" of the exemption would limit it to "employees who perform duties that directly further the core mission (or missions) of the religious entity." (JA986.) The court determined that the phrase "to perform work connected with the activities of the religious entity" implies some kind of limiting language (JA987), notwithstanding (i) that this language is an artifact of the original exemption that was limited to religious activities only, and (ii) that the Maryland Supreme Court's narrower reading renders the statute constitutionally defective, since it now discriminates between religious denominations that preferentially hire coreligionists at all levels of an organization (like Seventh Day Adventists, *see Gen. Conf. of Seventh-Day Adventists v. Horton*, — F. Supp. 3d —, 2025 WL 1703806, at *1 (D. Md. June 18, 2025), *appeal*

*docketed*, No. 25-1735 (4th. Cir)), and those that do not maintain this requirement. *See Catholic Charities Bureau*, 605 U.S. at 248 ("A law that differentiates between religions along theological lines is textbook denominational discrimination.").

Having held that the MFEPA religious employer exemption applies only to employees who "directly further" an organization's core mission, the *Doe III* court offered guideposts to assist trial courts with the "fact-intensive inquiry" of determining whether particular employees are covered by the exemption. (JA994.) The court observed that duties "directly" furthering a core mission are those that "are not one or more steps removed from taking the actions that effect the goals of the entity." (JA994.) The court contrasted a hypothetical janitor at a housing nonprofit, whose work "allows other staff members to work in a clean environment and better focus on their duties," with a hypothetical executive director of a charity that raises funds to build schools, whose "duties include managing other staff members to ensure that all fundraising events are scheduled, advertised, and ultimately successful. (JA994-995.)[11]

This janitor – executive director hypothetical illustrates that, for MFEPA exemption purposes, a nonprofit may employ two types of workers. Some, perhaps most, employees are tasked with duties that relate to and advance the

---

[11] The Maryland Supreme Court identified other guideposts, but as the district court observed, the parties did not focus at trial on those other guideposts.

mission.  Other employees help create a workplace that is conducive to accomplishing the mission.  Employees in that latter category may include janitors, or—as Maryland Supreme Court Justice Gould suggested at oral argument in *Doe III*—mailroom clerks.  June 2, 2023 Oral Argument at 40:53, https://tinyurl.com/mscargument.  Other such employees might include cafeteria workers or security guards.  These types of mostly entry-level, lower-paid employees are ubiquitous at organizations of all shapes, sizes, and missions.  These employees may have little or no insight about the purpose and goals of an organization or its operations.  Their job is to make life comfortable and safe for the workers who are on-mission.

At trial, both sides acknowledged that Catholic Relief Services' core mission is to serve the poor and vulnerable overseas.  (JA1108.)  The district court correctly found that Gateway, the system Mr. Doe helped develop and later managed, is an "important administrative tool for management and facilitation of CRS operations."  (JA1114.)  The court recognized that Gateway has made Catholic Relief Services "much more efficient" and has "drastically improved" the agency's "ability to capture funding opportunity data."  (JA1114 (citations omitted).)  The court also found that MEAL—the analytical work Mr. Doe did for the flagship "Changing the Way We Care" program—is implemented in all of Catholic Relief Services' overseas projects and is "required by most donors."

(JA1115 (citation omitted).)  Drawing on a robust trial record that included Mr.

Doe's own contemporaneous descriptions of his work, the court found that Mr.

Doe:

- Provided "training and support" to Catholic Relief Services employees on the Gateway application;

- Expanded and modified the Gateway system, assisted with "business needs," and served as a "liaison between Information Technology . . . and business owners";

- Coordinated "monthly learning webinars," collected data, and "worked . . . on the quantitative portion of [a] quarterly report that was submitted to donors"; and eventually

- Supervised direct reports on the Gateway system, and worked to "troubleshoot issues integrating data between a financial management system" and the Gateway system.

(JA1116-1117.)

Despite these well-supported factual findings, the district court held that,

with the exception of one temporary overseas position, Mr. Doe "did not directly

further a CRS core mission."  (JA1122.)  In making that determination, the district

court erroneously focused on those tasks that Mr. Doe did ***not*** perform.  True

enough, Mr. Doe did not himself solicit funds from donors, or (generally) perform

fieldwork abroad, or make decisions about programmatic goals.  (JA1124-1127.)

But the *Doe III* test does not confine the religious employer exemption to

employees who perform those limited tasks.  Rather, *Doe III* distinguished between

a janitor, who helps staff members "work in a clean environment and better focus

on their duties," and an executive director, who provides back-office managerial support for front-line fundraising professionals. (JA994-995.)

The *Doe III* test, a gloss on statutory text that places no express limit on any covered employees, is flexible enough to capture not just an organization's standard-bearers and fieldworkers but also many other employees who are less visible to the outside world, yet whose duties relate directly to the "actions that effect the goals of the entity." (JA994.) *Cf. Thorson v. Billy Graham Evangelistic Ass'n*, 687 N.W.2d 652, 656-57 (Minn. Ct. App. 2004) (where religious employer exemption under state law did not apply to "secular business activities engaged in by the religious association. . . the conduct of which is unrelated to the religious . . . purposes for which it is organized," limiting language was "properly considered in light of the purpose and mission of the entire entity, not the job responsibilities of the individual employee").

Mr. Doe, a highly paid professional with a graduate degree who would be challenging to replace (JA1289), is far more like the hypothetical executive director than the hypothetical janitor. Moreover, all of his work related directly to advancing Catholic Relief Services' mission. The Gateway system that Mr. Doe managed allows Catholic Relief Services to, among other things, "forecast . . . financial models," make informed decisions about "staff deployment," conduct "internal learning to see if there are certain types of awards that [the agency is]

competing for and not winning" so the agency could adjust its approach, manage "institutional donor customer relationship[s]," supply subrecipient performance information to donors upon request, and report key indicators to the board. (JA1304, JA1301, JA1309-1310, JA1420.)  The MEAL work that Mr. Doe performed for Changing the Way We Care was "absolutely critical and it was one of the three objectives of the program," as the "idea behind it was to generate all of the evidence around how [the agency] did the program and then use that to influence larger bodies and effect change that would ripple beyond th[e] demonstration countries."  (JA1328.)

