No. 25-1569

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**JOHN DOE,**

*Plaintiff-Appellee*,

**v.**

**CATHOLIC RELIEF SERVICES**,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the District of Maryland
(Julie R. Rubin, District Judge)

_____

## BRIEF OF INTERVENOR STATE OF MARYLAND

_____

ANTHONY G. BROWN
Attorney General of Maryland

JOSHUA M. SEGAL
Principal Deputy Solicitor General
200 Saint Paul Place
Baltimore, Maryland  21202
jsegal@oag.state.md.us
(410) 576-6446
(410) 576-6955 (facsimile)

January 2, 2026                Attorneys for Intervenor

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1569__      Caption: _John Doe v. Catholic Relief Services_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_State of Maryland_
(name of party/amicus)

_____

who is _____intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?          ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?          ☐ YES ☑ NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐ YES ☑ NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Joshua M. Segal                    Date:    January 2, 2026

Counsel for: State of Maryland

Print to PDF for Filing

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ............................................................1

ISSUES PRESENTED FOR REVIEW ....................................................2

STATEMENT OF THE CASE ................................................................2

    The Maryland Fair Employment Practices Act ..............................2

    This Lawsuit .....................................................................................3

    The Supreme Court of Maryland's Decision....................................5

    Further District Court Proceedings..................................................7

SUMMARY OF ARGUMENT..............................................................10

ARGUMENT ........................................................................................11

I.    THE DISTRICT COURT'S CONSTITUTIONAL RULINGS ARE REVIEWED DE NOVO.........................................................................................11

II.   THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT DOES NOT VIOLATE CATHOLIC RELIEF SERVICES' FREE EXERCISE RIGHTS. ...................12

    A.    The Maryland Fair Employment Practices Act's Small-Employer Exemption Does Not Trigger Strict Scrutiny.....................13

    B.    The Maryland Fair Employment Practices Act's Religious-Organization Exemption Is Not a "Mechanism for Individualized Exemptions." .......................................................................16

    C.    The Maryland Fair Employment Practices Act Survives Any Level of Scrutiny.................................................................19

III.  APPLYING THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT IN THESE CIRCUMSTANCES DOES NOT VIOLATE THE CHURCH AUTONOMY DOCTRINE. .......................................................................................20

    A.    The Church Autonomy Doctrine Shields Employment Decisions as to Ministers, Not an Organization's Entire Workforce. .................21

B.     Neither of Catholic Relief Services' Theories Supports Application of the Church Autonomy Doctrine Here. .........................22

       1.     Cases Such as This One Do Not Require Courts to Resolve Theological Controversies. ........................................................23

       2.     The Church Autonomy Doctrine Does Not Apply Just Because a Decision is "Rooted in Religious Belief." ..............25

C.     Catholic Relief Services' Position, If Accepted, Would Have Far-Reaching Consequences. ..............................................................29

CONCLUSION .................................................................................................32

REQUEST FOR ORAL ARGUMENT ....................................................................33

CERTIFICATE OF COMPLIANCE ........................................................................33

PERTINENT PROVISIONS ..................................................................................34

# TABLE OF AUTHORITIES

Page

## Cases

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ...................................................18

*Bell v. Presbyterian Church (U.S.A.)*,
  126 F.3d 328 (4th Cir. 1997) ............................................. 21, 26, 27

*Billard v. Charlotte Cath. High Sch.*,
  101 F.4th 316 (4th Cir. 2024) ...................................................30

*Bostock v. Clayton County*,
  590 U.S. 644 (2018)................................................................19

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)................................................................28

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)................................................................20

*Carver v. State*,
  482 Md. 469 (2022) ..................................................................5

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)................................................................12

*Corporation of Presiding Bishop of Church of Jesus Christ
  of Latter-Day Saints v. Amos*,
  483 U.S. 327 (1987)................................................................30

*Doe v. Catholic Relief Servs.*,
  484 Md. 640 (2023) ......................................................... passim

*Does 1-11 v. Board of Regents of Univ. of Colo.*,
  100 F.4th 1251 (10th Cir. 2024) ...............................................14

*Duquesne Univ. of Holy Spirit v. NLRB*,
  947 F.3d 824 (D.C. Cir. 2020)..................................................28

iii

*EEOC v. Roman Cath. Diocese of Raleigh*,
213 F.3d 795 (4th Cir. 2011) ...............................................29

*Employment Div., Dep't of Human Res. of Or. v. Smith*,
494 U.S. 872 (1990).................................................. 12, 17, 18

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ...............................................18

*Fulton v. City of Phila.*,
593 U.S. 522 (2021)................................................... passim

*Gaddy v. Corporation of President of Church of Jesus Christ
of Latter-Day Saints*,
148 F.4th 1202 (10th Cir. 2025) ......................................... 24, 25, 30

*Hernandez v. Commissioner of Internal Rev.*,
490 U.S. 680 (1989).......................................................32

*Holt v. Hobbs*,
574 U.S. 352 (2015).......................................................31

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)..................................................... 7, 21, 22, 26

*Jones v. Wolf*,
443 U.S. 595 (1979).......................................................24

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
344 U.S. 94 (1952)...................................................... 21, 23

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022).......................................................12

*Kim v. Board of Educ, of Howard County*,
93 F.4th 733 (4th Cir. 2024) ......................................... 14, 15

*McMahon v. World Vision, Inc.*,
704 F. Supp. 3d 1121 (W.D. Wash. 2023) .........................16

*NLRB v. Catholic Bishop of Chi.*,
440 U.S. 490 (1979).......................................................27

iv

*Our Lady of Guadalupe Sch. v. Morrisey-Berru*,
  591 U.S. 732 (2020)........................................................ 7, 22, 25, 29

*Pennsylvania Lab. Rels. Bd. v. State Coll. Area Sch. Dist.*,
  461 Pa. 494 (1975)...............................................................28

*R.G. & G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018) ...........................................19

*Rayburn v. General Conf. of Seventh-day Adventists*,
  772 F.2d 1164 (4th Cir. 1997) .................................. 4, 19, 27, 29

*Tandon v. Newsom*,
  593 U.S. 61 (2021)................................................... 13, 14, 15

*Union Gospel Mission of Yakima v. Ferguson*,
  No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024).......15

*United States v. Preuss*,
  703 F.3d 242 (4th Cir. 2012) ...........................................11

*Watson v. Jones*,
  80 U.S. (13 Wall) 679 (1871) ...........................................24

*We the Patriots USA, Inc. v. Hochul*,
  17 F.4th 266 (2d Cir. 2021) ...........................................18

## Statutes

42 U.S.C. § 2000e-1(a) ................................................. 30, 31

Md. Code Ann., State Gov't § 20-601(d)(1)(i)(2) (LexisNexis Supp. 2025)......3, 13

Md. Code Ann., State Gov't § 20-604(2) (LexisNexis Supp. 2025) .......... 3, 5, 6, 17

Md. Code Ann., State Gov't § 20-605(a)(3) (LexisNexis Supp. 2025) ..............3, 28

Md. Code Ann., State Gov't § 20-605(a)(3)(i) (LexisNexis Supp. 2025) ................3

Md. Code Ann., State Gov't § 20-606 (LexisNexis Supp. 2025).................. 2, 5, 38

Md. Code Ann., State Gov't § 20-606(a) (LexisNexis Supp. 2025) ..................2, 12

Md. Code Ann., State Gov't § 20-606(a)(1)(i) (LexisNexis Supp. 2025)................2

No. 25-1569

———————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————

### JOHN DOE,

*Plaintiff-Appellee*,

v.