Mr. Doe understood his mission-critical role.  As Mr. Doe described it, he, *e.g.*, "designed, documented, elicited feedback and achieved buy-in for [a] process that saves tens of hours in staff time each month" (JA3008); "buil[t] the capacity of country team colleagues and partners to leverage data" (JA3004); "[d]esigned and implemented a tool the risk and compliance unit used to drive a 65% increase in evidence of agency compliance to a USG policy" (JA2991); "closely advis[ed] . . . managers' decision-making, strategy, and communication to agency leaders as it related to managing Gateway" (JA2992); "contributed to the development and release of ten major business functions" (JA3005); "led the creation and implementation of [the agency's] knowledge management strategy" (JA3002); and "manage[d] a three-person team supporting an internal information management

platform . . . utilized by over 1,500 global users based in 70+ countries" (JA3008.).

Mr. Doe was not "one or more steps removed from taking the actions that effect

the goals of the entity." (JA994.) He, together with his domestic and international

colleagues, was directly involved in taking those actions and collectively bringing

about the agency's goals.

The district court erred not because it made the wrong factual findings, but

because it applied the facts it found to an unduly restrictive understanding of the

*Doe III* test, which is itself a narrowing of the plain language of MFEPA. Not only

is the district court's conclusion at odds with what *Doe III* held, it is impractical.

Under the district court's reasoning, an employee with a high school degree

working to pass out bags of rice in Cambodia would be covered by the MFEPA

religious employer exemption, but a Baltimore-based middle manager with an

advanced degree would not. Why would the legislature have excluded sexual

orientation discrimination claims by the fieldworker but not the middle manager?

Of course, the legislature would not have done so, and it did not do so.

Rather, the legislature excluded sexual orientation discrimination claims by

employees who "perform work connected with the activities of the religious

entity." Md. Code Ann., State Gov't § 20-604(2). The legislature understood that

its prohibition of sexual orientation discrimination in the workplace—still a

nascent legal concept when MFEPA was amended in 2001 to include that

prohibition—would substantially burden the free exercise rights of Marylanders whose religious traditions prohibit same-sex unions. (JA990 (quoting MCHR testimony that the Antidiscrimination Act of 2001 would not "force faith-based organizations to extend jobs to those who do not live in accordance with their religious beliefs" (citation omitted)).) When the legislature amended MFEPA in 2014 to prohibit gender identity discrimination in the workplace, it again updated the exemption to protect religious employers from such claims. (JA1090-1103.)

The Maryland Supreme Court's narrowing of the exemption to employees whose work directly furthers a nonprofit mission carves out low-ranking employees, like janitors, whose work is fungible and unrelated to the nonprofit's goals, not specialists like Mr. Doe whose work is indispensable to the success of a modern NGO.[12] If the Court remains unconvinced, then, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 12-603, the Court should certify the following question to the Maryland Supreme Court: Does the religious employer exemption in Md.

---

[12] At the Maryland Supreme Court and again at trial in the district court proceedings, Mr. Doe suggested that Article 36 of the Maryland Declaration of Rights would prohibit the application of the MFEPA religious employer exemption to him because the exemption ostensibly would harm his civil rights. Article 36 is Maryland's corollary to the Free Exercise Clause of the First Amendment. (JA986.) These provisions exist to protect religious exercise. They ***allow*** for religious exercise to be abridged in some circumstances, but they do not ***require*** the government to prioritize other rights or freedoms over religion in any circumstances. There is nothing unconstitutional about the Maryland General Assembly carving out certain claims from MFEPA in its effort to protect religious employers.

952001

Code Ann., State Gov't § 20-604(2), extend to an employee whose work makes a nonprofit "much more efficient," "drastically improve[s]" the nonprofit's fundraising efforts, and supplies information that is "required by most donors," despite that the employee may not be a policymaker or a fieldworker?

## V.  Enforcement of Title VII, the federal Equal Pay Act, or MFEPA to punish Catholic Relief Services for administering employee benefits in a manner consonant with its religious beliefs violates the agency's First Amendment rights.

The Court reviews the district court's rejection of Catholic Relief Services' free exercise defense, both at the summary judgment stage (with respect to Title VII and the federal Equal Pay Act) and after trial (with respect to MFEPA), *de novo*. *Colo. Bankers Life Ins. Co.*, 60 F.4th at 151; *Raleigh Wake Citizens Ass'n*, 827 F.3d at 340.

As discussed in Parts II-IV above,  the Court should reverse the judgment of the district court with respect to Mr. Doe's Title VII, Equal Pay Act, and MFEPA claims on statutory grounds.  However, if the Court declines to do so, the Court nevertheless should reverse the judgment of the district court because these statutes are not "neutral and of general applicability," *Church of the Lukumi Babalu Aye*, 508 U.S. at 531, and because enforcement of these laws against Catholic Relief Services would substantially burden the agency's religious exercise and could not satisfy strict scrutiny.

952001

As the Supreme Court explained in a pair of cases in 2021, a "law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing '"a mechanism for individualized exemptions."'" *Fulton*, 593 U.S. at 533 (alteration in original) (citations omitted). Moreover, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. Title VII, the federal Equal Pay Act, and MFEPA each fail the neutral-and-generally-applicable test under *Tandon*, and MFEPA flunks the test under *Fulton* as well.

**Tandon.** Each of Title VII, the federal Equal Pay Act, and MFEPA include exemptions that benefit secular employers, so under *Tandon*, these statutes trigger strict scrutiny when applied in a manner that burdens religious exercise. Title VII and MFEPA generally exempt, among other categories of employers, small businesses with fewer than fifteen employees. 42 U.S.C. § 2000e(b); Md. Code Ann., State Gov't § 20-601(d)(1)(i). The Equal Pay Act is subject to exceptions for, *e.g.*, employees of certain amusement or recreational establishments and camps; employees employed in the fishing and aquaculture industries; employees employed in connection with the publication of small newspapers; switchboard operators employed by independently owned public telephone companies with no

more than 750 stations; border patrol agents; and professional baseball players. 29 U.S.C. § 213(a)(3), (5), (8), (10), (18), (19).