### CATHOLIC RELIEF SERVICES,

*Defendant-Appellant*.

———————————————

On Appeal from the United States District Court for the District of Maryland
(Julie R. Rubin, District Judge)

———————————————

### BRIEF OF INTERVENOR STATE OF MARYLAND

———————————————

### JURISDICTIONAL STATEMENT

The district court had jurisdiction over Mr. Doe's federal claims under 28 U.S.C. § 1331 and had jurisdiction over his state law claims under 28 U.S.C. § 1367. This court has jurisdiction under 28 U.S.C. § 1291 to review the final judgment of the district court.

## ISSUES PRESENTED FOR REVIEW

1.    Do incidental burdens on religious exercise resulting from the Maryland Fair Employment Practices Act comport with the Free Exercise Clause despite (a) the statute's small-employer exemption, which is available to religious and secular employers alike; and (b) the statute's religious-employer exemption, which a court must adjudicate under a predetermined statutory framework?

2.    Under the church autonomy doctrine, may the Maryland Fair Employment Practices Act constitutionally be applied to a church's employment decisions as to non-ministerial employees notwithstanding claims that the decisions are rooted in religious belief?

## STATEMENT OF THE CASE

### The Maryland Fair Employment Practices Act

The Maryland Fair Employment Practices Act ("MFEPA") prohibits discrimination based on a series of characteristics. The statute bars employers from discriminating based upon "race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability." Md. Code Ann., State Gov't § 20-606(a)(1)(i) (LexisNexis Supp. 2025). It does not apply, however, to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work

2

connected with the activities of the religious entity." *Id.* § 20-604(2).  It also has other exceptions.  For instance, it does not prohibit a religiously affiliated educational institution "from hiring and employing employees of a particular religion." *Id.* § 20-605(a)(3)(i).  MFEPA also generally exempts employers with fewer than 15 employees. *Id.* § 20-601(d)(1)(i)(2).

**This Lawsuit**

This litigation arises out of Catholic Relief Services' termination of spousal health insurance coverage for its employee John Doe because his spouse is a man. (JA13-18.)  After exhausting administrative remedies, Mr. Doe sued Catholic Relief Services in the United States District Court for the District of Maryland; he raised claims under both federal law and Maryland law.  (JA19-31.)  Following the partial grant of a motion to dismiss, what remained were claims under Title VII of the Civil Rights Act of 1964, the federal Equal Pay Act, MFEPA, and the Maryland Equal Pay for Equal Work Act.  (JA19-23, JA27-31, JA151-153.)

On cross-motions for summary judgment, the district court held that the church autonomy doctrine, which protects churches' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine," did not bar the suit from going forward.  (JA929-930 (quoting *Rayburn v. General Conf. of Seventh-day Adventists*, 772 F.2d 1164,

1166-67 (4th Cir. 1997)).)[1]  Rejecting Catholic Relief Services' view that "any judicial inquiry into this case inevitably requires an inquiry into matters of Catholic faith and doctrine," the court reasoned that "this case concerns a social service organization's employment benefit decisions regarding a data analyst and does not involve [Catholic Relief Services'] spiritual or ministerial functions."  (JA929.) "This court need not question the sincerity or content of [Catholic Relief Services'] religious beliefs," the court continued, "to assess the applicability of neutral and generally applicable statutes."  (JA929-930.)

Having disposed of the church autonomy argument, the court granted partial summary judgment to each party.  It granted summary judgment to Mr. Doe on his Title VII claim for sex discrimination (JA930-936) and his federal Equal Pay Act claim for sex discrimination (JA937-938).  It granted summary judgment to Catholic Relief Services, however, on Mr. Doe's Title VII claim for retaliation, as well as his request for punitive damages.  (JA943-946.)

As to Mr. Doe's state law claims, the court denied both sides' cross-motions for summary judgment without prejudice, citing a need for guidance from the

---

[1] The district court construed Catholic Relief Services' church autonomy argument as "a renewed motion to dismiss for lack of subject matter jurisdiction." (JA929.)

4

Supreme Court of Maryland (then the Court of Appeals)[2] on "the proper

interpretation of MFEPA's religious exemption." (JA941.) After reconsideration,

the court certified three questions for decision by the Supreme Court of Maryland:

> I.    Whether the prohibition against sex discrimination in the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606, prohibits discrimination on the basis of sexual orientation.
>
> II.   Whether, under Md. Code Ann., State Gov't § 20-604(2), the Maryland Fair Employment Practices Act applies to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular sexual orientation or gender identity to perform work connected with all activities of the religious entity or only those activities that are religious in nature.
>
> III.  Whether the prohibition against sex discrimination in the Maryland Equal Pay for Equal Work Act, Md. Code Ann., Lab. & Empl. § 3-304, prohibits discrimination on the basis of sexual orientation.

(JA952-954.)

**The Supreme Court of Maryland's Decision**

On August 14, 2023, the Supreme Court of Maryland issued an opinion that

answered all three questions. *Doe v. Catholic Relief Servs.*, 484 Md. 640 (2023).

The court first held that MFEPA's prohibition against sex discrimination does not

---

[2] "At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022." *Carver v. State*, 482 Md. 469, 526 n.* (2022).

prohibit discrimination on the basis of sexual orientation. *Id.* at 653-61. It reasoned, among other things, that (1) the statute separately identifies both sex and sexual orientation as prohibited bases for discrimination; and (2) interpreting "sex" to include sexual orientation would enable a plaintiff to skirt MFEPA's religious exemption, which applies to claims for sexual orientation discrimination but not sex discrimination, simply by characterizing a sexual orientation discrimination claim as a sex discrimination claim. *Id.* at 654-56.

Second, the court held that the Maryland Equal Pay for Equal Work Act's prohibition against sex discrimination does not encompass sexual orientation discrimination, either. *Id.* at 661-65. It emphasized the need to read the two statutes in pari materia, as well as the fact that, even as the General Assembly added sexual orientation as a protected category in MFEPA, it declined to do so for the the Maryland Equal Pay for Equal Work Act. *Id.* at 662-64.