In rejecting Catholic Relief Services' free exercise defense to Mr. Doe's Title VII and Equal Pay Act claims at the summary judgment stage, District Judge Catherine Blake held that the categories of exempt organizations are not sufficiently similar to "a social services nonprofit with over 7000 employees." (JA936.) That analysis misreads *Tandon*. The question is not how similar the regulated parties are (in size, or any other way). Rather, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62; *see Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 204 (4th Cir. 2022) (Richardson, J., concurring in the judgment) ("'Comparable' suggests an all-things-considered test, which involves a potentially infinite set of inputs. That is not what is meant here. . . . In *Fulton*, the Court makes clear that we look to the 'asserted interests' of a rule and consider whether exempted secular conduct undermines those asserted interests in a similar way to religious conduct."); *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1277 (10th Cir. 2024) ("When a Policy makes a 'value judgment in favor of secular motivations, but not religious motivations,' it is not generally applicable." (citations omitted)).

952001

In *Tandon*, where the COVID regulation at issue exempted certain retail establishments but prohibited large religious gatherings in homes, the Court observed that "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather." 593 U.S. at 62. Here, comparability is "concerned with" the need to tamp down invidious workplace discrimination, not the features of the workplace. The government does not have a stronger or more particularized interest in rooting out discrimination by religious employers versus, for example, small businesses, oyster farms, or hometown newspapers. "Simply put, there is no meaningful constitutionally acceptable distinction between the types of exclusions at play here." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 689 (9th Cir. 2023).

District Judge Julie Rubin also rejected Catholic Relief Services' *Tandon* argument following trial on Mr. Doe's MFEPA claim, largely following Judge Blake's analysis but adding that the small business exemptions in Title VII and MFEPA could benefit religious and secular employers alike. That is true, but it does not render the statutes neutral and generally applicable under *Tandon*. The government cannot get around the constitutional restraint on treating "*any* comparable secular activity more favorably than religious exercise," 593 U.S. at 62, by placing *some* religious exercise on equal footing with secular activity. For that matter, it is "no answer that a State treats some comparable secular businesses

52

or other activities as poorly as or even less favorably than the religious exercise at issue." *Id.*; *see Union Gospel Mission of Yakima, Wash. v. Ferguson*, No. 23-CV-3027, 2024 WL 4660918, at *4 (E.D. Wash. Nov. 1, 2024) ("For purposes of examining whether a law is neutral or generally applicable . . . it is insufficient to examine how the law treats, for example, a religious employer with five employees and a secular employer with five employees. . . . [T]he Court must instead assess whether the [law] treats Plaintiff—a religious organization—differently than secular employers with fewer than [statutory threshold of] eight employees.").[13]

**Fulton.** After *Doe III*, MFEPA is not neutral and generally applicable for an additional reason: courts must now "consider the particular reasons for [an employer's] conduct" pursuant to a "a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (citations omitted). What appeared before to be an

---

[13] This Court's decision in *Kim v. Board of Education of Howard County*, 93 F.4th 733 (4th Cir. 2024), does not require a different outcome here. The statute at issue in *Kim* permitted only public school students to serve as student members on the county's school board. The law "makes no distinction between religious and secular. It bars non-public-school students, religious and nonreligious alike." *Id.* at 748. Of course, if a purpose for the law was to "mak[e] room for student perspectives on [county] school boards," *id.* at 749, it would make sense to limit participation to students whose schools are regulated by those boards. So, under *Tandon*, the two "activities" (attending public school versus attending parochial school) are not "comparable" in light of the "government interest that justifies the regulation at issue." 593 U.S. at 62. The same cannot be said for large religious employers versus small businesses or other categories of exempt employers: the government interest (ending workplace discrimination) is the same across these categories.

53

exemption applicable to all employees of religious corporations now is an exemption that requires courts to undertake "a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." (JA994.)

In her post-trial opinion, Judge Rubin remarked that the "individualized exemption mechanism that CRS incants is not a discretionary mechanism exercised by the State" and that "fact-specific inquiries are common as dishwater in deciding whether or not a particular statutory exemption or exception applies." (JA1135-1136.) That may be slightly overstated, at least in the context of state fair employment laws. Undersigned counsel have studied these laws across many jurisdictions and have yet to come across a single statute that, like MFEPA (after *Doe III*), requires courts to juggle the facts and circumstances of an individual employee's position before determining whether the employee is covered by a religious employer exemption. In any event, the fact that some, or many, statutes when viewed through the lens of free exercise may be subject to strict scrutiny is consistent with a legal system that, since its inception, has granted most-favored-nation status to religious exercise. This country, after all, was established by pilgrims seeking the freedom to practice their religion as they saw fit. Protection for religious exercise is enshrined in our founding documents. And that protection extends to any person (or organization) of faith whose religious exercise is substantially burdened by government regulation—at least where, as

here, the regulation at issue carves out secular conduct for special treatment or creates a system of individualized exemptions.

Because Title VII, the federal Equal Pay Act, and MFEPA are not neutral and generally applicable, and because enforcement of these statutes against Catholic Relief Services would substantially burden the agency's religious exercise, strict scrutiny applies. *See Mahmoud*, 145 S. Ct. at 2360-61 ("[I]n most circumstances, two questions remain after a burden on religious exercise is found. First, a court must ask if the burdensome policy is neutral and generally applicable. Second, if the first question can be answered in the negative, a court will proceed to ask whether the policy can survive strict scrutiny."). The same analysis presented above in connection with Catholic Relief Services' RFRA defense, with respect to both the substantial burden on the agency and Mr. Doe's failure to satisfy strict scrutiny, applies to this free exercise discussion. *See Singh v. Berger*, 56 F.4th 88, 107-08 (D.C. Cir. 2022) ("we can fairly take note of the parallelism between RFRA and the First Amendment, which imposes the same strict scrutiny test as RFRA on governmental actions that selectively exclude religious exercise from exemptions afforded to others for secular reasons"); *Liberty Univ.*, 733 F.3d at 99-100 (relying on free exercise case law to explain substantial burden in RFRA context). Application of these statutes under the circumstances of this case would impair Catholic Relief Services' sincere exercise of its faith and would not be the

least restrictive means of furthering a compelling governmental interest. The Court should reverse the district court's rulings as to Counts I, VIII, and IX of Mr. Doe's complaint.

## CONCLUSION

The Court should reverse the judgment of the district court and remand for entry of judgment in Catholic Relief Services' favor.