Finally, the court addressed the scope of MFEPA's exemption for a religious entity's "employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." *Id.* at 665-73 (interpreting State Gov't § 20-604(2)). Mr. Doe had argued that the phrase "work connected with the activities of a religious entity" should be interpreted as coextensive with the First Amendment's "ministerial exception." *Doe*, 484 Md. at 665-66; *see Hosanna-Tabor Evangelical Lutheran*

6

*Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (recognizing ministerial exception); *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, 591 U.S. 732, 756 (2020) (extending ministerial exception to employees who perform "vital religious duties"). Catholic Relief Services, by contrast, had argued that the exemption applies to all activities, not just those that are religious, and therefore prevents claims by any employee. *Doe*, 484 Md. at 666-67, 670.

The court struck a middle ground. Declining to limit the religious exemption to ministers or extend it to all employees, the court held that, for the exemption to apply, "the employee's duties must directly further the core mission(s)—religious or secular, or both—of the religious entity." *Id.* at 673. And rather than leave the determination open-ended, the court offered a series of guidelines. For instance, the court explained that duties that "directly" further a religious entity's core mission are "duties that are not one or more steps removed from taking the actions that effect the goals of the entity." *Id.* The court also explained that "a religious entity may have both religious and secular core missions, and more than one of each." *Id.* And it provided a non-exhaustive list of factors for a trial court to consider in determining what constitutes a religious entity's core mission. *Id.* at 673 & n.20.

**Further District Court Proceedings**

After the Supreme Court of Maryland's decision, the parties stipulated to dismissal with prejudice of Mr. Doe's sex discrimination claims under both MFEPA

and the Maryland Equal Pay for Equal Work Act. (JA1106-1107.) The district court then held a bench trial on Mr. Doe's sexual orientation claim under MFEPA; that trial focused on whether Catholic Relief Services could avail itself of the statute's religious entity exemption. (JA1107.)

The district court concluded that the exemption did not apply because Mr. Doe "did not directly further a [Catholic Relief Services] core mission" in any of the positions he had held for the organization. (JA1122.) The court explained that Mr. Doe "did not directly serve the poor and vulnerable overseas, solicit or secure funding for projects, or possess authority to determine how [Catholic Relief Services] would pursue its mission through its programs." (JA1124.) Although "from time to time, he may have been called upon to assist those who were responsible for undertaking actions that effect [Catholic Relief Services'] goals," the court continued, "he was always one or more steps removed from taking action[s] that effect [Catholic Relief Services'] goals or that bear such responsibility." (JA1124.)

The district court then rejected Catholic Relief Services' claim that liability under MFEPA would violate its rights under the Free Exercise Clause. (JA1129-1136.) On that score, the court determined that MFEPA is neutral and generally applicable and therefore is subject only to rational-basis review. (JA1129-1136.) First, the court concluded that MFEPA's exceptions for small

8

employers and for employers "with respect to the employment of aliens outside of the State" did not favor secular activities over comparable religious activities; it emphasized that each of those exceptions applies to both secular and religious employers, and that Catholic Relief Services was not comparable to the employers qualifying for them. (JA1131-1134.) Second, the court held that the fact-intensive inquiry required by the Supreme Court of Maryland's *Doe* decision did not constitute a "mechanism for individualized exemptions" within the meaning of *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). (JA1134-1136.) The court explained that "[t]he exemption at issue here is categorical and statutory, not discretionary, in nature; it does not require State approval or disapproval." (JA1135.) Although the inquiry is fact-specific, the court reasoned, "fact-specific inquiries are as common as dishwater in deciding whether or not a particular statutory exemption or exception applies." (JA1135-1136.) Strict scrutiny therefore did not apply; instead, MFEPA was subject only to rational-basis review, which it survived. (JA1136.)

Having rejected Catholic Relief Services' constitutional and statutory defenses, the district court entered judgment in Mr. Doe's favor in the amount of $60,000, to which the parties had stipulated. (JA1136-1137.) This appeal followed (JA1138) and, because Catholic Relief Services challenged the constitutionality of both federal and state statutes, the United States and the State of Maryland intervened to address the constitutionality of their respective laws.

9

# SUMMARY OF ARGUMENT

Any burden that MFEPA places on religious exercise does not violate the Free Exercise Clause.  MFEPA is neutral because its object is not to restrict practices because they are religiously motivated.  It is generally applicable because, aside from exemptions that favor religion, it applies to secular and religious entities alike.  And it contains no discretionary mechanism for granting exemptions from its prohibitions.  Contrary to Catholic Relief Services' view, MFEPA's exemption for small employers does not mean the statute treats comparable secular activity more favorably than religious exercise, for the exemption is available to all small employers, whether secular or religious.   And MFEPA's religious-employer exemption, as interpreted by the Supreme Court of Maryland, is not a mechanism for granting individualized exemptions; it is a statutory defense that a court adjudicates using defined criteria.  Because MFEPA is neutral and generally applicable, it is subject only to rational-basis review, which it easily survives.  But even if strict scrutiny applies, MFEPA's prohibition on employment discrimination is, by definition, narrowly tailored to the compelling interest in eliminating employment discrimination.

Liability here under MFEPA also does not violate the church autonomy doctrine.  Although church autonomy shields a religious organization's ecclesiastical functions in a variety of respects, it does not supply broad immunity for decisions as

10

to all of an organization's employees. Upholding such immunity by accepting Catholic Relief Services' position as to Mr. Doe would be at odds with the Supreme Court's (and this Court's) recognition of only the ministerial exception, applicable only to those who perform vital religious duties, as church autonomy's manifestation in the employment setting. Even though Catholic Relief Services' position would extend immunity only to decisions made "for religious reasons," moreover, any such limitation is illusory because of the ease with which a religious institution can make that claim. And although church autonomy does prevent courts from resolving matters of theological controversy, a garden-variety employment discrimination claim under a secular statutory framework requires nothing of the sort.

The district court's judgment should be affirmed.

## ARGUMENT

### I. THE DISTRICT COURT'S CONSTITUTIONAL RULINGS ARE REVIEWED DE NOVO.

Whether MFEPA's application here violates the Free Exercise Clause and whether it violates the church autonomy doctrine are constitutional questions. Accordingly, the district court's rulings on those questions are reviewed de novo. *See, e.g.*, *United States v. Preuss*, 703 F.3d 242, 245 (4th Cir. 2012).