Respectfully submitted,

*/s/ Joe Dugan*

Joe Dugan
Brandon K. Wharton
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
Phone: (410) 727-7702
jdugan@gejlaw.com
bwharton@gejlaw.com

Dated: September 13, 2025    *Counsel for Defendant-Appellant Catholic Relief Services–United States Conference of Catholic Bishops*

952001

## REQUEST FOR ORAL ARGUMENT

Catholic Relief Services respectfully requests that the Court hear oral argument in this appeal.

# CERTIFICATE OF COMPLIANCE—FED. R. APP. P. 32(G)(1)

1.      This brief contains 12,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

2.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.  This brief therefore complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

# STATUTORY ADDENDUM

The following Addendum contains the citation and verbatim text of all pertinent constitutional provisions, statutes, ordinances, rules, and regulations.

# ADDENDUM INDEX

28 U.S.C. § 1291 ........................................................................... iii

28 U.S.C. § 1331 ...........................................................................iv

28 U.S.C. § 1367 ........................................................................... v

29 U.S.C. § 213 ............................................................................vi

42 U.S.C. § 12113 ........................................................................xix

42 U.S.C. § 2000bb ......................................................................xxi

42 U.S.C. § 2000bb-1 ................................................................. xxii

42 U.S.C. § 2000bb-3 ................................................................ xxiii

42 U.S.C. § 2000e ......................................................................xxiv

42 U.S.C. § 2000e-1 ................................................................. xxvii

Md. Code Ann., Cts. & Jud. Proc. § 12-603 ................................ xxviii

Md. Code Ann., State Gov't § 20-601 ........................................xxix

Md. Code Ann., State Gov't § 20-604 ......................................... xxxii

952001

# 28 U.S.C. § 1291

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

952001

# 28 U.S.C. § 1331

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

952001

# 28 U.S.C. § 1367

## § 1367. Supplemental jurisdiction

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

**(1)** the claim raises a novel or complex issue of State law,

**(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

**(3)** the district court has dismissed all claims over which it has original jurisdiction, or

**(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

**(d)** The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

**(e)** As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

952001

## § 213. Exemptions

**(a) Minimum wage and maximum hour requirements**

The provisions of sections 206 (except subsection (d) in the case of paragraph (1) of this subsection) and 207 of this title shall not apply with respect to--

**(1)** any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

**(2)** Repealed. Pub.L. 101-157, § 3(c)(1), Nov. 17, 1989, 103 Stat. 939

**(3)** any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33 ⅓ per centum of its average receipts for the other six months of such year, except that the exemption from sections 206 and 207 of this title provided by this paragraph does not apply with respect to any employee of a private entity engaged in providing services or facilities (other than, in the case of the exemption from section 206 of this title, a private entity engaged in providing services and facilities directly related to skiing) in a national park or a national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture; or

**(4)** Repealed. Pub.L. 101-157, § 3(c)(1), Nov. 17, 1989, 103 Stat. 939

**(5)** any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to,

952001

or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; or

**(6)** any employee employed in agriculture (A) if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor, (B) if such employee is the parent, spouse, child, or other member of his employer's immediate family, (C) if such employee (i) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) commutes daily from his permanent residence to the farm on which he is so employed, and (iii) has been employed in agriculture less than thirteen weeks during the preceding calendar year, (D) if such employee (other than an employee described in clause (C) of this subsection) (i) is sixteen years of age or under and is employed as a hand harvest laborer, is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) is employed on the same farm as his parent or person standing in the place of his parent, and (iii) is paid at the same piece rate as employees over age sixteen are paid on the same farm, or (E) if such employee is principally engaged in the range production of livestock; or

**(7)** any employee to the extent that such employee is exempted by regulations, order, or certificate of the Secretary issued under section 214 of this title; or

**(8)** any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto; or

**(9)** Repealed. Pub.L. 93-259, § 23(a)(1), Apr. 8, 1974, 88 Stat. 69

**(10)** any switchboard operator employed by an independently owned public telephone company which has not more than seven hundred and fifty stations; or

**(11)** Repealed. Pub.L. 93-259, § 10(a), Apr. 8, 1974, 88 Stat. 63

**(12)** any employee employed as a seaman on a vessel other than an American vessel; or

**(13), (14)** Repealed. Pub.L. 93-259, §§ 9(b)(1), 23(b)(1), Apr. 8, 1974, 88 Stat. 63, 69

**(15)** any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in

952001

domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

**(16)** a criminal investigator who is paid availability pay under section 5545a of Title 5;

**(17)** any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is--

**(A)** the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

**(B)** the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

**(C)** the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

**(D)** a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and

who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour; or

**(18)** any employee who is a border patrol agent, as defined in section 5550(a) of Title 5; or

**(19)** any employee employed to play baseball who is compensated pursuant to a contract that provides for a weekly salary for services performed during the league's championship season (but not spring training or the off season) at a rate that is not less than a weekly salary equal to the minimum wage under section 206(a) of this title for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities.

**(b) Maximum hour requirements**

The provisions of section 207 of this title shall not apply with respect to--

**(1)** any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49; or

**(2)** any employee of an employer engaged in the operation of a rail carrier subject to part A of subtitle IV of Title 49; or

**(3)** any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act; or

**(4)** Repealed. Pub.L. 93-259, § 11(c), Apr. 8, 1974, 88 Stat. 64

Add. viii

**(5)** any individual employed as an outside buyer of poultry, eggs, cream, or milk, in their raw or natural state; or

**(6)** any employee employed as a seaman; or

**(7)** Repealed. Pub.L. 93-259, § 21(b)(3), Apr. 8, 1974, 88 Stat. 68

**(8)** Repealed. Pub.L. 95-151, § 14(b), Nov. 1, 1977, 91 Stat. 1252

**(9)** any employee employed as an announcer, news editor, or chief engineer by a radio or television station the major studio of which is located (A) in a city or town of one hundred thousand population or less, according to the latest available decennial census figures as compiled by the Bureau of the Census, except where such city or town is part of a standard metropolitan statistical area, as defined and designated by the Office of Management and Budget, which has a total population in excess of one hundred thousand, or (B) in a city or town of twenty-five thousand population or less, which is part of such an area but is at least 40 airline miles from the principal city in such area; or