II.  **THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT DOES NOT VIOLATE CATHOLIC RELIEF SERVICES' FREE EXERCISE RIGHTS.**

"[L]aws incidentally burdening religion," the Supreme Court has explained, "are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are both neutral and generally applicable." *Fulton*, 593 U.S. at 533 (citing *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878-82 (1990)); *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (explaining that a law is not neutral and generally applicable if it is specifically directed at religious practice, prohibits religious conduct while allowing secular conduct that undermines the government's interest in a similar way, or contains a mechanism for individualized exemptions).  Here, even if MFEPA incidentally burdens religion, it is neutral and generally applicable.  It is neutral because its "object" is not "to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  And it is generally applicable because, apart from provisions that *favor* religious organizations, it applies to religious and secular entities alike.  With certain exceptions defined by statute, all employers are prohibited from discriminating based on a series of characteristics, including race, religion, sex, age, sexual orientation, gender identity, and disability.  State Gov't § 20-606(a).  MFEPA thus is subject only to rational-basis review, which it easily survives.

12

Catholic Relief Services argues, however, that MFEPA is *not* neutral and generally applicable because of its exemption for small employers and because of the very religious-employer exemption that the Supreme Court of Maryland construed in *Doe*. These arguments fail because the small-employer exemption applies to both religious and secular employers, and because MFEPA's religious-employer exemption is not a "mechanism for granting exceptions" on an individualized basis. *Fulton*, 593 U.S. at 537. But even if strict scrutiny applies, MFEPA is narrowly tailored to the compelling government interest in eliminating employment discrimination.

### A. The Maryland Fair Employment Practices Act's Small-Employer Exemption Does Not Trigger Strict Scrutiny.

Under *Tandon v. Newsom*, 593 U.S. 61 (2021), exceptions to government regulations trigger strict scrutiny only where they treat a "comparable secular activity more favorably than religious exercise." *Id.* at 62. Contrary to Catholic Relief Services' view, *see* Appellant's Br. 50, MFEPA's small-employer exemption treats no comparable secular activity more favorably than religious exercise and therefore does not make the statute constitutionally suspect.

First, the small-employer exemption (like MFEPA's other exceptions, which Catholic Relief Services does not discuss) does not favor secular activity at all. MFEPA generally exempts employers with fewer than 15 employees. State Gov't § 20-601(d)(1)(i)(2). That exemption applies to secular and religious employers

13

alike:  *Both* are exempt from MFEPA's prohibition on discrimination if they have fewer than 15 employees.  Conversely, if an organization has 15 employees or more, it cannot claim to be exempt regardless of whether it is secular or religious. Employment (or even discrimination) by a small employer, the activity that MFEPA exempts, thus is not "secular activity" but, rather, is activity that can be either secular or religious.  The small-employer exemption accordingly does not treat secular activity "more favorably," *Tandon*¸ 593 U.S. at 62; it treats the same activity the same, regardless of whether it is religious or secular.  *See Kim v. Board of Educ, of Howard County*, 93 F.4th 733, 748 (4th Cir. 2024) (upholding Maryland law governing student membership in county board of education because "Maryland's law makes no distinction between religious and secular" but, rather, "bars non-public-school students, religious and nonreligious alike, from choosing or serving as the student member").  Similarly, even under the terms of the very case law that Catholic Relief Services cites, *see* Appellant's Br. 51, the exemption does not "make[] a value judgment in favor of secular motivations, but not religious motivations." *Does 1-11 v. Board of Regents of Univ. of Colo.*, 100 F.4th 1251, 1277 (10th Cir. 2024).

Second, even if the activity falling within the small-employer exemption were somehow considered secular (despite the exemption's applicability to religious employers as well), it is not comparable to the activity at issue here.  The secular

14

activity comparable to that of Catholic Relief Services is employment by a large secular employer; in the absence of another exception, such employment, like that of Catholic Relief Services, is subject to MFEPA.  Meanwhile, the activity comparable to employment by a small secular employer is employment by a small religious employer, which is equally protected.  *Cf. Kim*, 93 F.4th at 747-49 (upholding law barring students from all private schools, whether religious or secular, from serving on the county's board of education).  This is not a matter of "some comparable secular businesses or other activities" being subjected to the same requirements as religious employment, *Tandon*, 593 U.S. at 62; it is the *same* activity being subjected to those requirements.  Especially in that light, Catholic Relief Services provides no reason to conclude that employment by an organization of thousands is comparable to employment by an organization of 14 or fewer.

The Eastern District of Washington's unpublished decision in *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) is unpersuasive.  *Union Gospel* held that Washington's anti-discrimination law was not generally applicable because it "exempt[ed] employers with fewer than eight employees."  *Id.* at *3.  In so holding, though, the decision effectively ignored that, for strict scrutiny to apply, a law must treat a "*secular* activity more favorably than religious exercise*.*"  *Tandon*, 593 U.S. at 62 (emphasis added).  Far more persuasive is *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d

15

1121 (W.D. Wash. 2023), *rev'd on other grounds*, 147 F.4th 959 (9th Cir. 2025), which held that the Washington small-employer exemption and the Title VII small-employer exemption did not trigger strict scrutiny because they applied to both religious and secular employers and thus "d[id] not demonstrate disparate treatment between comparable secular and religious activity." *Id.* at 1142; *see id.* (contrasting these statutes with hypothetical ones that "exempted small *religious* employers but not small *secular* employers"). The same logic applies here.

### B. The Maryland Fair Employment Practices Act's Religious-Organization Exemption Is Not a "Mechanism for Individualized Exemptions."

Alternatively, Catholic Relief Services claims that MFEPA is not generally applicable because it purportedly includes a mechanism for individualized exemptions—namely, the same religious-employer exemption that the Supreme Court of Maryland construed in *Doe*, and that the district court applied in this case. *See* Appellant's Br. 53-54 (discussing *Fulton*). *Fulton* and other decisions make clear, however, that this exemption is not the sort of mechanism that renders a law constitutionally suspect.

In *Fulton*, a religious foster care agency's challenge to a city requirement that agencies not discriminate based on sexual orientation, the Supreme Court applied strict scrutiny because of a provision that allowed a city official to grant an exemption from the requirement "in his/her sole discretion." 593 U.S. at 535. The

16

Court reasoned that "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Id.* at 533 (quoting *Smith*, 494 U.S. at 884; second alteration in original). Applying that principle, the Court determined that the "in his/her sole discretion" clause created a "formal mechanism for granting exceptions" that made the law not generally applicable and therefore triggered strict scrutiny. *Fulton*, 593 U.S. at 537.