**(10)(A)** any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers; or

**(B)** any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers; or

**(11)** any employee employed as a driver or driver's helper making local deliveries, who is compensated for such employment on the basis of trip rates, or other delivery payment plan, if the Secretary shall find that such plan has the general purpose and effect of reducing hours worked by such employees to, or below, the maximum workweek applicable to them under section 207(a) of this title; or

**(12)** any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year; or

**(13)** any employee with respect to his employment in agriculture by a farmer, notwithstanding other employment of such employee in connection with livestock auction operations in which such farmer is engaged as an adjunct to the raising of livestock, either on his own account or in conjunction with other farmers, if such employee (A) is primarily employed during his workweek in agriculture by such farmer, and (B) is paid for his

952001

employment in connection with such livestock auction operations at a wage rate not less than that prescribed by section 206(a)(1) of this title; or

**(14)** any employee employed within the area of production (as defined by the Secretary) by an establishment commonly recognized as a country elevator, including such an establishment which sells products and services used in the operation of a farm, if no more than five employees are employed in the establishment in such operations; or

**(15)** any employee engaged in the processing of maple sap into sugar (other than refined sugar) or syrup; or

**(16)** any employee engaged (A) in the transportation and preparation for transportation of fruits or vegetables, whether or not performed by the farmer, from the farm to a place of first processing or first marketing within the same State, or (B) in transportation, whether or not performed by the farmer, between the farm and any point within the same State of persons employed or to be employed in the harvesting of fruits or vegetables; or

**(17)** any driver employed by an employer engaged in the business of operating taxicabs; or

**(18), (19)** Repealed. Pub.L. 93-259, §§ 15(c), 16(b), Apr. 8, 1974, 88 Stat. 65

**(20)** any employee of a public agency who in any workweek is employed in fire protection activities or any employee of a public agency who in any workweek is employed in law enforcement activities (including security personnel in correctional institutions), if the public agency employs during the workweek less than 5 employees in fire protection or law enforcement activities, as the case may be; or

**(21)** any employee who is employed in domestic service in a household and who resides in such household; or

**(22)** Repealed. Pub.L. 95-151, § 5, Nov. 1, 1977, 91 Stat. 1249

**(23)** Repealed. Pub.L. 93-259, § 10(b)(3), Apr. 8, 1974, 88 Stat. 64

**(24)** any employee who is employed with his spouse by a nonprofit educational institution to serve as the parents of children--

**(A)** who are orphans or one of whose natural parents is deceased, or

**(B)** who are enrolled in such institution and reside in residential facilities of the institution,

while such children are in residence at such institution, if such employee and his spouse reside in such facilities, receive, without cost, board and lodging from such institution, and are together compensated, on a cash basis, at an annual rate of not less than $10,000; or

**(25), (26)** Repealed. Pub.L. 95-151, §§ 6(a), 7(a), Nov. 1, 1977, 91 Stat. 1249, 1250

Add. x

**(27)** any employee employed by an establishment which is a motion picture theater; or

**(28)** any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight;

**(29)** any employee of an amusement or recreational establishment located in a national park or national forest or on land in the National Wildlife Refuge System if such employee (A) is an employee of a private entity engaged in providing services or facilities in a national park or national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture, and (B) receives compensation for employment in excess of fifty-six hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed; or

**(30)** a criminal investigator who is paid availability pay under section 5545a of Title 5.

**(c) Child labor requirements**

**(1)** Except as provided in paragraph (2) or (4), the provisions of section 212 of this title relating to child labor shall not apply to any employee employed in agriculture outside of school hours for the school district where such employee is living while he is so employed, if such employee--

**(A)** is less than twelve years of age and (i) is employed by his parent, or by a person standing in the place of his parent, on a farm owned or operated by such parent or person, or (ii) is employed, with the consent of his parent or person standing in the place of his parent, on a farm, none of the employees of which are (because of subsection (a)(6)(A)) required to be paid at the wage rate prescribed by section 206(a)(5) of this title,

**(B)** is twelve years or thirteen years of age and (i) such employment is with the consent of his parent or person standing in the place of his parent, or (ii) his parent or such person is employed on the same farm as such employee, or

**(C)** is fourteen years of age or older.

**(2)** The provisions of section 212 of this title relating to child labor shall apply to an employee below the age of sixteen employed in agriculture in an occupation that the Secretary of Labor finds and declares to be particularly hazardous for the employment of children below the age of sixteen, except where such employee is employed by his parent or by a person standing in

the place of his parent on a farm owned or operated by such parent or person.

**(3)** The provisions of section 212 of this title relating to child labor shall not apply to any child employed as an actor or performer in motion pictures or theatrical productions, or in radio or television productions.

**(4)(A)** An employer or group of employers may apply to the Secretary for a waiver of the application of section 212 of this title to the employment for not more than eight weeks in any calendar year of individuals who are less than twelve years of age, but not less than ten years of age, as hand harvest laborers in an agricultural operation which has been, and is customarily and generally recognized as being, paid on a piece rate basis in the region in which such individuals would be employed. The Secretary may not grant such a waiver unless he finds, based on objective data submitted by the applicant, that--

**(i)** the crop to be harvested is one with a particularly short harvesting season and the application of section 212 of this title would cause severe economic disruption in the industry of the employer or group of employers applying for the waiver;

**(ii)** the employment of the individuals to whom the waiver would apply would not be deleterious to their health or well-being;

**(iii)** the level and type of pesticides and other chemicals used would not have an adverse effect on the health or well-being of the individuals to whom the waiver would apply;

**(iv)** individuals age twelve and above are not available for such employment; and

**(v)** the industry of such employer or group of employers has traditionally and substantially employed individuals under twelve years of age without displacing substantial job opportunities for individuals over sixteen years of age.

**(B)** Any waiver granted by the Secretary under subparagraph (A) shall require that--

**(i)** the individuals employed under such waiver be employed outside of school hours for the school district where they are living while so employed;

**(ii)** such individuals while so employed commute daily from their permanent residence to the farm on which they are so employed; and

**(iii)** such individuals be employed under such waiver (I) for not more than eight weeks between June 1 and October 15 of any calendar year, and (II) in accordance with such other terms and conditions as the Secretary shall prescribe for such individuals' protection.