Applying the Supreme Court of Maryland's *Doe* decision to determine whether or not an employee's duties directly further the employer's core missions—and, thus, whether the employee falls within MFPA's religious-organizations exemption—is not, as Catholic Relief Services claims, a "mechanism for individualized exemptions." This exemption is not one (as in *Fulton*) that any government official has the power to "grant[]," *Fulton*, 593 U.S. at 537; it is a self-executing statutory carveout from the application of MFEPA. State Gov't § 20-604(2); *see Fulton*, 593 U.S. at 533 (question is whether the exemption-granting mechanism allows "*the government* to consider the particular reasons for a person's conduct" (emphasis added)). The exemption, in other words, is a defense that may be accepted or rejected on the basis of evidence. Although the First Amendment does bind courts, neither Catholic Relief Services nor its amici cite any

17

case treating a court's application of statutorily prescribed criteria as a "formal mechanism for granting exceptions" within the meaning of *Fulton*.

Further, "[i]ndividualized exemptions" within the meaning of *Fulton* are only those made on an "ad hoc" basis, or with "less than clear considerations." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687-88 (9th Cir. 2023) (en banc); *see Smith*, 494 U.S. at 884 (distinguishing a generally applicable statute from one allowing exemptions for "good cause"). Decisions made under a predetermined legal framework are not the kind of "individualized exemptions" at issue in *Fulton*, even if they are made on a case-by-case basis and require consideration of the facts. *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288 (2d Cir. 2021) (explaining that "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons" (quotation marks and citation omitted)); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("While of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the *Smith* Court . . . .").

Here, although *Doe* did not set forth a bright-line rule, it articulated a legal standard with a series of guidelines for courts to follow. *See Doe*, 484 Md. at 673. Those guidelines relate not just to how courts are to identify an organization's core

18

mission or missions, but also to how courts are to determine whether an employee's duties "directly" further those missions. *See id.* The substantive nature of the exemption thus contrasts sharply with the ad hoc, "in his/or sole discretion" exemption mechanism in *Fulton*. And the exemption does not (as in *Fulton*) allow any decisionmaker, let alone the government, "to decide which reasons for not complying . . . are worthy of solicitude." *Fulton*, 593 U.S. at 537.

### C.    The Maryland Fair Employment Practices Act Survives Any Level of Scrutiny.

As explained above, because MFEPA is neutral and generally applicable, it does not trigger strict scrutiny. Instead, MFEPA is subject only to rational-basis review, and because the statute prohibits employment discrimination, it is rationally related to the interest in combating such discrimination.

But MFEPA would satisfy strict scrutiny in any event. First, Maryland has a compelling interest in eliminating discrimination in employment. *See Rayburn*, 772 F.2d at 1168 ("It would, of course, be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin."); *R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 n.12 (6th Cir. 2018) (noting "EEOC's compelling interest in combating discrimination in the workforce"), *aff'd sub nom. Bostock v. Clayton County*, 590 U.S. 644 (2018); *id.* at 591 n.12 ("Courts have repeatedly acknowledged that Title VII serves a compelling interest in eradicating all forms of invidious employment

discrimination proscribed by the statute."); *see also Bostock*, 590 U.S. at 649-53 (interpreting Title VII's ban on sex discrimination to encompass discrimination based on sexual orientation or transgender status).

Second, MFEPA is narrowly tailored to that interest. Far from sweeping too broadly, MFEPA gives religious organizations leeway beyond what this Court and the Supreme Court have determined the First Amendment requires (as explained at pages 21-22 and 25-27 below), in that its religious exemption applies to some non-ministers. And by definition, there is no less restrictive approach, even at the level of a single organization, that would equally serve the compelling interest in eliminating discrimination. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) (dismissing fear that "discrimination in hiring, for example on the basis of race, might be cloaked as religious practice to escape legal sanction," because "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal"). MFEPA therefore is constitutional regardless of the level of scrutiny that applies.

### III. APPLYING THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT IN THESE CIRCUMSTANCES DOES NOT VIOLATE THE CHURCH AUTONOMY DOCTRINE.

Alternatively, Catholic Relief Services argues that the church autonomy doctrine bars courts from resolving "disputes[] like this one," Appellant's Br. 13,

and that the case therefore should have been dismissed for lack of subject matter jurisdiction, Appellant's Br. 13, 19-20. Although Catholic Relief Services' brief does not distinguish among statutes, its arguments necessarily encompass the position that the church autonomy doctrine bars MFEPA's application here. That position is incorrect. In the employment context, the church autonomy doctrine protects employment decisions with respect to ministers or their equivalent. As to other employees, the mere claim that an employment decision is "rooted in religious belief" does not shield an employer from liability, nor do cases like this one require courts to resolve matters of theological controversy.

### A. The Church Autonomy Doctrine Shields Employment Decisions as to Ministers, Not an Organization's Entire Workforce.

The First Amendment protects religious organizations' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. at 186 (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). This "church autonomy" doctrine, however, is limited. At its core, it requires civil courts "not to intermeddle in internal ecclesiastical disputes." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330 (4th Cir. 1997). More recently, the Supreme Court has explained that the doctrine "protect[s] [a religious institution's] autonomy with respect to internal management decisions that are essential to the

institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746. It does not, however, grant religious organizations "general immunity from secular laws." *Id.*

In the employment context, the church autonomy doctrine takes the form of the ministerial exception, which requires courts to "stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* at 746; *see Hosanna-Tabor*, 565 U.S. at 191-92 (holding that employee came within the ministerial exception because she "held herself out as a minister of the Church" and her "job duties reflected a role in conveying the Church's message and carrying out its mission"). As *Hosanna-Tabor* explained, "[t]he members of a religious group put their faith in the hands of their ministers," and "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . intrudes upon more than a mere employment decision." *Id.* at 188. The Court has since clarified that the ministerial exception applies to employees performing "vital religious duties" at the core of a religious organization's mission, regardless of title. *Our Lady of Guadalupe*, 591 U.S. at 756.

## B. Neither of Catholic Relief Services' Theories Supports Application of the Church Autonomy Doctrine Here.

Catholic Relief Services' brief in this Court does not claim that Mr. Doe's roles fell within the ministerial exception; indeed, Catholic Relief Services stipulated below that his roles were *not* ministerial. (JA1119.) But Catholic Relief Services still claims that the church autonomy doctrine shields it from liability under MFEPA

22

(as well as federal law), for essentially two reasons. First, Catholic Relief Services claims that this is a "theological controversy," Appellant's Br. 19, that cannot be resolved using "neutral principles," Appellant's Br. 18. Second, it claims that its decision regarding Mr. Doe is constitutionally protected because it was "rooted in religious belief." Appellant's Br. 18. Even assuming that Catholic Relief Services is a "church," and thus potentially eligible to invoke the church autonomy doctrine's protections, neither of these arguments passes muster.