952001

**(5)(A)** In the administration and enforcement of the child labor provisions of this chapter, employees who are 16 and 17 years of age shall be permitted to load materials into, but not operate or unload materials from, scrap paper balers and paper box compactors--

**(i)** that are safe for 16- and 17-year-old employees loading the scrap paper balers or paper box compactors; and

**(ii)** that cannot be operated while being loaded.

**(B)** For purposes of subparagraph (A), scrap paper balers and paper box compactors shall be considered safe for 16- or 17-year-old employees to load only if--

**(i)(I)** the scrap paper balers and paper box compactors meet the American National Standards Institute's Standard ANSI Z245.5-1990 for scrap paper balers and Standard ANSI Z245.2-1992 for paper box compactors; or

**(II)** the scrap paper balers and paper box compactors meet an applicable standard that is adopted by the American National Standards Institute after August 6, 1996, and that is certified by the Secretary to be at least as protective of the safety of minors as the standard described in subclause (I);

**(ii)** the scrap paper balers and paper box compactors include an on-off switch incorporating a key-lock or other system and the control of the system is maintained in the custody of employees who are 18 years of age or older;

**(iii)** the on-off switch of the scrap paper balers and paper box compactors is maintained in an off position when the scrap paper balers and paper box compactors are not in operation; and

**(iv)** the employer of 16- and 17-year-old employees provides notice, and posts a notice, on the scrap paper balers and paper box compactors stating that--

**(I)** the scrap paper balers and paper box compactors meet the applicable standard described in clause (i);

**(II)** 16- and 17-year-old employees may only load the scrap paper balers and paper box compactors; and

**(III)** any employee under the age of 18 may not operate or unload the scrap paper balers and paper box compactors.

The Secretary shall publish in the Federal Register a standard that is adopted by the American National Standards Institute for scrap paper balers or paper box compactors and certified by the Secretary to be protective of the safety of minors under clause (i)(II).

**(C)(i)** Employers shall prepare and submit to the Secretary reports--

**(I)** on any injury to an employee under the age of 18 that requires medical treatment (other than first aid) resulting from the employee's contact with a

Add. xiii

scrap paper baler or paper box compactor during the loading, operation, or unloading of the baler or compactor; and

**(II)** on any fatality of an employee under the age of 18 resulting from the employee's contact with a scrap paper baler or paper box compactor during the loading, operation, or unloading of the baler or compactor.

**(ii)** The reports described in clause (i) shall be used by the Secretary to determine whether or not the implementation of subparagraph (A) has had any effect on the safety of children.

**(iii)** The reports described in clause (i) shall provide--

**(I)** the name, telephone number, and address of the employer and the address of the place of employment where the incident occurred;

**(II)** the name, telephone number, and address of the employee who suffered an injury or death as a result of the incident;

**(III)** the date of the incident;

**(IV)** a description of the injury and a narrative describing how the incident occurred; and

**(V)** the name of the manufacturer and the model number of the scrap paper baler or paper box compactor involved in the incident.

**(iv)** The reports described in clause (i) shall be submitted to the Secretary promptly, but not later than 10 days after the date on which an incident relating to an injury or death occurred.

**(v)** The Secretary may not rely solely on the reports described in clause (i) as the basis for making a determination that any of the employers described in clause (i) has violated a provision of section 212 of this title relating to oppressive child labor or a regulation or order issued pursuant to section 212 of this title. The Secretary shall, prior to making such a determination, conduct an investigation and inspection in accordance with section 212(b) of this title.

**(vi)** The reporting requirements of this subparagraph shall expire 2 years after August 6, 1996.

**(6)** In the administration and enforcement of the child labor provisions of this chapter, employees who are under 17 years of age may not drive automobiles or trucks on public roadways. Employees who are 17 years of age may drive automobiles or trucks on public roadways only if--

**(A)** such driving is restricted to daylight hours;

**(B)** the employee holds a State license valid for the type of driving involved in the job performed and has no records of any moving violation at the time of hire;

**(C)** the employee has successfully completed a State approved driver education course;

**(D)** the automobile or truck is equipped with a seat belt for the driver and any passengers and the employee's employer has instructed the employee that the seat belts must be used when driving the automobile or truck;

**(E)** the automobile or truck does not exceed 6,000 pounds of gross vehicle weight;

**(F)** such driving does not involve--

**(i)** the towing of vehicles;

**(ii)** route deliveries or route sales;

**(iii)** the transportation for hire of property, goods, or passengers;

**(iv)** urgent, time-sensitive deliveries;

**(v)** more than two trips away from the primary place of employment in any single day for the purpose of delivering goods of the employee's employer to a customer (other than urgent, time-sensitive deliveries);

**(vi)** more than two trips away from the primary place of employment in any single day for the purpose of transporting passengers (other than employees of the employer);

**(vii)** transporting more than three passengers (including employees of the employer); or

**(viii)** driving beyond a 30 mile radius from the employee's place of employment; and

**(G)** such driving is only occasional and incidental to the employee's employment.

For purposes of subparagraph (G), the term "occasional and incidental" is no more than one-third of an employee's worktime in any workday and no more than 20 percent of an employee's worktime in any workweek.

**(7)(A)(i)** Subject to subparagraph (B), in the administration and enforcement of the child labor provisions of this chapter, it shall not be considered oppressive child labor for a new entrant into the workforce to be employed inside or outside places of business where machinery is used to process wood products.

**(ii)** In this paragraph, the term "new entrant into the workforce" means an individual who--

**(I)** is under the age of 18 and at least the age of 14, and

**(II)** by statute or judicial order is exempt from compulsory school attendance beyond the eighth grade.

**(B)** The employment of a new entrant into the workforce under subparagraph (A) shall be permitted--

**(i)** if the entrant is supervised by an adult relative of the entrant or is supervised by an adult member of the same religious sect or division as the entrant;

Add. xv

**(ii)** if the entrant does not operate or assist in the operation of power-driven woodworking machines;

**(iii)** if the entrant is protected from wood particles or other flying debris within the workplace by a barrier appropriate to the potential hazard of such wood particles or flying debris or by maintaining a sufficient distance from machinery in operation; and

**(iv)** if the entrant is required to use personal protective equipment to prevent exposure to excessive levels of noise and saw dust.