> **1.    Cases Such as This One Do Not Require Courts to Resolve Theological Controversies.**

As to Catholic Relief Services' first argument, deciding this case does not require resolution of a theological controversy, nor does Catholic Relief Servies point to any respect in which the district court in fact resolved such a controversy. The district court did not determine which view of Catholic doctrine is right or wrong, or whether any decision made by Catholic Relief Services is correct as a matter of ecclesiastical law. Nor, for that matter, would any court applying MFEPA have to make similar determinations. Instead, the district court determined that the discrimination in this case violated *Maryland* law (JA1128-1129) and that Mr. Doe's duties did not directly further Catholic Relief Services' core mission of "serv[ing] the poor and vulnerable overseas." (JA1107, JA1122-1128.) Far from resolving "matters of . . . faith and doctrine," Appellant's Br. 17 (quoting *Kedroff*, 344 U.S. at 116; ellipsis in original), the district court decided this case based on the very sort of

"neutral principles of law" that Catholic Relief Services suggests were lacking, Appellant's Br. 17 (quoting *Jones v. Wolf*, 443 U.S. 595, 604 (1979)). This case could scarcely be farther removed from *Watson v. Jones*, 80 U.S. (13 Wall) 679, 733 (1871), on which Catholic Relief Services relies: there, in stating that "civil courts exercise no jurisdiction" over "a matter which concerns theological controversy," the Supreme Court pointed to a scenario in which a court "substitut[ed] its own judgment for that of the ecclesiastical court" and "decide[d] that ruling elders, declared to be such by that tribunal, are not such, and must not be recognized by the congregation." *Id.* at 734.[3]

Catholic Relief Services nevertheless suggests that Mr. Doe's claims were barred by the church autonomy doctrine because, in evaluating a constitutional defense (or, in the case of Mr. Doe's federal claims, the application of the Religious Freedom Restoration Act ("RFRA")), a court might have to assess whether any burdens on its religious exercise are substantial and, in the course of doing so, might have to resolve ecclesiastical questions. *See* Appellant's Br. 19. That possibility provides no basis for applying the church autonomy doctrine: at its essence, Catholic Relief Services' position is that merely *raising* a defense crafted specifically to

---

[3] Although *Watson* described this as a question of jurisdiction more than 150 years ago, modern cases generally treat church autonomy as an affirmative defense, not a jurisdictional defect. *See, e.g.*, *Gaddy v. Corporation of President of Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1212 (10th Cir. 2025).

protect religious exercise entitles the plaintiff to dismissal on the ground that some aspect of the defense may not be justiciable. The brief offers no authority for that sort of bootstrapping. In any event, the district court here had no occasion to consider whether any burden was "substantial," and courts commonly make these determinations without resolving ecclesiastical questions. *See*, *e.g.*, *Hobby Lobby*, 573 U.S. at 682.

### 2. The Church Autonomy Doctrine Does Not Apply Just Because a Decision is "Rooted in Religious Belief."

Alternatively, Catholic Relief Services suggests that the church autonomy doctrine applies here because it protects employment decisions that are "rooted in religious belief." Appellant's Br. 18 (quoting *Gaddy*, 148 F.4th at 1212). This argument cannot be squared with the Supreme Court's careful articulation of the ministerial exception. *Our Lady of Guadalupe* made clear that the exception is an application of the church autonomy doctrine to the employment setting. *See* 591 U.S. at 746 (identifying "selection of the individuals who play certain key roles" as a "component of" churches' "autonomy with respect to internal management decisions that are essential to the institution's central mission"). That makes sense, for ministers' duties "lie at the very core of the mission" of a religious organization. *Id.* at 754; *see id.* at 757 (holding that Catholic school's teachers fell within the exception because "they were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith"). In

25

neither *Hosanna-Tabor* nor *Our Lady of Guadalupe* did the Court suggest that, for all of its efforts to define the contours of the ministerial exception, the church autonomy doctrine might actually shield an organization's hiring and firing of *all* employees, as long as it is rooted in religious belief. *See Hosanna-Tabor*, 565 U.S. at 188 (contrasting decision "to accept or retain an unwanted minister" with "a mere employment decision"). That individual Justices have suggested as much in their own, separate opinions, *see* U.S. Br. 23-24, only underscores that this capacious view of the doctrine has not taken hold.

Nor has this Court suggested that church autonomy broadly shields employment decisions with respect to non-ministerial employees. To the contrary, this Court has confirmed, in a case where it accepted the employer's invocation of the ministerial exception and a separate claim of entanglement, that "churches are not—and should not be—above the law"; thus, "[t]heir employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." *Rayburn*, 772 F.2d at 1172; *see id.* at 1168 (observing that application of the ministerial exception depends on "the function of the position"). Catholic Relief Services' invocation of church autonomy here contravenes that pronouncement.

Contrary to the United States' view, see U.S. Br. 28-30, this Court's decision in *Bell*, 126 F.3d 328, illustrates the limited scope of the church autonomy doctrine.

26

*Bell* held that the dispute before it was "ecclesiastical," so as to bar the plaintiff's claims, *because* the plaintiff was a minister. *See id.* at 332-333. After describing a series of cases concerning the ministerial exception, this Court reasoned that "it follows that [the plaintiff] was serving in a religious ministry." *Id.* at 332. And the Court barred the plaintiff's suit because the suit challenged the church's "decision on how it would expend funds raised by the church for religious purposes, *which directly related to its outreach ministry and Bell's status as a minister*." *Id.* at 332-33 (emphasis added).

The Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), also does not support application of the church autonomy doctrine here. *See* U.S. Br. 24-25. That decision did not mention church autonomy, rely on church autonomy cases, or even resolve any constitutional question.[4] Instead, it interpreted the National Labor Relations Board's jurisdiction-granting statute narrowly to avoid "difficult and sensitive" constitutional questions, relating to

---

[4] The case's mention of the "autonomous position of management" does not, as the United States implies, refer to church autonomy. *See* U.S. Br. 25. Instead, it is part of a statement regarding collective bargaining rights in general. *See Catholic Bishop of Chi.¸* 440 U.S. at 502 ("The Pennsylvania Supreme Court aptly summarized the effect of mandatory bargaining when it observed that the 'introduction of a concept of mandatory collective bargaining, regardless of how narrowly the scope of negotiation is defined, necessarily represents an encroachment upon the former autonomous position of management.'" (quoting *Pennsylvania Lab. Rels. Bd. v. State Coll. Area Sch. Dist.*, 461 Pa. 494, 504 (1975))).