**(d) Delivery of newspapers and wreathmaking**

The provisions of sections 206, 207, and 212 of this title shall not apply with respect to any employee engaged in the delivery of newspapers to the consumer or to any homeworker engaged in the making of wreaths composed principally of natural holly, pine, cedar, or other evergreens (including the harvesting of the evergreens or other forest products used in making such wreaths).

**(e) Maximum hour requirements and minimum wage employees**

The provisions of section 207 of this title shall not apply with respect to employees for whom the Secretary of Labor is authorized to establish minimum wage rates as provided in section 206(a)(3) of this title, except with respect to employees for whom such rates are in effect; and with respect to such employees the Secretary may make rules and regulations providing reasonable limitations and allowing reasonable variations, tolerances, and exemptions to and from any or all of the provisions of section 207 of this title if he shall find, after a public hearing on the matter, and taking into account the factors set forth in section 206(a)(3) of this title, that economic conditions warrant such action.

**(f) Employment in foreign countries and certain United States territories**

The provisions of sections 206, 207, 211, and 212 of this title shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country or within territory under the jurisdiction of the United States other than the following: a State of the United States; the District of Columbia; Puerto Rico; the Virgin Islands; outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act (ch. 345, 67 Stat. 462); American Samoa; Guam; Wake Island; Eniwetok Atoll; Kwajalein Atoll; and Johnston Island.

**(g) Certain employment in retail or service establishments, agriculture**

The exemption from section 206 of this title provided by paragraph (6) of subsection (a) of this section shall not apply with respect to any employee employed by an establishment (1) which controls, is controlled by, or is

under common control with, another establishment the activities of which are not related for a common business purpose to, but materially support the activities of the establishment employing such employee; and (2) whose annual gross volume of sales made or business done, when combined with the annual gross volume of sales made or business done by each establishment which controls, is controlled by, or is under common control with, the establishment employing such employee, exceeds $10,000,000 (exclusive of excise taxes at the retail level which are separately stated).

**(h) Maximum hour requirement: fourteen workweek limitation**

The provisions of section 207 of this title shall not apply for a period or periods of not more than fourteen workweeks in the aggregate in any calendar year to any employee who--

**(1)** is employed by such employer--

**(A)** exclusively to provide services necessary and incidental to the ginning of cotton in an establishment primarily engaged in the ginning of cotton;

**(B)** exclusively to provide services necessary and incidental to the receiving, handling, and storing of raw cotton and the compressing of raw cotton when performed at a cotton warehouse or compress-warehouse facility, other than one operated in conjunction with a cotton mill, primarily engaged in storing and compressing;

**(C)** exclusively to provide services necessary and incidental to the receiving, handling, storing, and processing of cottonseed in an establishment primarily engaged in the receiving, handling, storing, and processing of cottonseed; or

**(D)** exclusively to provide services necessary and incidental to the processing of sugar cane or sugar beets in an establishment primarily engaged in the processing of sugar cane or sugar beets; and

**(2)** receives for--

**(A)** such employment by such employer which is in excess of ten hours in any workday, and

**(B)** such employment by such employer which is in excess of forty-eight hours in any workweek,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

Any employer who receives an exemption under this subsection shall not be eligible for any other exemption under this section or section 207 of this title.

**(i) Cotton ginning**

The provisions of section 207 of this title shall not apply for a period or periods of not more than fourteen workweeks in the aggregate in any period of fifty-two consecutive weeks to any employee who--

952001

**(1)** is engaged in the ginning of cotton for market in any place of employment located in a county where cotton is grown in commercial quantities; and

**(2)** receives for any such employment during such workweeks--

**(A)** in excess of ten hours in any workday, and

**(B)** in excess of forty-eight hours in any workweek,

compensation at a rate not less than one and one-half times the regular rate at which he is employed. No week included in any fifty-two week period for purposes of the preceding sentence may be included for such purposes in any other fifty-two week period.

**(j) Processing of sugar beets, sugar beet molasses, or sugar cane**

The provisions of section 207 of this title shall not apply for a period or periods of not more than fourteen workweeks in the aggregate in any period of fifty-two consecutive weeks to any employee who--

**(1)** is engaged in the processing of sugar beets, sugar beet molasses, or sugar cane into sugar (other than refined sugar) or syrup; and

**(2)** receives for any such employment during such workweeks--

**(A)** in excess of ten hours in any workday, and

**(B)** in excess of forty-eight hours in any workweek,

compensation at a rate not less than one and one-half times the regular rate at which he is employed. No week included in any fifty-two week period for purposes of the preceding sentence may be included for such purposes in any other fifty-two week period.

952001

## § 12113. Defenses

**(a) In general**
It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

**(b) Qualification standards**
The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

**(c) Qualification standards and tests related to uncorrected vision**
Notwithstanding section 12102(4)(E)(ii) of this title, a covered entity shall not use qualification standards, employment tests, or other selection criteria based on an individual's uncorrected vision unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and consistent with business necessity.

**(d) Religious entities**
**(1) In general**
This subchapter shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

**(2) Religious tenets requirement**
Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of such organization.

**(e) List of infectious and communicable diseases**
**(1) In general**
The Secretary of Health and Human Services, not later than 6 months after July 26, 1990, shall--
**(A)** review all infectious and communicable diseases which may be transmitted through handling the food supply;
**(B)** publish a list of infectious and communicable diseases which are transmitted through handling the food supply;

**(C)** publish the methods by which such diseases are transmitted; and

**(D)** widely disseminate such information regarding the list of diseases and their modes of transmissability[1] to the general public.

Such list shall be updated annually.

**(2) Applications**

In any case in which an individual has an infectious or communicable disease that is transmitted to others through the handling of food, that is included on the list developed by the Secretary of Health and Human Services under paragraph (1), and which cannot be eliminated by reasonable accommodation, a covered entity may refuse to assign or continue to assign such individual to a job involving food handling.

**(3) Construction**

Nothing in this chapter shall be construed to preempt, modify, or amend any State, county, or local law, ordinance, or regulation applicable to food handling which is designed to protect the public health from individuals who pose a significant risk to the health or safety of others, which cannot be eliminated by reasonable accommodation, pursuant to the list of infectious or communicable diseases and the modes of transmissability[1] published by the Secretary of Health and Human Services.