27

church-state entanglement, that would arise from the Board's exercise of jurisdiction over teachers in church schools. *Catholic Bishop of Chi,* 440 U.S. at 507. In reaching that conclusion, the Court emphasized "the critical and unique role of the teacher in fulfilling the mission of a church-operated school," as well the possibility that the Board could have to determine whether schools' "challenged actions were mandated by their religious creeds." *Id.* at 501-02; *see Duquesne Univ. of Holy Spirit v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020) (observing that *Catholic Bishop of Chicago* rested on the "vital role played by teachers" at church-operated schools). Liability here under MFEPA (which includes a co-religionist exception for religious schools, *see* State Gov't § 20-605(a)(3)) does not implicate these concerns.[5]

Finally, even assuming that entanglement concerns could theoretically support expanding church autonomy in the employment sphere beyond the ministerial exception, the specific inquiry prescribed by the Supreme Court of Maryland—which Catholic Relief Services does not appear to challenge directly—raises no such concerns. Determining if an employee's duties directly further a religious organization's core missions, whether religious or secular, is no more

---

[5] The right of expressive association also does not bolster Catholic Relief Services' church autonomy argument. See U.S. Br. 26-27 (discussing *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)). Cases such as *Dale* concern compulsory membership in groups, not decisions regarding whom to employ, and neither this Court nor the Supreme Court has upheld an expressive-association claim based on the employer-employee relationship.

28

problematic than assessing whether a particular employee comes within the ministerial exception because she performs "vital religious duties" or because her duties lie within the "core" of the organization's religious mission. *Our Lady of Guadalupe*, 591 U.S. at 754, 756; *see id.* at 746 (describing church autonomy doctrine as protecting "internal management decisions that are *essential to the institution's central mission*" (emphasis added)); *Rayburn*, 772 F.2d at 1169 (explaining that court must "determine whether a position is important to the spiritual and pastoral mission of the church" to determine whether the ministerial exception applies); *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2011) (same); *see also Our Lady of Guadalupe*, 591 U.S. at 757 (characterizing "a religious institution's explanation of the role of . . . employees in the life of the religion in question" as "important," not dispositive). If anything, the inquiry under *Doe* is less problematic, because an organization's "core missions" can be religious or secular, and a court need not determine which components of the organization's work are "religious." 484 Md. at 673.

## C. Catholic Relief Services' Position, If Accepted, Would Have Far-Reaching Consequences.

The implications of Catholic Relief Services' view of the church autonomy doctrine are sweeping. Under its theory, an employer could escape liability for discrimination merely by asserting that a challenged employment action was motivated by religion—or, put differently, that it was "rooted in religious belief."

Appellants' Br. 21 (quoting *Gaddy*, 148 F.4th at 1212). As long as an employer asserts a "religious reason[]," Appellants' Br. 20, any employee, regardless of position, could be terminated on any otherwise-prohibited basis. Not only that, but the employer, it appears, could turn any employment dispute into a non-justiciable "theological controversy," Appellant's Br. 19, merely by *asserting* a defense meant to protect religious rights.

Catholic Relief Services' "rooted in religious belief" theory would mean that even Title VII's co-religionist exemption is inadequate. *See* 42 U.S.C. § 2000e-1(a) (providing that Title VII does not apply to a religious organization "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [organization] of its activities"). In *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), the Supreme Court did not say this co-religionist exemption was constitutionally required;[6] it said that it was not *un*constitutional because "there is ample room for accommodation of religion under the Establishment Clause." *Id.* at 338; *see Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024)

---

[6] Nor was the Court's conclusion "premised on the assumption that the First Amendment *requires* such an exemption for religious organizations." Gen. Conf. of Seventh-day Adventists Br. 8 (emphasis in original). The Court observed that the exemption "lift[ed] a regulation that burdens the exercise of religion," not that the burden on religious exercise was unconstitutional. *Amos*, 483 U.S. at 338.

(deeming the exemption "constitutionally inspired" and likening it to RFRA); *see also Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (explaining that "Congress enacted RFRA in order to provide *greater* protection for religious exercise than is available under the First Amendment" (emphasis added)).  Under Catholic Relief Services' view, though, the exemption is not only constitutionally mandatory, but also unconstitutionally insufficient: while the exemption shields "the employment of individuals of a particular religion," 42 U.S.C. § 2000e-1(a), Catholic Relief Services' position would require immunity for all employment decisions rooted in religious belief.

Further, Catholic Relief Services' "rooted in religious belief" theory would invite opportunistic claims of immunity from anti-discrimination law.  It is no answer that plaintiffs may be able to contest such claims on their facts.  Any such ability could not constitutionally extend to questioning whether a particular religion indeed requires a certain practice or dictates a certain belief.  *See, e.g.*, *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989).  Instead, it would be limited to challenging the sincerity of the employer's belief, as well as whether that belief in fact motivated the employer's decision.  But it is both easy to claim that a decision is "rooted in religious belief" and difficult to question that claim when the employer is, by definition, a religious institution.  In practice, therefore, there is little difference between Catholic Relief Services' position and extension of the

31

ministerial exception to cover all employees.  This Court should not weaken civil rights protections in this manner.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Joshua M. Segal

_____

JOSHUA M. SEGAL
Principal Deputy Solicitor General
200 Saint Paul Place
Baltimore, Maryland  21202
jsegal@oag.state.md.us
(410) 576-6446
(410) 576-6955 (facsimile)

Attorneys for Intervenor

## REQUEST FOR ORAL ARGUMENT

Intervenor State of Maryland respectfully requests that the Court hear oral argument in this appeal, which has been tentatively calendared for the March argument session, as the appellant challenges the constitutionality of an important state statute.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 7,070 words, excluding the parts of the brief exempted by Rule 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Joshua M. Segal

_____

Joshua M. Segal

33

**PERTINENT PROVISIONS**

**Maryland Code Annotated, State Government Article**

**§ 20-601. Definitions.**

**(a)** In this subtitle the following words have the meanings indicated.

**(b)**

    **(1)** "Disability" means:

        **(i)**

            **1.** a physical disability, infirmity, malformation, or disfigurement that is caused by bodily injury, birth defect, or illness, including epilepsy; or

            **2.** a mental impairment or deficiency;

        **(ii)** a record of having a physical or mental impairment as otherwise defined under this subsection; or

        **(iii)** being regarded as having a physical or mental impairment as otherwise defined under this subsection.

    **(2)** "Disability" includes:

        **(i)**

            **1.** any degree of paralysis, amputation, or lack of physical coordination;

            **2.** blindness or visual impairment;

            **3.** deafness or hearing impairment;

            **4.** muteness or speech impediment; and

            **5.** physical reliance on a service animal, wheelchair, or other remedial appliance or device; and

        **(ii)** retardation and any other mental impairment or deficiency that may have necessitated remedial or special education and related services.