**Footnotes**

[1]

So in original. Probably should be "transmissibility".

952001

# 42 U.S.C. § 2000bb

## § 2000bb. Congressional findings and declaration of purposes

**(a) Findings**

The Congress finds that--

**(1)** the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

**(2)** laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

**(3)** governments should not substantially burden religious exercise without compelling justification;

**(4)** in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

**(5)** the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are--

**(1)** to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

**(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

952001

# 42 U.S.C. § 2000bb-1

## § 2000bb-1. Free exercise of religion protected

**(a) In general**
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

**(b) Exception**
Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

**(c) Judicial relief**
A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

952001

## § 2000bb-3. Applicability

**(a) In general**

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

**(b) Rule of construction**

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

**(c) Religious belief unaffected**

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

952001

# 42 U.S.C. § 2000e

## § 2000e. Definitions

For the purposes of this subchapter--

**(a)** The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers.

**(b)** The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

**(c)** The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

**(d)** The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

**(e)** A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or,

952001

where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization--

**(1)** is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended;

**(2)** although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

**(3)** has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

**(4)** has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

**(5)** is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

**(f)** The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

**(g)** The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

Add. xxv

952001

**(h)** The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959, and further includes any governmental industry, business, or activity.

**(i)** The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act.

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

**(k)** The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

**(l)** The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

**(m)** The term "demonstrates" means meets the burdens of production and persuasion.

**(n)** The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e-16 of this title.

952001

# 42 U.S.C. § 2000e-1

## § 2000e-1. Exemption

### (a) Inapplicability of subchapter to certain aliens and employees of religious entities

This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

### (b) Compliance with statute as violative of foreign law

It shall not be unlawful under section 2000e-2 or 2000e-3 of this title for an employer (or a corporation controlled by an employer), labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining (including on-the-job training programs) to take any action otherwise prohibited by such section, with respect to an employee in a workplace in a foreign country if compliance with such section would cause such employer (or such corporation), such organization, such agency, or such committee to violate the law of the foreign country in which such workplace is located.

### (c) Control of corporation incorporated in foreign country

**(1)** If an employer controls a corporation whose place of incorporation is a foreign country, any practice prohibited by section 2000e-2 or 2000e-3 of this title engaged in by such corporation shall be presumed to be engaged in by such employer.

**(2)** Sections 2000e-2 and 2000e-3 of this title shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

**(3)** For purposes of this subsection, the determination of whether an employer controls a corporation shall be based on--

**(A)** the interrelation of operations;

**(B)** the common management;

**(C)** the centralized control of labor relations; and

**(D)** the common ownership or financial control,

of the employer and the corporation.

952001

### § 12-603. Power of Supreme Court of Maryland to answer question certified by courts outside State

The Supreme Court of Maryland of this State may answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.

# Md. Code Ann., State Gov't § 20-601

## § 20-601. Definitions

(a) In this subtitle the following words have the meanings indicated.

(b)(1) "Disability" means:

(i) 1. a physical disability, infirmity, malformation, or disfigurement that is caused by bodily injury, birth defect, or illness, including epilepsy; or

2. a mental impairment or deficiency;

(ii) a record of having a physical or mental impairment as otherwise defined under this subsection; or

(iii) being regarded as having a physical or mental impairment as otherwise defined under this subsection.

(2) "Disability" includes:

(i) 1. any degree of paralysis, amputation, or lack of physical coordination;

2. blindness or visual impairment;

3. deafness or hearing impairment;

4. muteness or speech impediment; and

5. physical reliance on a service animal, wheelchair, or other remedial appliance or device; and

(ii) intellectual and any other mental impairment or deficiency that may have necessitated remedial or special education and related services.

(c)(1) "Employee" means:

(i) an individual employed by an employer; or

(ii) an individual working as an independent contractor for an employer.

(2) Unless the individual is subject to the State or local civil service laws, "employee" does not include:

(i) an individual elected to public office;

(ii) an appointee on the policy making level; or

(iii) an immediate adviser with respect to the exercise of the constitutional or legal powers of an elected office.

(d)(1) "Employer" means:

(i) a person that:

1. is engaged in an industry or business; and

2. A. has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; or

B. if an employee has filed a complaint alleging harassment, has one or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; and

(ii) an agent of a person described in item (i) of this paragraph.

952001

(2) "Employer" includes the State to the extent provided in this title.

(3) Except for a labor organization, "employer" does not include a bona fide private membership club that is exempt from taxation under § 501(c) of the Internal Revenue Code.

(e)(1) "Employment agency" means:

(i) a person that regularly undertakes with or without compensation to procure:

1. employees for an employer; or

2. opportunities for employees to work for an employer; and

(ii) an agent of a person described in item (i) of this paragraph.

(2) Except for the United States Employment Service and the system of State and local employment services receiving federal assistance, "employment agency" does not include a unit of the United States, the State, or a political subdivision of the State.

(f) "Genetic information" has the meaning stated in § 27-909(a)(3) of the Insurance Article.

(g) "Genetic test" has the meaning stated in § 27-909(a)(5) of the Insurance Article.

(h) "Harassment" includes:

(1) unwelcome and offensive conduct, which need not be severe or pervasive, when:

(i) the conduct is based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, disability, or military status; and

(ii) 1. submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;

2. submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or

3. based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile; and

(2) sexual harassment.

(i)(1) "Labor organization" means:

(i) a labor organization engaged in an industry; and

(ii) an agent of an organization described in item (i) of this paragraph.

(2) "Labor organization" includes:

(i) an organization of any kind, an agency, or an employee representation committee, group, association, or plan:

1. in which employees participate; and

2. that exists, wholly or partly, for the purpose of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment; and

(ii) a conference, general committee, joint or system board, or joint council that is subordinate to a national or international labor organization.

(j) "Religion" includes all aspects of religious observances, practice, and belief.

(k) "Sexual harassment" includes conduct, which need not be severe or pervasive, that consists of unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature when:

(1) submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;

(2) submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or

(3) based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile.

952001

# Md. Code Ann., State Gov't § 20-604

## § 20-604. Scope of subtitle

This subtitle does not apply to:

(1) an employer with respect to the employment of aliens outside of the State; or

(2) a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity.

952001