**(c)**

    **(1)** "Employee" means:

        **(i)** an individual employed by an employer; or

        **(ii)** an individual working as an independent contractor for an employer.

    **(2)** Unless the individual is subject to the State or local civil service laws, "employee" does not include:

        **(i)** an individual elected to public office;

        **(ii)** an appointee on the policy making level; or

        **(iii)** an immediate adviser with respect to the exercise of the constitutional or legal powers of an elected office.

**(d)**

    **(1)** "Employer" means:

        **(i)** a person that:

34

**1.** is engaged in an industry or business; and

**2.**

    **A.** has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; or

    **B.** if an employee has filed a complaint alleging harassment, has one or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; and

**(ii)** an agent of a person described in item (i) of this paragraph.

**(2)** "Employer" includes the State to the extent provided in this title.

**(3)** Except for a labor organization, "employer" does not include a bona fide private membership club that is exempt from taxation under § 501(c) of the Internal Revenue Code.

**(e)**

**(1)** "Employment agency" means:

**(i)** a person that regularly undertakes with or without compensation to procure:

    **1.** employees for an employer; or

    **2.** opportunities for employees to work for an employer; and

**(ii)** an agent of a person described in item (i) of this paragraph.

**(2)** Except for the United States Employment Service and the system of State and local employment services receiving federal assistance, "employment agency" does not include a unit of the United States, the State, or a political subdivision of the State.

**(f)** "Genetic information" has the meaning stated in § 27-909(a)(3) of the Insurance Article.

**(g)** "Genetic test" has the meaning stated in § 27-909(a)(5) of the Insurance Article.

**(h)** "Harassment" includes:

**(1)** unwelcome and offensive conduct, which need not be severe or pervasive, when:

**(i)** the conduct is based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability; and

**(ii)**

    **1.** submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;

    **2.** submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or

    **3.** based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile; and

**(2)** sexual harassment.

35

**(i)**
    **(1)** "Labor organization" means:
        **(i)** a labor organization engaged in an industry; and
        **(ii)** an agent of an organization described in item (i) of this paragraph.
    **(2)** "Labor organization" includes:
        **(i)** an organization of any kind, an agency, or an employee representation committee, group, association, or plan:
            **1.** in which employees participate; and
            **2.** that exists, wholly or partly, for the purpose of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment; and
        **(ii)** a conference, general committee, joint or system board, or joint council that is subordinate to a national or international labor organization.
**(j)** "Religion" includes all aspects of religious observances, practice, and belief.
**(k)** "Sexual harassment" includes conduct, which need not be severe or pervasive, that consists of unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature when:
    **(1)** submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;
    **(2)** submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or
    **(3)** based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile.

## § 20-604. Scope of subtitle.

This subtitle does not apply to:
    **(1)** an employer with respect to the employment of aliens outside of the State; or
    **(2)** a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity.

## § 20-605. Exceptions.

**(a)** Notwithstanding any other provision of this subtitle, this subtitle does not prohibit:
    **(1)** an employer from hiring and employing employees, an employment agency from classifying or referring for employment any individual, a labor organization

36

from classifying its membership or classifying or referring for employment any individual, or an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs from admitting or employing any individual in a program, on the basis of the individual's sex, age, religion, national origin, or disability, if sex, age, religion, national origin, or disability is a bona fide occupational qualification reasonably necessary to the normal operation of that business or enterprise;

**(2)** an employer from establishing and requiring an employee to adhere to reasonable workplace appearance, grooming, and dress standards that are directly related to the nature of the employment of the employee and that are not precluded by any provision of State or federal law, as long as the employer allows any employee to appear, groom, and dress consistent with the employee's gender identity;

**(3)** a school, college, university, or other educational institution from hiring and employing employees of a particular religion, if:

    **(i)** the institution is wholly or substantially owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society; or

    **(ii)** the curriculum of the institution is directed toward the propagation of a particular religion; or

**(4)** except as provided in subsection (b) of this section, an employer, employment agency, or labor organization from observing the terms of a bona fide seniority system or any bona fide employee benefit plan, such as a retirement, pension, or insurance plan, that is not a subterfuge to evade the purposes of this subtitle.

**(b)** An employee benefit plan may not excuse the failure to hire any individual.

## § 20-606. Unlawful employment practices.

**(a)** An employer may not:

**(1)** fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:

    **(i)** the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

    **(ii)** the individual's refusal to submit to a genetic test or make available the results of a genetic test;

**(2)** limit, segregate, or classify its employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment

37

opportunities or otherwise adversely affect the individual's status as an employee because of:

    **(i)** the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

    **(ii)** the individual's refusal to submit to a genetic test or make available the results of a genetic test;

**(3)** request or require genetic tests or genetic information as a condition of hiring or determining benefits;

**(4)** fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee or an applicant for employment; or

**(5)** engage in harassment of an employee.

**(b)** An employment agency may not:

**(1)** fail or refuse to refer for employment or otherwise discriminate against any individual because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

**(2)** classify or refer for employment any individual on the basis of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

**(c)** A labor organization may not:

**(1)** exclude or expel from its membership, or otherwise discriminate against, any individual because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment;

**(2)** limit, segregate, or classify its membership, or classify or fail or refuse to refer for employment any individual, in any way that would deprive or tend to deprive the individual of employment opportunities, limit the individual's employment opportunities, or otherwise adversely affect the individual's status as an employee or as an applicant for employment because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

**(3)** cause or attempt to cause an employer to discriminate against an individual in violation of this section.

**(d)** An employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs, including on-the-job training programs, may not discriminate against any individual in admission to, or employment in, any program established to provide apprenticeship or other training or retraining because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

**(e)**

**(1)** Except as provided in paragraph (2) of this subsection, an employer, labor organization, or employment agency may not print or cause to be printed or published any notice or advertisement relating to employment by the employer, membership in or any classification or referral for employment by the labor organization, or any classification or referral for employment by the employment agency that indicates any preference, limitation, specification, or discrimination based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability.

**(2)** A notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, age, national origin, marital status, or disability if religion, sex, age, national origin, marital status, or disability is a bona fide occupational qualification for employment.

**(f)** An employer may not discriminate or retaliate against any of its employees or applicants for employment, an employment agency may not discriminate against any individual, and a labor organization may not discriminate or retaliate against any member or applicant for membership because the individual has:

**(1)** opposed any practice prohibited by this subtitle; or

**(2)** made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle.

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

|  |  |  |
|---|---|---|
| | * | |
| JOHN DOE, | | |
| | * | |
| *Plaintiff-Appellee*, | | |
| v. | * | |
| | | No. 25-1569 |
| CATHOLIC RELIEF SERVICES, | * | |
| | | |
| *Defendant-Appellant*. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**CERTIFICATE OF SERVICE**

I certify that, on this 2nd day of January, 2026, the Brief of Intervenor State of Maryland was filed and served electronically on counsel of record who are registered CM/ECF users.

/s/ Joshua M. Segal

_____

Joshua M. Segal

40