**No. 25-1569**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**JOHN DOE,**

**PLAINTIFF-APPELLEE,**

**v.**

**CATHOLIC RELIEF SERVICES,**

**DEFENDANT-APPELLANT.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Hon. Julie R. Rubin, United States District Judge)

# BRIEF OF PLAINTIFF-APPELLEE JOHN DOE

Eve L. Hill, Esq. (Bar No. 19938)
Lauren DiMartino, Esq. (Bar No. 22046)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
ldimartino@browngold.com

Shannon C. Leary, Esq. (Bar No. 18396)
James A. Hill, Esq. (Bar No. 21718)
GILBERT EMPLOYMENT LAW, P.C.
8403 Colesville Road, Suite 1000
Silver Spring, Maryland 20910
Tel: (301) 608-0880
Fax: (301) 608-0881
Sleary-efile@gelawyer.com
Jhill-efile@gelawyer.com

(Continued on next page)

Anthony J. May, Esq. (Bar No. 20301)
NUSINOV SMITH LLP
2800 Quarry Lake Drive, Suite 160
Baltimore, Maryland 21209
Tel: (410) 554-3600
Fax: (410) 554-3636
amay@nusinovsmith.com

*Attorneys for Plaintiff-Appellee John Doe*

Dated: January 2, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 2

I. CRS Hires Doe Under the Guise that "All Dependents Are Covered," Then Terminates His Dependent Health Benefits. ........ 2

II. Doe Obtains Summary Judgment on His Federal Claims and the Supreme Court of Maryland Interprets MFEPA's Religious Exemption to Apply Only to Employees Who "Directly" Further "Core Mission(s)." ........ 4

III. The District Court Weighed the Evidence, Concluded that CRS Violated MFEPA, and Rejected CRS's Defenses. ........ 6

SUMMARY OF THE ARGUMENT ........ 9

STANDARD OF REVIEW ........ 11

ARGUMENT ........ 12

I. The Church Autonomy Doctrine Does Not Strip the Court of Authority to Remedy Sex-Based Discrimination. ........ 12

A. The church autonomy doctrine does not afford religious defendants blanket immunity. ........ 12

B. CRS's and Intervenor's arguments contort the doctrine's applicability and misconstrue the facts of this case. ........ 17

II. Title VII's Section 702 Exemption Does Not Authorize Sex Discrimination. ........ 21

III. RFRA Does Not Apply to Private Party Disputes and Any Burden to Provide Health Benefits Does Not Outweigh the Compelling Interest in Preventing Unlawful Sex Discrimination. ........ 27

A. This Court should follow the majority of courts and hold that RFRA is inapplicable to suits between private parties. ........ 28

1. RFRA's unambiguous language requires the government to be a party. ....29

2. Congress intended for RFRA to apply only in cases involving the government. ....32

3. RFRA cannot require the judiciary or private plaintiffs to "stand in the government's shoes." ....35

B. Even if RFRA applied, CRS failed to adduce evidence to establish substantial burden or that Title VII and EPA's enforcement is not the least restrictive means of combating sex discrimination. ....38

1. CRS cannot show that providing Doe with equal benefits—as it did for over 16 months—would substantially burden its religious exercise. ....39

a. As a matter of law, providing Doe with the same benefits as his peers does not equate to forced endorsement of Doe's marriage. ....40

b. This Court has rejected the argument that religion is substantially burdened when a religious tenet is too far removed from the provision of employment benefits. ....42

c. Speculative perceptions of others cannot establish substantial burden. ....44

2. Any substantial burden is justified because equal protection laws are the least restrictive means of furthering Congress's compelling interest in eradicating discrimination. ....46

a. The government has a compelling interest in eradicating discrimination based on sexual orientation. ....46

b. There are no less restrictive alternatives to enforcing anti-discrimination laws, particularly where religious exemptions already exist. ....51

IV. Title VII, EPA, and MFEPA Are Neutral and Generally Applicable Antidiscrimination Statutes that Do Not Violate CRS's First Amendment Rights. ....53

A. Title VII, EPA, and MFEPA are neutral and generally applicable, and no court has ever held otherwise. ....................................................54

1. The relevant statutes are neutral. ..........................................54

2. The relevant statutes are generally applicable. ........................56

a. CRS and Intervenor misinterpret comparability under Tandon. ...............................................................57

b. The Supreme Court of Maryland's fact-intensive inquiry does not impact MFEPA's general applicability...........62

B. Even under a strict scrutiny analysis, CRS cannot establish a substantial burden on religious exercise. ........................................65

V. The District Court Correctly Applied the Supreme Court of Maryland's Test to Find MFEPA's Religious Exemption Inapplicable. ................................65

A. The district court correctly concluded that all of Doe's positions were "one or more steps removed from" effecting CRS's core mission. ....65

B. Exempting CRS from MFEPA would violate Article 36 of the Maryland Declaration of Rights as applied to Doe. ...........................71

CONCLUSION ...............................................................................................72

STATUTORY ADDENDUM .....................................................................Add. i

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .................................................................. 57, 58

*Adams v. Comm'r*,
170 F.3d 173 (3d Cir. 1999) ..........................................................61

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024)................................................... 17, 42

*Archdiocese of Wash. v. Moersen,*
399 Md. 637 (2007)......................................................................87

*Arizonans for Official Eng. v. Arizona*,
520 U.S. 43 (1997) ........................................................................1

*Assicurazioni Generali, S.p.A. v. Neil*,
160 F.3d 997 (4th Cir. 1998)..........................................................82

*Bell v. Presbyterian Church,*
126 F.3d 328 (4th Cir. 1997)..........................................................22

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022)............................................................15

*Billard v. Charlotte Cath. High Sch.*,
101 F.4th 316 (4th Cir. 2024)...................................................... *passim*

*Billard v. Charlotte Cath. High Sch.*,
No. 3:17-CV-00011, 2021 WL 4037431
(W.D.N.C. Sept. 3, 2021) ...................................................... 29, 34, 41

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ......................................................................30

*Boggan v. Miss. Conf. of the United Methodist Church*,
222 Fed. App'x 352 (5th Cir. 2007)................................................34

*Bostock v. Clayton Cnty., Ga,*
140 S. Ct. 1731 (2020) ............................................................. *passim*

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ....................20

*Braunfeld v. Brown*,
366 U.S. 599 (1961) ....................86

*Brzonkala v. Va. Polytech. Inst. & State Univ.*,
169 F.3d 820 (4th Cir.1999) ....................40

*Buford v. United States*,
532 U.S. 59 (2001) .................... 12, 84

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .................... 42, 55, 63, 64

*Butler v. Drive Auto. Indus. of Am., Inc.*,
793 F.3d 404 (4th Cir. 2015) ....................12

*Carson ex rel. O.C. v. Makin*,
596 U.S. 767 (2022) ....................69

*Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) .................... 20, 23

*Christian v. Umpqua Bank*,
984 F.3d 801 (9th Cir. 2020) ....................64

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993) .................... 65, 66, 67, 79

*City & Cnty. of San Francisco, California v. Env't Prot. Agency*,
604 U.S. 334 (2025) ....................44

*City of Boerne v. Flores*,
521 U.S. 507 (1997) .................... 32, 33

*Cline v. Cath. Diocese of Toledo*,
206 F.3d 651 (6th Cir. 2000) .................... 25, 54, 55

*Commonwealth v. Beshear*,
981 F.3d 505 (6th Cir. 2020) ....................75

*Corporation of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) .................................................. 24, 68, 76

*Craig v. State*,
220 Md. 590 (1959) .................................................. 85

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) .................................................. 57

*Davis v. Ermold*,
223 L.Ed.2d 213 (U.S. 2025) .................................................. 86

*Demkovich v. St. Andrew the Apostle Par., Calumet City*,
3 F.4th 968 (7th Cir. 2021) .................................................. 29

*Dennis v. Sparks*,
449 U.S. 24 (1980) .................................................. 46

*DeSimone v. Bartow*,
355 F. App'x 44 (7th Cir. 2009) .................................................. 54

*Diaz v. Pan Am. World Airways, Inc.*,
442 F.2d 385 (5th Cir. 1971) .................................................. 53

*Discover Bank v. Vaden*,
396 F.3d 366 (4th Cir. 2005) .................................................. 28

*Dixon v. Edwards*,
290 F.3d 699 (4th Cir. 2002) .................................................. 14

*Doe v. Cath. Relief Servs.*,
484 Md. 640 (2023) .................................................. *passim*

*Doe v. San Diego Unified School District*,
19 F.4th 1173 (9th Cir. 2021) .................................................. 74

*Does 1-6 v. Mills*,
566 F. Supp. 3d 34 (D. Me.) .................................................. 75, 78

*Dole v. Shenandoah Baptist Church*,
899 F.2d 1389 (4th Cir. 1990) .................................................. *passim*

*E.E.O.C. v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991) ....................................................................................71

*E.E.O.C. v. Catholic Univ. of Am.*,
83 F.3d 455 (D.C. Cir. 1996) ......................................................................32

*E.E.O.C. v. Fremont Christian Sch.*,
781 F.2d 1362 (9th Cir. 1986)............................................................ 27, 51, 55

*E.E.O.C. v. Miss. Coll.*,
626 F.2d 477 (5th Cir. 1980).........................................................................56

*E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018)................................................................. *passim*

*Edison Elec. Inst. v. U.S. Env't Prot. Agency*,
996 F.2d 326 (D.C. Cir. 1993) .....................................................................44

*Edley-Worford v. Va. Conf. of United Methodist Church*,
430 F. Supp. 3d 132 (E.D. Va. 2019)............................................................17

*Elvig v. Calvin Presbyterian Church*,
375 F.3d 951 (9th Cir. 2004).........................................................................18

*Employment Division v. Smith*,
494 U.S. 872 (1990) ........................................................................... *passim*

*Fernandez v. Wynn Oil Co.*,
653 F.2d 1273 (9th Cir. 1981)........................................................................53

*Fitzgerald v. Roncalli High Sch., Inc.*,
73 F.4th 529 (7th Cir. 2023)..........................................................................30

*Fulton v. City of Phila.*,
593 U.S. 522 (2021) ........................................................................... *passim*

*Garrick v. Moody Bible Inst.*,
95 F.4th 1104 (7th Cir. 2024).................................................................. 16, 17

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir. 2010)............................................................ 33, 36, 38

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006) .................................................................... 42, 47, 79

*Goodman v. Archbishop Curley High Sch., Inc.*,
149 F. Supp. 3d 577 (D. Md. 2016) ......................................................17

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) .......................................................... 34, 36, 38

*Harrell v. Donahue*,
638 F.3d 975 (8th Cir. 2011)...........................................................................43

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) ..........................................................................48

*Herx v. Diocese of Fort Wayne-S. Bend, Inc.*,
772 F.3d 1085 (7th Cir. 2014)...........................................................................19

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
565 U.S. 171 (2012) ........................................................................... 5, 16

*In re Young*,
141 F.3d 854 (8th Cir. 1998)...........................................................................32

*Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*,
493 U.S. 378 (1990) ...........................................................................49

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005) ...........................................................................50

*Jones v. Wolf*,
443 U.S. 595 (1979) ...........................................................................15

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
344 U.S. 94 (1952) ...........................................................................13

*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011)...........................................................................25

*Kim v. Bd. of Educ. of Howard Cnty.*,
93 F.4th 733 (4th Cir. 2024)............................................................ 67, 69, 78

*King v. Hillen*,
21 F.3d 1572 (Fed. Cir. 1994) .......... 64

*Konikov v. Orange Cnty., FL*,
290 F. Supp. 2d 1315 (M.D. Fla. 2003) .......... 13

*Landholt v. Corley*,
149 F.4th 486 (4th Cir. 2025) .......... 85

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) .......... 33, 34, 38, 45

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 41

*Loving v. Virginia,*
388 U.S. 1 (1967) .......... 30

*Mahoney v. Doe*,
642 F.3d 1112 (D.C. Cir. 2011) .......... 48

*Malm v. U.S. I.N.S.*,
16 F. App'x 197 (4th Cir. 2001) .......... 44

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
584 U. S. 617 (2018) .......... 58, 66, 67

*Mathis v. Christian Heating & Air Conditioning, Inc.*,
158 F. Supp. 3d 317 (E.D. Pa. 2016) .......... 34

*McDaniel v. Paty*,
435 U.S. 618 (1978) .......... 39, 40

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .......... 30, 31

*McMahon v. World Vision, Inc.*,
704 F. Supp. 3d 1121 (W.D. Wash. 2023) .......... 77

*McMillan v. State*,
258 Md. 147 (1970) .......... 86

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
966 F.3d 346 (5th Cir. 2020) ....................................................................16

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) ...............................................................................45

*Mistretta v. United States*,
488 U.S. 361 (1989) .............................................................................43

*Monasky v. Taglieri*,
589 U.S. 68 (2020) ...............................................................................12

*Nat'l Lab. Rel. Bd. v. Cath. Bishop of Chi.*,
440 U.S. 490 (1979) .............................................................................23

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008)..................................................................17

*Nesbit v. Gears Unlimited, Inc.*,
347 F.3d 72 (3d Cir. 2003) .....................................................................72

*O'Connell v. United States Conf. of Cath. Bishops*,
134 F.4th 1243 (D.C. Cir. 2025) ....................................................... 15, 22

*Obergefell v. Hodges*,
576 U.S. 644 (2015) .............................................................................86

*Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*,
477 U.S. 619 (1986) .............................................................................24

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ........................................................... 16, 21, 31, 76

*Paty v. McDaniel*,
547 S.W.2d 897 (Tenn. 1977) ................................................................40

*Pink v. Modoc Indian Health Project, Inc.*,
157 F.3d 1185 (9th Cir. 1998)..................................................................71

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
393 U.S. 440 (1969) .............................................................................23

*Proctor v. Wash. Metro. Area Transit Auth.*,
412 Md. 691 (2010) .......... 85

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) .......... 15, 18, 23

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985) .......... *passim*

*Redhead v. Conf. of Seventh-Day Adventists*,
440 F. Supp. 2d 211 (E.D.N.Y 2006) .......... 63

*Reed Elsevier, Inc. v. Muchnick*,
559 U.S. 154 (2010) .......... 43

*Richardson v. Northwest Christian Univ.*,
242 F. Supp. 3d 1132 (D. Or. 2017) .......... 18

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 57, 59

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......... 67, 73

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) .......... 50

*Rumsfeld v. Forum for Acad. & Inst. Rts.*,
547 U.S. 47 (2006) .......... 49, 54

*Rweyemamu v. Cote*,
520 F.3d 198 (2d Cir. 2008) .......... 35

*Sabir v. Williams*,
52 F.4th 51 (2d Cir. 2022) .......... 42

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*,
426 U.S. 696 (1976) .......... 13, 16

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
363 F.3d 299 (4th Cir. 2004) .......... 76

*Sherbert v. Verner*,
374 U.S. 398 (1963) .................................................................. 39, 40, 76, 86

*Snyder v. Holy Cross Hosps.*,
30 Md. App. 317 (1976) .................................................................. 86, 87

*Spivack v. City of Philadelphia*,
109 F.4th 158 (3d Cir. 2024) .................................................................. *passim*

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ..................................................................34

*Tandon v. Newsom*,
593 U.S. 61 (2021) .................................................................. *passim*

*Thomas v. Collins*,
323 U.S. 516 (1945) ..................................................................86

*Tomic v. Cath. Diocese*,
442 F.3d 1036 (7th Cir. 2006) .................................................................. 33, 34

*Tomka v. Seiler Corp.*,
66 F.3d 1295 (2d Cir. 1995) ..................................................................72

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
471 U.S. 290 (1985) ..................................................................14

*Tulsa Pro. Collection Servs., Inc. v. Pope*,
485 U.S. 478 (1988) ..................................................................46

*U.S. Bank N. A. v. Village at Lakeridge, LLC*,
583 U.S. 387 (2018) ..................................................................84

*U.S. Dep't of Lab. v. Shenandoah Baptist Church*,
707 F. Supp. 1450 (W.D. Va. 1989)..................................................................61

*United States v. Burke*,
504 U.S. 229 (1992) .................................................................. 56, 64

*United States v. Lee*,
455 U.S. 252 (1982) .................................................................. 50, 60, 61, 62

*United States v. Morrison*,
529 U.S. 598 (2000) ....................................................40

*United States v. Sterling*,
75 M.J. 407 (C.A.A.F. 2016)....................................................42

*United States v. Wilgus*,
638 F.3d 1274 (10th Cir. 2011)....................................................45

*Washington Cty. v. Gunther*,
452 U.S. 161 (1981) ....................................................73

*Watson v. Jones*,
80 U.S. 679 (1871) .................................................... 16, 18

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021)....................................................70

*Werft v. Desert Sw. Ann. Conf. of United Methodist Church*,
377 F.3d 1099 (9th Cir. 2004)....................................................62

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .................................................... 39, 40, 61

*Yniguez v. Arizona*,
939 F.2d 727 (9th Cir. 1991)....................................................1

**Statutes**

28 U.S.C. § 2403....................................................1

29 U.S.C. § 213.................................................... 57, 58

42 U.S.C. § 12113.................................................... 23, 24

42 U.S.C. § 2000bb.................................................... 30, 33

42 U.S.C. § 2000bb-1 .................................................... *passim*

42 U.S.C. § 2000bb-2 ....................................................31

42 U.S.C. § 2000bb-3 ....................................................35

42 U.S.C. § 2000e.................................................... 57, 58

42 U.S.C. § 2000e-1 .......... 2, 21, 58, 59

42 U.S.C. § 3613 .......... 38

52 U.S.C. § 20510 .......... 38

Md. Code Ann., Cts. & Jud. Proc. § 12-605 .......... 69

Md. Code Ann., State Gov't § 20-601 .......... 57

**Regulations**

29 C.F.R. § 1620.27 .......... 60

**Legislative History**

H.R. Rep. 103–88 (1993) .......... 32

S. Rep. No. 103–111 (1993) .......... 32, 34

**Other Authorities**

Article 36 of the Maryland Declaration of Rights .......... 11, 71, 72

Dan Friedman, *The Maryland State Constitution*

(Oxford Univ. Press, 1st ed. 2011) .......... 71

*E.E.O.C. Compliance Manual on Religious Discrimination* § C.1, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (Jan. 15, 2021) .......... 21–22

Ross, A., and McDermott, Jr., F., *The Equal Pay Act of 1963: A Decade of Enforcement*, Boston College Industrial and Commercial Law Review, Vol. 16, No. 1 (Nov. 1974) .......... 60

## INTRODUCTION

This is a straightforward case of discrimination. "An individual's homosexuality or transgender status is not relevant to employment decisions," *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 659-62 (2020), but because Plaintiff-Appellee John Doe—a non-ministerial employee—is a man married to a man, Defendant-Appellant Catholic Relief Services ("CRS") refused to provide him with the same compensation package that it provides to straight married employees.

To avoid liability, CRS asks the Court to expand First Amendment protections to give blanket immunity to religious employers whenever a religious defense is raised. Its interpretation of Title VII of the Civil Rights Act of 1967 ("Title VII"), the federal Equal Pay Act ("EPA"), and Maryland's Fair Employment Practices Act ("MFEPA") would allow it and other religious employers to create a subclass of employees who may be paid less than their peers. It and Intervenor U.S. Department of Justice ("Intervenor")[1] also ask this Court to ignore the plain language of the Religious Freedom Restoration Act ("RFRA") and

---

[1] The Department of Justice intervened pursuant to 28 U.S.C. § 2403(a), which confers standing upon the government to weigh in "on the question of constitutionality" of a challenged Act of Congress—nothing more. *See Yniguez v. Arizona*, 939 F.2d 727 (9th Cir. 1991), *vacated on other grounds by Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997). To the extent its arguments go beyond the constitutionality of Title VII and EPA, the Court should decline to consider them.

find that individual plaintiffs must stand in the shoes of the government and prove that complying with civil rights laws does not unduly burden a religious employer's religious exercise. For the reasons set forth below, this Court should reject CRS's and Intervenor's arguments and affirm.

## STATEMENT OF THE ISSUES

I. Whether the church autonomy doctrine prohibits courts from addressing any matter where a party generally asserts a religious defense unrelated to internal church governance.

II. Whether Title VII's § 702 exemption allowing religious employers to favor co-religionists in hiring permits religious organizations to make discriminatory compensation decisions on the basis of sex.

III. Whether RFRA, which prohibits the "[g]overnment" from substantially burdening a person's religious exercise, applies in litigation between private parties.

IV. Whether Title VII, EPA, and MFEPA are neutral and generally-applicable antidiscrimination statutes such that the enforcement of these statutes does not violate CRS's First Amendment rights.

V. Whether the district court correctly interpreted and applied the Supreme Court of Maryland's religious exemption under MFEPA in concluding that Doe's data analyst positions were "one or more steps removed" from effecting CRS's mission to serve the poor and vulnerable overseas.

## STATEMENT OF THE CASE

### I. CRS Hires Doe Under the Guise that "All Dependents Are Covered," Then Terminates His Dependent Health Benefits.

Doe is a gay man in a legally recognized marriage to another man. (JA1115). In 2016, Doe attended a job fair where he met CRS recruiter Anna Cowell. (JA925, JA955). Doe and Cowell discussed entry-level positions at CRS, namely, a data

analyst position that focused on facilitating select business functions within CRS's customized version of Salesforce—a business platform and project portfolio system called Gateway.[2] (JA1113). Doe was clear about his sexual orientation and asked whether CRS would provide health benefits to his same-sex spouse. (JA955, JA965, JA3037). Cowell responded: "[A]ll dependents are covered." (JA955, JA965). CRS hired Doe in June 2016 as an entry-level Program Data Analyst. (JA955, JA966).

Until his resignation from CRS in August 2024 (JA1115), Doe held various technology-focused positions. (JA956, JA1115-1116). His job duties were secular in nature. *See* (JA986). They entailed, among other things: reporting and data analytics; providing support to Gateway users; collaborating with other team members to develop content for trainings and presentations about Gateway and Salesforce; and making system enhancements to Gateway. *See* (JA1116-1118).

It is undisputed that Doe's job responsibilities concerning the improvement, enhancement, design, utilization, and training of Gateway mirror those of his straight, female colleagues who, like Doe, are married to men. (JA938). It is also

[2] Gateway is CRS's agency-wide data management software built on the Salesforce.com software. (JA1113). Doe was specifically hired to work on the "Pipeline and Projects" application within Gateway. Appellant's Br. 6 n.2. The "Pipeline and Projects" application is primarily used to track funding opportunities and collect information related to grant compliance. (JA1501-1508).

undisputed that, while Doe at times trained CRS employees on how to use and input data into Gateway, he never held a decision-making role, or any role, where he used that data to influence CRS's business operations. *See* (JA1108, JA1119, JA1124-1127).

Upon his hiring in June 2016, Doe enrolled his same-sex spouse in CRS's benefit enrollment system, which CRS approved. (JA925, JA956). Five months later, CRS's Benefits Manager informed Doe that CRS's approval was "in error." (JA956). CRS continued to provide Doe dependent benefits for over 16 months until CRS terminated them. (JA956-957). According to CRS, it terminated Doe's benefits because "it considers the provision of those benefits to be contrary to its Catholic values." (JA957).[3]

## II. Doe Obtains Summary Judgment on His Federal Claims and the Supreme Court of Maryland Interprets MFEPA's Religious Exemption to Apply Only to Employees Who "Directly" Further "Core Mission(s)."

On June 1, 2018, Doe timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("E.E.O.C."). (JA957). Doe received a right-to-sue letter on May 27, 2020, and filed a federal lawsuit

---

[3] CRS's contention that it offered Doe a "technical increase" as a substitute for equal dependent benefits is contradicted by the record. *See* (JA945) (finding at summary judgment that both CRS's former head of Human Resources and former Executive Vice President of Human Resources denied that the increase was tied to Doe's termination of benefits).

against CRS on June 12, 2020. (JA957). On cross-motions for summary judgment, the district court awarded summary judgment to Doe, concluding that CRS violated federal civil rights laws and discriminated against Doe on the basis of sex. (JA924-947).

Regarding Doe's Title VII claims, the court found that "Doe's sex was indisputably a but-for cause of CRS's employment action." (JA930). The court rejected CRS's arguments that it was not subject to Title VII, concluding "that none of CRS's arguments succeed and awarding summary judgment to Doe" on his Title VII claims. (JA930-931). The court noted—and CRS conceded—that the First Amendment's "ministerial exception" was "not at issue in this case." (JA931).[4]

Moreover, the court found that CRS violated the EPA. (JA937-938). Explaining that "[p]ay under the EPA includes the failure to provide equal health insurance benefits," the court concluded that affidavits submitted by Doe's straight, female colleagues—who were also married to men—established "a prima facie case of sex-discrimination under the federal EPA." (JA937-938). Notably, the court held that "CRS has not challenged this showing or addressed the EPA's subsequent burden shifting." (JA938).

[4] *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 181 (2012).

In granting summary judgment to Doe, the Court rejected all of the affirmative defenses that CRS raised. It held that: (1) the church autonomy doctrine did not apply because "this case concerns a social service organization's employment benefit decisions regarding a data analyst and does not involve CRS's spiritual or ministerial functions" (JA929); (2) "Section 702 does not apply because it does not exempt sex discrimination" (JA931); (3) "RFRA does not apply to suits between purely private parties" (JA932); and (4) no Free Exercise analysis was needed because Title VII is neutral and generally applicable (JA934).

The court certified three questions to the Supreme Court of Maryland concerning Doe's state law claims. (JA954). Relevant to this appeal, the Supreme Court of Maryland held that to avail itself of MFEPA's religious exemption, an employer must demonstrate that an "employee's duties … directly further the core mission(s) … of the religious entity." (JA994). The court provided non-exhaustive factors to be determined by a factfinder, including that the employee's "duties … are not one or more steps removed from taking the actions that effect the goals of the entity[.]" (JA994-995).

## III. The District Court Weighed the Evidence, Concluded that CRS Violated MFEPA, and Rejected CRS's Defenses.

After a three-day bench trial and post-trial briefing, the district court entered judgment in Doe's favor under MFEPA, (JA1104), making the following factual findings:

- “CRS’s mission is to serve the poor and vulnerable overseas.”

- “Most CRS employees ‘are not required to adhere to the Catholic faith[.]’”

- Opposite-sex spouses are entitled to CRS dependent health benefits.

- “Gateway houses information about CRS funding awards and solicitations, compliance data for fundraising projects overseas, CRS institutional donor customer relationship management, and CRS project-level and institutional data.”

- “Gateway, including its Pipeline and Projects application, does not deliver or connect aid to the poor and vulnerable overseas; it is also not a tool or form of aid provided to Participants.”[5]

- Doe previously “had experience working with Salesforce at secular companies.”

- Doe and his supervisor were in the best position to describe Doe’s duties.

- “Doe never input data into Gateway.”

- “While working on the Changing the Way We Care Team,[6] Doe had no direct contact with Participants.”

- “None of Doe’s positions were ‘ministerial,’ ‘representational,’ or ‘explicitly religious’ in nature.”

- “Doe did not provide direct humanitarian relief in any of his CRS roles.”

- “Doe did not work directly with donors in any of his CRS roles.”

[5] “‘Participants’ are individuals who receive CRS humanitarian aid.” (JA1109).

[6] “Changing the Way We Care” (“CTWWC”) is a CRS overseas program “‘designed to end the institutionalization of children’ and promote family-based care.” (JA1112).

- "Doe did not directly pursue funding opportunities on behalf of CRS in any of his roles."
- Doe never served on CRS's Board or its Executive Leadership Team that advised CRS's CEO.
- While Doe "contribute[d]" to CRS's determination of its goals, he "did not make decisions about how to implement CRS relief projects[.]"

(JA1108-1119).

In response to CRS's attempt to focus on the import of the data that Doe managed in Gateway, rather than the duties he performed related to maintaining the data, the court credited the testimony of Doe's colleagues who worked in similar positions. It noted that while "data is always beneficial … the information that you would get out of … Gateway is only as good as the information that goes into it. … [I]f Gateway ceased to exist, CRS would still be able to carry out its mission and do its work." (JA1123).

Based on its factual findings, the court applied the Supreme Court of Maryland's factors and concluded under the totality of circumstances that "Doe did not directly further a CRS core mission in any of his five positions held during his employment by CRS." (JA1122). "Doe's work on the Gateway Team was important and certainly benefitted CRS; nonetheless, his duties were … one or more steps removed from the actions that effect CRS goals." (JA1123). In his roles

with CRS's "MEAL Team" on the CTWWC program,[7] the Court found that Doe did not: secure or solicit funding; directly serve the poor and vulnerable overseas; make decisions impacting CRS's goals and mission; or directly work with aid recipients. (JA1126). Instead, "Doe's duties were focused on aiding CRS in its collection and reporting of data related to the" program. *Id.*

The court rejected CRS's arguments that MFEPA violates the First Amendment's Free Exercise Clause because CRS "fail[ed] to demonstrate that MFEPA is not generally applicable in its application to CRS" and it declined to reach CRS's strict scrutiny argument on that basis. (JA1136). The court reasoned that "a large, secular nonprofit" would be "subject to identical treatment under MFEPA," (JA1133-1134) and MFEPA's exemption, unlike the cases cited by CRS, "is categorical and statutory, not discretionary, in nature; it does not require State approval or disapproval." (JA1135).

The district court entered an order of judgment in Doe's favor and awarded him damages in the amount of $60,000. CRS timely appealed. (JA1137-1138).

## SUMMARY OF THE ARGUMENT

***First***, the church autonomy doctrine does not strip the Court of authority to hear every case where a religious defense is raised. Instead, it may consider the

[7] "MEAL ("Monitoring, Evaluation, Accountability, and Learning") is a framework that is not unique to CRS. (JA1114-1115).

evidence regarding CRS's discrimination without wading into religious doctrine, as Doe does not dispute the sincerity of CRS's religious belief and providing equal health benefits to hired employees implicates neither inner church governance nor associational concerns under the First Amendment.

***Second***, courts consistently reject the request CRS makes here: to expand Title VII's exemption that allows religious organizations to favor co-religionists in hiring and rule that the exemption gives them broader authority to hire individuals of all religions and then discriminate against them in compensation on protected bases. Section 702 does not permit discrimination on the basis of sex.

***Third***, RFRA—which dictates that the "[g]overnment shall not substantially burden a person's exercise of religion," 42 U.S.C. § 2000bb-1(a)—does not apply between private parties. CRS's position ignores RFRA's plain language, the majority of circuit courts' interpretation of that language, legislative intent, and common sense. Even if RFRA applied, CRS cannot show that Title VII or EPA substantially burdens its religious exercise and thus triggers strict scrutiny. Regardless, Doe prevails because the government has a compelling interest in enforcing Title VII and EPA, and such enforcement is the least restrictive means of achieving that interest.

***Fourth***, the statutes at issue do not violate CRS's First Amendment right to religious exercise. Title VII, EPA, and MFEPA are neutral and generally applicable. Even if they were not, the statutes survive strict scrutiny.

***Fifth***, the district court properly applied the Supreme Court of Maryland's MFEPA religious exemption test. This Court should defer to the district court's weighing of evidence because the question is one that hinges on a factual analysis—not a legal interpretation. Moreover, if MFEPA's religious exemption applied, it would violate Doe's rights under Article 36 of the Maryland Declaration of Rights.

## STANDARD OF REVIEW

CRS appeals both the district court's grant of summary judgment on Doe's federal claims and its decision on the application of MFEPA's exemption after a bench trial. The Court reviews the district court's grant of summary judgment in favor of Doe *de novo*. *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 407 (4th Cir. 2015).

As for the district court's decision following a bench trial on the MFEPA exemption, the Court should review it for clear error. "Generally, questions of law are reviewed *de novo* and questions of fact, for clear error, while the appropriate standard of appellate review for a mixed question 'depends ... on whether answering it entails primarily legal or factual work.'" *Monasky v. Taglieri*, 589

U.S. 68, 83-84 (2020) (citation omitted). Because cases applying totality-of-the-circumstances tests like MFEPA's religious exemption here present a task for fact-finders, and thus have a factual foundation, clear error review is appropriate. *Id.* at 84; *accord Buford v. United States*, 532 U.S. 59, 64-65 (2001) (where "factual nuance may closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details," deferential review is appropriate).

## ARGUMENT

### I. The Church Autonomy Doctrine Does Not Strip the Court of Authority to Remedy Sex-Based Discrimination.

#### A. The church autonomy doctrine does not afford religious defendants blanket immunity.

The church autonomy (or ecclesiastical abstention) doctrine—which CRS invokes here in an attempt to gain blanket immunity, Appellants' Br. 16-19—focuses on two issues not relevant to Doe's claims: (1) "the truth or falsity of [CRS's] religious beliefs," *see id.* at 19; and (2) matters of internal church government, *see, e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 717 (1976).[8]

---

[8] CRS claims that Doe's hiring of an expert "counter-theologian" and mentioning of the plus-one model is evidence that Doe is wading into the theological thicket. Not so. First, the expert and plus-one model are relevant ***only if*** RFRA applies, and even

The church autonomy doctrine protects religious institutions from government interference in *religious* decisions, but does not place business decisions beyond the reach of the law. *See Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 303-05 (1985). "When a civil dispute merely involves a church as a party … and when it can be decided without resolving an ecclesiastical controversy, a civil court may properly exercise jurisdiction." *Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002). As this Court has explained, "employment decisions may be subject to Title VII scrutiny[] where the decision does not involve the church's *spiritual* functions." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1170-71 (4th Cir. 1985) (emphasis added) (applying the ministerial exception).

"Unlike the ministerial exception, which completely bars judicial inquiry into protected employment decisions, the ecclesiastical abstention doctrine is a qualified limitation, requiring only that courts decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine.'" *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017). Because "churches are not—and should not be—above the law," *Rayburn*, 772 F.2d at

---

then, they are relevant only to the question of substantial burden, not the sincerity of CRS's religious belief. *See e.g.*, *Konikov v. Orange Cnty., FL*, 290 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003). Second, summary judgment was not decided on either of these points, so they need not be considered here.

1171, courts may review the "secular components" of disputes and do so by applying a neutral-principles-of-law approach. *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) (citing *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979)) ("So long as the court relies 'exclusively on objective, well-established [legal] concepts,' it may permissibly resolve a dispute even when parties are religious bodies.").

Contrary to CRS's and Intervenor's arguments, the doctrine does not bar the Court from deciding *every* case involving a religious institution or defense. *See Rayburn*, 772 F.2d at 1165; *O'Connell v. United States Conf. of Cath. Bishops*, 134 F.4th 1243, 1258 (D.C. Cir. 2025) ("The church autonomy doctrine protects against judicial interference in ecclesiastical matters; it does not provide religious organizations with a blanket immunity") (citing *Hosanna-Tabor*, 565 U.S. at 195 n.4); *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1112 (7th Cir. 2024); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) ("But '[t]he First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships") (citations omitted); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746-47 (2020) (explaining that the First Amendment's preclusion of state interference in matters of faith and doctrine "does not mean that religious institutions enjoy a general immunity from secular laws," but instead, it "protect[s]

their autonomy with respect to internal management decisions that are essential to the institution's central mission").

Courts routinely address matters peripheral to religion without delving into "the core of ecclesiastical concern." *Cf. Serbian*, 426 U.S. at 717; *Watson v. Jones*, 80 U.S. 679, 728 (1871). Indeed, courts evaluate claims and defenses like the ones here without wading into the "theological thicket." *E.g., Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008), *overruled on other grounds by Apache Stronghold v. United States*, 101 F. 4th 1036 (9th Cir. 2024) (requiring a party to "present evidence sufficient to allow a trier of fact rationally to find [that] … government action [would] 'substantially burden' the [party's] exercise of religion"); *Garrick*, 95 F.4th at 1112; *Goodman v. Archbishop Curley High Sch., Inc.*, 149 F. Supp. 3d 577, 586-88 (D. Md. 2016) (holding that plaintiffs may challenge a religious basis for discrimination as pretextual without violating employer's First Amendment rights); *Edley-Worford v. Va. Conf. of United Methodist Church*, 430 F. Supp. 3d 132, 138 (E.D. Va. 2019) (rejecting the ecclesiastical-abstention defense because case did not require "extensive inquiry ... into religious law and polity" and would not "disturb the decisions of the *highest ecclesiastical tribunal*" (emphasis in original)) (internal quotation omitted). Thus, "[w]hen a civil right depends upon an ecclesiastical matter, … the civil tribunal

tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them." *Watson*, 80 U.S. at 731.

The neutral-principles-of-law approach is not reserved only for "property disputes," as CRS insinuates. *Compare* Appellant's Br. 18 *with Rayburn*, 772 F.2d at 1171 (listing cases where Title VII applied to employment disputes involving religious institutions); *Richardson v. Northwest Christian Univ.*, 242 F. Supp. 3d 1132, 1146 (D. Or. 2017) (citing *Puri*, 844 F.3d at 1162) (rejecting ecclesiastical abstention argument in a Title VII case because there was "no need to pass judgment on questions of religious faith or doctrine in order to resolve plaintiff's claims" since they could "be resolved by applying ordinary principles of employment law") (internal quotation omitted); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 969 (9th Cir. 2004) (declining to apply church autonomy doctrine because Title VII asked only that "religious institutions honor their secular obligations not to sexually harass those who have been called to become ministers of their faiths"); *Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, 772 F.3d 1085, 1087, 1091 (7th Cir. 2014) (declining to intervene prior to trial because "[t]he district court ha[d] not ordered a religious question submitted to the jury for decision," rather, it "promised to instruct the jury *not* to weigh or evaluate the Church's doctrine regarding in vitro fertilization" in a matter involving a religious school's termination of a teacher).

In ruling on Doe and CRS's motions for summary judgment, the district court was not required to determine which party correctly interpreted the Bible or whether gay men belong in ministry. Instead, the district court accepted the Catholic church's beliefs as sincere but concluded that because "this case concerns a social service organization's employment benefit decisions regarding a data analyst," applying neutral and generally-applicable statutes did not implicate the church autonomy doctrine. (JA929-930).

### B. CRS's and Intervenor's arguments contort the doctrine's applicability and misconstrue the facts of this case.

It is undisputed that "[m]ost CRS employees 'are not required to adhere to the Catholic faith[.]'" (JA1108); *see also* (JA1050) ("CRS is not in the business of promoting the Catholic religion as a faith tradition that we believe that all people should be adopting."). Doe specifically disclosed that he was married to a man; CRS hired him and, for 16 months, provided him with dependent health benefits. (JA955, 966-967). Intervenor's arguments concerning the church autonomy doctrine contort the facts of this case. CRS is not being forced "to hire messengers and other personnel who do not share their religious views[.]" Intervenor's Br. 24.

Nor does this case involve individuals "'who unite themselves to [a religious] body … with an implied consent to' its internal system of 'government[.]'" *Id.* at 26-27 (quoting *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission,* 605 U.S. 238, 257 (2025)

(Thomas, J., concurring)). The cases CRS and Intervenor rely on involved voluntary association, which is not at issue in this case. *See id.* ("*First* is the right of association"); *see also* Intervenor's Br. 26 (citing *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (right to association case)). CRS did not cut ties with Doe like the organizations in *Catholic Charities Bureau* and *Boy Scouts of America*; instead, CRS—knowing Doe's marriage did not "submit to" the tenets of the Catholic faith, *Catholic Charities Bureau*, 605 U.S. at 257—continued to employ (and promote) Doe while discriminating against him in compensation because of his sex. (JA3551).

Intervenor's position that religious organizations must be permitted to "protect their 'autonomy with respect to internal management decisions that are essential to the institution's central mission,' … includ[ing] the right to 'select[] … the individuals who play certain key roles,'" Intervenor's Br. 21 (quoting *Our Lady*, 591 U.S. at 746), is similarly misplaced. *Our Lady* involves the ministerial exemption. It narrowly referred to decisions regarding teachers of religion and addressed employment contracts explicitly linking teachers' tenure with their obligation to "'model and promote' Catholic 'faith and morals'" and to further the school's mission to "promote a Catholic School Faith Community." 591 U.S. at 739-40. Here, it is undisputed that "CRS's mission is to serve the poor and vulnerable overseas" and Doe was not hired into a role that requires him "to adhere

to the Catholic faith." (JA1108). As CRS stipulated, "[n]one of Doe's positions were 'ministerial,' 'representational,' or 'explicitly religious' in nature." (JA1119).

Intervenor suggests that *any* decision made by a religious employer constitutes an "internal management decision[] that [is] essential to the institution's central mission," and every position is a "key role[]."[9] Intervenor's Br. 21. The Court should reject Intervenor's interpretation—particularly in a case involving health benefits where the trier of fact has already determined that the plaintiff's role was not central to the defendant's mission. (JA1122-1129).

*Bell v. Presbyterian Church,* 126 F.3d 328 (4th Cir. 1997), does not hold otherwise. *See* Intervenor's Br. 28-29. *Bell* involved the termination of a minister's position due to internal funding decisions in an interfaith organization with the mission to "promot[e] a public policy that reflects prophetic Jewish-Christian values." 126 F.3d at 329. The Court held that because the organization's decision may have been in an effort to "fulfill its discernment of the divine will for its ministry," and its "religious purpose [was] borne out by [its] engagement of [plaintiff] in its 'ministry,'" the decision fell "within the ecclesiastical sphere." *Id.*

---

[9] Intervenor claims, without citation, that the church autonomy doctrine "allows religious organizations to demand that *non-ministerial* employees also share the organization's religious doctrine and live out those beliefs." Intervenor's Br. 22. Not so. The church autonomy doctrine simply "protects against judicial interference in ecclesiastical matters," *O'Connell*, 134 F.4th at 1258, it does not dictate the confines of Title VII or the Free Exercise clause.

at 332-33. This case, on the other hand, does not involve (1) an entity with a religious mission, (2) the internal organization of such an entity, or (3) a ministerial role.

Taken to its logical conclusion, CRS and Intervenor would strip courts of their ability to hear any matter involving any claimed implication of religion—no matter how tangential. According to them, so long as the defendant claims a matter involves "spiritual functions,"[10] the court must look away. *See* Appellant's Br. 18. No court has applied the doctrine this broadly. *See, e.g.*, *Puri*, 844 F.3d at 1164; *accord Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 448 (1969).

Declining to adopt such a broad rule does not pose a "significant risk that the First Amendment will be infringed[.]" Intervenor's Br. 25 (quoting *Nat'l Labor Rel. Bd. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)). Any risk is mitigated by the court's weighing of evidence—allowing a case to proceed is not an automatic win for a plaintiff and there are other First Amendment safeguards available. *Cf. Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628 (1986) (holding that investigating the circumstances of an employee's

---

[10] For this proposition, CRS cites *Catholic Charities Bureau*, but there, the Court "addresse[d] only the denominational neutrality challenge raised by petitioners and [did] not reach the further two constitutional arguments considered by the Wisconsin Supreme Court[.]" 605 U.S. at 246, n.2.

discharge "violates no constitutional rights" and should be permitted "if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge.").

## II. Title VII's Section 702 Exemption Does Not Authorize Sex Discrimination.

Section 702 exempts "a religious corporation … with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by the corporation … of its religious activities …." 42 U.S.C. § 2000e-1(a). Thus, under Title VII, religious organizations are permitted to discriminate on the basis of *religion* in narrow circumstances. *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987) (citing 42 U.S.C. § 2000e-1(a)).

Section 702, however, "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *see also Rayburn*, 772 F.2d at 1166 ("While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin[.]"); *accord E.E.O.C. Compliance Manual on Religious Discrimination* § C.1, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (Jan. 15, 2021) ("Religious organizations are subject to the Title VII prohibitions against

discrimination on the basis of race, color, sex, [and] national origin."); *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 667 (6th Cir. 2000).

Recently, this Court reiterated its understanding that § 702 "operate[s] as a defense only to claims of *religious* discrimination—allowing religious institutions to favor *co-religionists* in hiring—and not to claims of race or sex discrimination." *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 322 (4th Cir. 2024) (emphasis in original) ("No federal appellate court in the country has embraced the … argument that Title VII permits religiously motivated sex discrimination by religious organizations."). This Court declined the defendant's invitation to "to step beyond existing precedent and significantly diminish Title VII's protections," and rejected the religious employer's argument that "if religion motivates an employment decision—even one that also discriminates based on sex … then Title VII no longer applies[.]" *Id.* at 324. It should do so again here.

CRS asks this Court to read this exemption to allow religious organizations to compensate employees differently based on their sex, even for employees in secular roles who are not required to comply with CRS's religious tenets. It has not identified a single case that reads § 702 so broadly. Instead, CRS relies on the absence of language both in relevant cases and in the statute itself to argue that its novel interpretation is valid. *See* Appellant's Br. 21-25. The non-binding, non-persuasive cases CRS cites exclusively involve the hiring and termination of

individuals "whose beliefs and conduct are [not] consistent with the employer's religious precepts." *See id.* at 22-23. CRS identifies no decision allowing discrimination against an employee on the basis of sex, particularly in the terms of their *continued* employment. *See E.E.O.C. v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986) (holding that even if "§ 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences," providing health insurance to married men and not married women on the basis of religious beliefs constitutes a violation of Title VII).

Nor does *Bostock* make any "assurance" to support CRS's argument. Appellant's Br. 24. *Bostock* highlighted that an express exemption for religious organizations already exists. *Compare id.* at 23 *with Bostock*, 590 U.S. at 681-82 ("[W]orries about how Title VII may intersect with religious liberties are nothing new; they even predate the statute's passage. As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations. § 2000e–1(a)."). CRS does not cite a single post-*Bostock* case interpreting Title VII in the way CRS requests.

Contrary to CRS's assertion, comparing Title VII to the Americans with Disabilities Act's ("ADA") religious exemptions supports Doe's interpretation—not CRS's. The ADA contains two explicit defenses for "religious entities." 42 U.S.C. § 12113(d)(1)-(2). The first clause mirrors Title VII's 702 exemption, and

the second clause, 42 U.S.C. § 12113(d)(2)—titled "Religious tenets requirement"—separately specifies that a "religious organization may require that all applicants and employees conform to the religious tenets of such organization." Importantly, no similar provision appears in Title VII. The distinction in these provisions demonstrates that Congress knows how to allow for discrimination on the basis of religious conduct when it intends to do so. In other words, CRS's argument would make subsection (2) redundant, because, according to CRS, it is already addressed by subsection (1). *See Discover Bank v. Vaden*, 396 F.3d 366, 369 (4th Cir. 2005) ("It is a classic canon of statutory construction that courts must give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous." (internal quotation and citations omitted); *contra* Appellant's Br. 24-25.

CRS posits that if it were not permitted to discriminate against a hired employee who does not adhere to Catholic teachings, then "an employee with a *Bostock*-type claim would avoid the exemption so long as the employee steered clear in its pleadings from any reference to 'religious' discrimination." Appellant's Br. at 24. In reality, it is CRS that attempts to transform Doe's sex discrimination case into one about religion—a danger commonly associated with attempts to expand § 702. *See Billard v. Charlotte Cath. High Sch.*, No. 3:17-CV-00011, 2021 WL 4037431, at *10 (W.D.N.C. Sept. 3, 2021), *rev'd and remanded*, 101 F.4th

316 (4th Cir. 2024) (providing example of how § 702's expansion "could lead to legal outcomes that completely erase Title VII's protections for protected groups working for religious institutions"); *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 995 (7th Cir. 2021) (Hamilton, J., dissenting) (same).

Indeed, CRS's "argument would let religious employers completely bypass Title VII liability, if they could prove their discrimination was related to a religious justification … eras[ing] protections against racial discrimination, sexism, gender discrimination, sexual orientation discrimination, and xenophobia by employers against hundreds of thousands of employees." *Billard*, 2021 WL 4037431, at *10 (stating that defendant's argument would mean that if it genuinely believed that "the Bible forbids interracial marriage," then, § 702 would allow it to terminate benefits for "an employee who married someone of a different race"). Decades of precedent demonstrate that courts will not allow religion to justify illegal discrimination. *Cf. Loving v. Virginia,* 388 U.S. 1, 3 (1967) (reversing and referencing that the trial judge who sentenced the Lovings stated: "The fact that [God] separated the races shows that he did not intend for the races to mix"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 595, 602 n.28 (1983) (upholding IRS's decision to revoke university's tax-exempt status over a policy that expelled students who "date outside their own race" because although the policy was based on "a genuine belief that the Bible forbids interracial dating and marriage,"

"however sincere the rationale may be, racial discrimination in education [was] contrary to public policy").

CRS attempts to assuage this concern by suggesting the Court apply a "pretext inquiry—akin to step three of the *McDonnell Douglas Corp. v. Green* framework"—to the employer's proffered religious rationale to determine if the religious beliefs are sincere. Appellant's Br. 25 (quoting *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529, 536 (7th Cir. 2023) (Brennan, J. concurring)). Yet, the broad interpretation of the church autonomy doctrine that CRS asks for would result in any pretext argument "running headlong into [a] theological debate." *See* Appellant's Br. 19; *id.* at 17 ("The lines [CRS] has drawn in its benefits programming are supported by authoritative Catholic teaching, but the Court cannot wade into this dispute"). In other words, CRS's argument would mean a *McDonell Douglas*-like analysis would be barred by the ecclesiastical abstention doctrine. This argument ignores Congress's intent to balance individual liberties and religious freedoms by creating statutory exemptions and defenses—*e.g.*, Title VII's exemption under § 702 and RFRA when the government is a party—that permit courts to apply secular laws to religious defendants while "protect[ing] their autonomy with respect to internal management decisions." *Our Lady*, 591 U.S. at 746.

Simply put, adopting CRS's position "would entail a reworking of Fourth

Circuit precedent to leave all employees of religious institutions subject to forms of discrimination previously—and in every other circuit—prohibited by Title VII." *Billard*, 101 F.4th at 328 n.6.

## III. RFRA Does Not Apply to Private Party Disputes and Any Burden to Provide Health Benefits Does Not Outweigh the Compelling Interest in Preventing Unlawful Sex Discrimination.

RFRA provides

> (a) In General. - *Government* shall not substantially burden a person's exercise of religion….
> (b) Exception. - *Government* may substantially burden a person's exercise of religion only if *it* demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.
> (c) Judicial Relief – A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*.

42 U.S.C. § 2000bb-1 (emphasis added). Given this clear language, "only one federal court of appeals has held that RFRA applies to a lawsuit between private parties, while all others to consider the question disagree."[11] *Billard*, 101 F.4th at

---

[11] CRS and Intervenor's claim that the Eighth and D.C. Circuits have created a "split" is incorrect. Appellant's Br. 26-27; Intervenor's Br. 15 (citing *E.E.O.C. v. Catholic University of America*, 83 F.3d 455 (D.C. Cir. 1996); *In re Young*, 141 F.3d 854 (8th Cir. 1998)). Whether RFRA applied in a suit between private parties was never presented to the court for review in either case. *Catholic University* involved the E.E.O.C. (a government entity), and the plaintiff's arguments were limited to constitutional grounds. *Id.* at 469. *Young* involved whether debtors' religious tithes could be recovered from a church in bankruptcy proceedings, and primarily

328 (comparing cases). Even if RFRA *did* apply,[12] CRS has not provided evidence that providing equal benefits to its employees in same-sex marriages would substantially burden its religious practices. Moreover, because the enforcement of comprehensive civil rights laws is the least restrictive means of achieving the government's compelling interest in preventing unlawful discrimination, CRS's defense fails on all fronts.

### A. This Court should follow the majority of courts and hold that RFRA is inapplicable to suits between private parties.

Relying on its straightforward plain language, the Sixth, Seventh, and Ninth Circuits have all rejected the argument that RFRA applies when the government is not a party. *See Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015); *Gen'l Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410-12 (6th Cir. 2010); *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837-43 (9th Cir. 1999).

Other courts have reached similar conclusions. *See Boggan v. Miss. Conf. of the United Methodist Church*, 222 Fed. App'x 352, 353 (5th Cir. 2007), *cert.*

---

addressed whether RFRA was constitutional as applied to federal laws in light of *City of Boerne v. Flores*, 521 U.S. 507 (1997). 141 F.3d at 857, 863.

[12] Even if applicable, RFRA only applies to the *federal* government because of limits on Congressional power, *Boerne*, 521 U.S. at 534-35, and thus would not be a defense to Doe's state law MFEPA claim.

*denied,* 552 U.S. 813 (2007) (affirming a district court decision that concluded RFRA does not apply to suits between private parties); *Billard*, 2021 WL 4037431 at *17 (listing district courts that have decided RFRA is limited to cases where the government is a party).

The Second Circuit's decision in *Hankins v. Lyght*, 441 F.3d 96, 104 (2d Cir. 2006), is an outlier. *See, e.g.*, *Tomic*, 442 F.3d at 1042 ("The [*Hankins*] decision is unsound. RFRA is applicable only to suits to which the government is a party."); *Listecki*, 780 F.3d at 737 ("The only circuit to analyze the issue and hold to the contrary did so in the limited situation when the government *could* have been a party, over a strong dissent, and has retreated from its holding." (Emphasis in original)); *Rweyemamu v. Cote*, 520 F.3d 198, 201 & n.2 (2d Cir. 2008) (explaining that the Second Circuit itself does "not understand how [RFRA] can apply to a suit between private parties").

Nevertheless, CRS and Intervenor invite this Court to expand RFRA to private parties by ignoring plain statutory language, defying the Court's precedent, diverging from the majority of courts, and redefining what it means to be a state actor. The Court should decline that invitation.

**1. RFRA's unambiguous language requires the government to be a party.**

When the meaning of a statute's language is unambiguous, a court should apply the plain and ordinary meaning of the terms. *Bostock*, 590 U.S. at 674.

RFRA's text prohibits only government action: the "*[g]overnment* shall not substantially burden a person's exercise of religion," 42 U.S.C. § 2000bb-1(a) (emphasis added); the "*[g]overnment*" must demonstrate that any substantial burden is narrowly tailored to a compelling governmental interest, *id.* § 2000bb-1(b) (emphasis added); RFRA authorizes "appropriate relief against *a government*," *id.* § 2000bb-1(c) (emphasis added).

"The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party." *McGill*, 617 F.3d at 410; *see also id.* at 411 (quoting § 2000bb(b)) (purpose of RFRA is "to provide a claim or defense to persons whose religious exercise is substantially burdened by government"); *accord Bostock*, 590 U.S. at 682 (stating that RFRA "prohibits the federal government from substantially burdening a person's exercise of religion"); *Billard*, 101 F.4th at 328.

In *Hankins*, then-Judge Sotomayor noted in dissent that two provisions of RFRA "limit its application to disputes in which the government is a party." 441 F.3d at 114 (Sotomayor, J. dissenting). ***First***, "section 2000bb–1(b) of RFRA provides that where a law imposes a substantial burden on religion, the '*government*'" must "demonstrate" "'that application of the burden' is the least restrictive means of furthering a compelling governmental interest." *Id.* at 115 (emphasis in original). "The statute defines 'demonstrate' as 'meet[ing] the

burdens of going forward with the evidence and of persuasion.' 42 U.S.C. § 2000bb–2(3). Where, as here, the government is not a party, it cannot 'go[] forward' with any evidence." *Id.* The only ways to reconcile this provision with the *Hankins* majority's opinion that RFRA applied between private parties would be (1) "to require government intervention in every private suit where one of the parties asserts that a law has—even incidentally—imposed a substantial burden on religious freedom" or (2) "to force private parties to bear the burden RFRA places on the government." *Id.* at n.8. Neither of these options is appropriate, however, because (1) "[a]bsent a clear statement that Congress intended such a result, it is not the role of this Court to mandate such widespread and automatic federal intervention in lawsuits between private parties" and (2) RFRA "gives no indication that Congress intended private parties to bear such a burden, nor would it be appropriate to require private parties to satisfy the stringent burden RFRA places on the government." *Id.*

***Second***, § 2000bb–1(c) states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a *government*." (Emphasis in original). Supposing Intervenor were right that, in this clause, "the phrase 'against a government' … modifies 'obtain appropriate relief,"

Intervenor's Br. 16, it does not explain how a party would be able to obtain relief against an entity (the government) that was not a party to the suit.

**2. Congress intended for RFRA to apply only in cases involving the government.**

Even if RFRA's language were ambiguous, its legislative history affirms that it applies only to government parties. "In describing RFRA's purpose, the [Report from the Committee on the Judiciary] refers to 'government actions,' 'only governmental actions,' and 'every government action.'" *Listecki*, 780 F.3d at 737 (quoting S. Rep. No. 103–111, at 8–9 (1993), *as reprinted in*, 1993 U.S.C.C.A.N. 1892, 1894)). Further:

> All of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party. The lack of even a single example of a RFRA claim or defense in a suit between private parties in these Reports tends to confirm what is evident from the plain language of the statute: It was not intended to apply to suits between private parties.

*Hankins*, 441 F.3d at 115 n.9 (Sotomayor, J. dissenting) (citing S. Rep. No. 103–111 (1993); H.R. Rep. 103–88 (1993)); *accord McGill*, 617 F.3d at 411 ("RFRA's legislative history supports our view that Congress did not intend the statute to apply against private parties," highlighting examples in Senate reports referring to lawsuits and hypothetical situations involving the government as a party).

It is undisputed that part of Congress's purpose in passing RFRA was "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398

(1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)" and override the decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). 42 U.S.C. § 2000bb(a)-(b); *see also* Appellant's Br. 27; Intervenor's Br. 13-14. Yet CRS and Intervenor omit that *Sherbert* and *Yoder* were cases against *government* officials, *i.e.*, members of the South Carolina Employment Security Commission and the State of Wisconsin. *Sherbert*, 374 U.S. at ; *Yoder*, 406 U.S. at 207; *see also Smith*, 494 U.S. at 883 (stating that the Court had "never invalidated any governmental action on the basis of the *Sherbert* test except the denial of unemployment compensation"). Although CRS contends the test "applied to private-party litigation" in *McDaniel v. Paty*, it omits that the case was originally "remanded to cure the deficiency of failure to make the Attorney General of Tennessee a party." *Paty v. McDaniel*, 547 S.W.2d 897, 901 (Tenn. 1977), *rev'd*, *McDaniel v. Paty*, 435 U.S. 618 (1978). Thus, it is CRS's interpretation that would run counter to *Yoder* and *Sherbert*—not that of Doe and the majority of courts resolving the issue. *See Smith*, 494 U.S. at 883 ("Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest.").

RFRA's inapplicability in limited situations does not mean it provides *less* protection than existed previously, as Intervenor contends. *Compare* Intervenor's Br. 9 *with Brzonkala v. Va. Polytech. Inst. & State Univ.*, 169 F.3d 820, 881-82 (4th Cir. 1999) ("[RFRA] created a right of religious exercise that was more

generous than that right protected by the Constitution"), *aff'd sub nom. United States v. Morrison*, 529 U.S. 598 (2000). Instead, it did exactly what it was intended to do. *Cf.* S. Rep. No. 103-111, 9 ("[T]he compelling interest test generally should not be construed more stringently or more leniently than it was prior to *Smith*.").

CRS and Intervenor's claim that RFRA would result in an absurdity if it were limited to "cases litigated by the E.E.O.C." is unfounded. Appellant's Br. 29; Intervenor's Br. 14. ***First***, it would hardly be "anomalous" for Congress to have allowed a defendant to raise RFRA against the E.E.O.C. but not a private plaintiff. *See* Appellant's Br. 29-30; Intervenor's Br. 14. Congress may very well have provided a defense that gives religious entities protection from the power and resources of the government (the entity subject to the commands of the Free Exercise Clause), while not conferring that "advantage" over individual employees. *See Billard*, 2021 WL 4037431, at *20-21 ("The Court concludes that the alleged undesirable policy consequence of having a different standard for private and government enforcement can hardly be called absurd.").

***Second***, CRS's argument that such a "super statute" cannot have been intended to apply only in a "tiny fraction" of cases brought by the E.E.O.C., Appellant's Br. 28-29, ignores that employment cases are only a sliver of the cases in which RFRA is raised. *See, e.g.*, *Little Sisters of the Poor Saints Peter and Paul*

*Home v. Pennsylvania*, 591 U.S. 657 (2020) (healthcare); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (criminal defense); *Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022) (prisons); *United States v. Sterling*, 75 M.J. 407 (C.A.A.F. 2016) (military); *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (land use). It also ignores that there are employment cases where RFRA would apply even without E.E.O.C.'s involvement, such as those involving other government agencies. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

The proper party to address the arguments CRS makes concerning RFRA is the government, where appropriate. CRS may not require Doe—a private citizen—to shoulder the government's burden.

**3. RFRA cannot require the judiciary or private plaintiffs to "stand in the government's shoes."**

The Court should also reject Intervenor's argument that the judiciary or a private party availing itself of civil rights protections is a "government actor." Intervenor's Br. 18-19. Intervenor cites no authority for such a change in the way the judicial-legal system operates, and statutory interpretation counsels against such a finding that would result in an absurdity.

***First***, § 2000bb-3 undercuts CRS and Intervenor's arguments. CRS and Intervenor acknowledge that RFRA applies "to all Federal law, and the *implementation* of that law…." § 2000bb-3, Applicability (emphasis added). Only

the legislative and executive branches of a government may *implement* a law. *Cf. Harrell v. Donahue*, 638 F.3d 975, 983 (8th Cir. 2011) ("RFRA … provides that the Government cannot *impose* a law that substantially burdens a person's free exercise of religion." (emphasis added)). Conversely, the judiciary is typically considered to *adjudicate*. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160 (2010); *Mistretta v. United States*, 488 U.S. 361, 383 (1989) (noting the Supreme Court's "expressed" vigilance "that the Judicial Branch neither be assigned nor allowed tasks that are more properly accomplished by [other] branches" (citation omitted)). Although the judiciary may be involved in the *enforcement* of Title VII and EPA, it is not involved in its *implementation*, as the two terms are not synonymous. *See, e.g.*, *City & Cnty. of San Francisco, Ca. v. Env't Prot. Agency*, 604 U.S. 334, 347 (2025) (defining "implement" and distinguishing it from "enforcement"); *Malm v. U.S. I.N.S.*, 16 Fed. App'x 197, 202 (4th Cir. 2001) ("A treaty that is not self-executing is enforceable only to the extent that it is implemented by Congress."); *Edison Elec. Inst. v. U.S. Env't Prot. Agency*, 996 F.2d 326, 333 (D.C. Cir. 1993) (distinguishing between the "enforcement" of a statute and its "implementation").

***Second***, neither CRS nor Intervenor address how a court—as the government actor—could "go forward" with evidence, let alone require Doe to stand in the government's shoes to do so. *See* 42 U.S.C. § 2000bb-2(3). Without

citing authority, Intervenor speculates that § 2000bb-2(3) could be "read as requiring the *court* to conclude that enforcing the statute against that defendant would be the least restrictive means to further a compelling government interest." Intervenor's Br. 18. But a court's role in weighing evidence is vastly different from the task of "going forward with the evidence" and taking on the burden to "persua[de]." *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 n.4 (2011) (distinguishing "burden of production" and "persuasion" from "burden of proof").

***Third***, CRS and Intervenor offer no explanation for how "[a] person whose religious exercise has been burdened" would assert RFRA as a claim or defense *in a judicial proceeding* to "obtain appropriate relief against" *the judiciary*, as stated in § 2000bb–1(c)—a sub-section titled "Judicial relief." Holding that RFRA applies to suits between private parties would place more burden on the government by requiring it to intervene in every case in which RFRA is raised because "[a] private party cannot step into the shoes of the 'government' and demonstrate a compelling governmental interest and that it is the least restrictive means of furthering that compelling governmental interest." *Listecki*, 780 F.3d at 736; *see United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (expressing the significant onus RFRA places on the government).

***Fourth***, Intervenor's argument that a private plaintiff bringing suit under a federal statute acts "under the color of law," Intervenor's Br. 18-19, ignores the

longstanding principle that "[p]rivate use of state-sanctioned private remedies or procedures does not rise to the level of state action." *Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) (stating that state action "may be found" in rare cases where "private parties make use of state procedures with the overt, significant assistance of state officials"); *see also Dennis v. Sparks*, 449 U.S. 24, 28 (1980) ("[M]erely resorting to the courts and being on the winning side of a lawsuit does not make a party [a state actor]."). If Intervenor were correct that asserting a federal claim transformed a private citizen into a state actor, there would be no need for statutes to create private rights of action. *See, e.g.*, 42 U.S.C. § 3613 ("Enforcement by private persons"); 52 U.S.C. § 20510(b) ("Private right of action").

Because "only one federal court of appeals has held that RFRA applies to a lawsuit between private parties … what exactly it would mean to expand RFRA's scope so dramatically is largely untested and difficult to anticipate." *Billard*, 101 F.4th at 328. This Court should hold, consistent with the majority of courts, that RFRA does not apply between private parties.

### B. Even if RFRA applied, CRS failed to adduce evidence to establish substantial burden or that Title VII and EPA's enforcement is not the least restrictive means of combating sex discrimination.

Even if this Court finds that RFRA applies (it does not), CRS's defense still fails. To assert a viable RFRA defense, a religious claimant first must demonstrate

that the government action at issue *substantially* burdens a sincere religious exercise, *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 585 (6th Cir. 2018) (citing *Gonzales*, 546 U.S. at 428)—a showing CRS has not made on this record. CRS's defense further fails because laws prohibiting discrimination against non-ministerial employees are the least restrictive means of furthering the government's compelling interest to combat employment discrimination. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396 (4th Cir. 1990); *accord* 42 U.S.C. § 2000bb–1.

**1. CRS cannot show that providing Doe with equal benefits—as it did for over 16 months—would substantially burden its religious exercise.**

RFRA provides that "Government shall not *substantially burden* a person's exercise of religion." 42 U.S.C. § 2000bb-1(a) (emphasis added). "[N]ot every interference with conduct motivated by a sincere religious belief constitutes the substantial burden that RFRA prohibits." *Sterling*, 75 M.J. at 417 ("[H]aving restraints placed on behavior that is religiously motivated does not necessarily equate to either a pressure to violate one's religious beliefs or a substantial burden on one's exercise of religion."). "To make religious motivation the critical focus is … to read out of RFRA the condition that only *substantial* burdens on the exercise of religion trigger the compelling interest requirement." *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (emphasis added).

Instead, the Court must discern "whether the regulation at issue 'force[d a defendant] to engage in conduct that their religion forbids or … prevent[ed] them from engaging in conduct their religion requires.'" *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (citation omitted); *see also Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 391 (1990) (finding that there was no evidence to support that paying a generally applicable tax violated appellant's religious beliefs) (citations omitted)).

To the extent reached, CRS's RFRA defense fails on the merits because supplying Doe spousal benefits (1) does not equate to forced endorsement of his marriage, (2) as a matter of law is too attenuated from the illicit immoral activity CRS takes issue with, and (3) only speculatively affects the opinions of third parties.

**a. As a matter of law, providing Doe with the same benefits as his peers does not equate to forced endorsement of Doe's marriage.**

Compliance with Title VII and EPA does not equate to forced endorsement of Doe's marriage. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Inst. Rts.*, 547 U.S. 47, 52 (2006) (holding that requiring a college to allow military recruiters on campus in compliance with an equal access policy did not constitute an endorsement of the military's view on sexual orientation). Providing benefits to same-sex spouses did not "actually assist or facilitat[e]" Doe's marriage because

the marriage is lawful, independent of CRS's involvement. *See R.G.*, 884 F.3d 589; *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 841-42 (1995) (holding that requiring a state university to provide funds equally to both religious and secular student publications did not constitute support for students' religious messages). Indeed, the provision of spousal benefits to an employee is no more an endorsement of an employee's marriage than paying taxes is an endorsement of government spending. *Cf. United States v. Lee*, 455 U.S. 252 (1982); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 564 (2005).

In *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, the employer argued that permitting a transgender employee "to represent herself as a woman would cause [the employer] to 'violate God's commands' because it would make him 'directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift.'" 884 F.3d at 588. The Sixth Circuit acknowledged that the employer's belief constituted "an honest conviction," but nonetheless held "that, as a matter of law, tolerating [the employee's] understanding of her sex and gender identity is not tantamount to supporting it."[13] *Id.* The same is true here.

---

[13] Notably, *Bostock* involved three consolidated cases—one of which was *E.E.O.C. v. R.G. See Bostock*, 590 U.S. at 653-54. CRS claims that *Bostock* left the door open to address religious protections, Appellant's Br. 2, but the Supreme Court declined to walk through that door by not addressing the issue in that case.

Unlike *Fulton v. City of Philadelphia*, where a religious foster care agency was required to "certify[] a family" as suitable for raising a child, 593 U.S. 522, 529-30 (2021), CRS need not provide a stamp of approval on Doe's legal union to comply with the law. Doe seeks nothing more than to have CRS provide dependent benefits to employees' spouses when their partnerships are recognized by the state, as it did for 16 months. Thus, "preventing the sex discrimination" here has "no significant impact on [CRS's] religious beliefs or doctrines." *Fremont Christian Sch.*, 781 F.2d at 1368.

**b. This Court has rejected the argument that religion is substantially burdened when a religious tenet is too far removed from the provision of employment benefits.**

Where the "requirements at issue do not cut to the heart of [the religious beliefs]" the burden on those religious beliefs is "limited." *Dole*, 899 F.2d at 1397. Here, CRS does not posit that providing health benefits to same-sex spouses is a sin. Rather, the policy against provision of such benefits is rooted in its religious belief that marriage is between one man and one woman. Appellant's Br. 5-6. The sin that CRS seeks to avoid condoning is sexual relations outside of a heterosexual marriage. (JA3110-3111). But CRS' provision of spousal benefits has no effect on that purported sin.

This Court considered a similar issue in *Dole* and rejected the idea that paying women equal to men was a substantial burden on the church's religious

beliefs because the disparate pay policy at issue was too far removed from the religious tenet upon which the belief was based. This Court acknowledged that the disparate pay policy was "grounded on a biblical passage" that the "husband is the head of the house." *Dole*, 899 F.2d at 1392, 1397. However, "church members testified that the Bible does not mandate a pay differential based on sex. They also testified that no Shenandoah doctrine prevents Roanoke Valley from paying women as much as men or from paying the minimum wage." *Id.* at 1397. Likewise, although CRS's policy barring the provision of benefits to same-sex spouses may be "grounded on" the sincerely held religious belief that marriage is between a man and a woman, providing the benefits in a non-discriminatory manner does not "cut to the heart of" that religious belief. *Id.* ("The fact that Roanoke Valley must incur increased payroll expenses to conform to FLSA requirements is not the sort of burden that is determinative in a free exercise claim.").

Doe was married to a man prior to beginning at CRS. (JA1115). CRS nevertheless provided spousal benefits for 16 months—most of which were after recognizing its purported mistake. (JA1008-1009); *accord Dole*, 899 F.2d at 1397-98. There is no evidence that supplying those benefits had any effect on illicit sexual activity within Doe's marriage and therefore there is no evidence to establish a substantial burden under RFRA.

#### c. Speculative perceptions of others cannot establish substantial burden.

CRS argues that "scandal" occurs if CRS's "actions would 'lead a third party to believe'" that CRS "agrees with the evil acts of" Doe. Appellant's Br. 32 (quoting JA3554). Again, as a matter of law, CRS's argument fails.

Courts will not "allow the preferences and prejudices of [third-parties] to determine whether the sex discrimination [is] valid." *R.G.*, 884 F.3d at 586 (quoting *Diaz v. Pan Am. World Airways, Inc*., 442 F.2d 385, 389 (5th Cir. 1971)); *cf. Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276 (9th Cir. 1981) (holding that customers' preferences cannot transform a person's sex into a relevant consideration for an employment decision, even if evidence shows that the employer's business would suffer as a result); *DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009) (rejecting argument that "ban on encoded writing infringes upon" a person's religious exercise "because other patients might obtain and read his journals" and finding that "speculation of this sort does not constitute the sort of evidence necessary to establish a substantial burden"). Like the college students in *Rumsfeld*, Catholics are able to "appreciate the difference between speech [an organization] sponsors and speech the [organization] permits because legally required to do so, pursuant to an equal access policy." *Rumsfeld*, 547 U.S. at 65.

Courts have rejected CRS's attempt to distinguish between a "public union between persons of the same sex, and nonpublic (or at least nonobvious) lifestyle

choices, such as a remarriage without annulment or conception of a child through in vitro fertilization." Appellant's Br. 34-35. For example, in *Cline*, a Catholic school terminated an unmarried teacher's contract upon seeing that she had become pregnant because "[t]he Church [did] not uphold sexual intercourse outside of marriage." 206 F.3d at 656. The Sixth Circuit held that relying on the outward showing of a pregnancy violated Title VII because "it punishes only women for sexual relations because those relations are revealed through pregnancy." *Id.* at 667 (listing cases that relied on the same reasoning); *accord Fremont Christian Sch.*, 781 F.2d at 1368 (finding that if providing married female employees life insurance and disability benefits did "not undermine the School's religious goals then it is inconceivable that providing health benefits" would be a burden).

The same logic applies here. Although other employees in opposite-sex marriages are engaging in marital practices that violate the Catholic church's beliefs (e.g. "remarriage without annulment or conception of a child through in vitro fertilization"), only homosexuality is revealed through the administrative process for enrolling in insurance. In other words, CRS's policy punishes only employees in same-sex marriages. As a result, this Court can and should conclude, without wading into the "theological thicket," such a practice, like in *Cline*, violates Title VII.

#### 2. Any substantial burden is justified because equal protection laws are the least restrictive means of furthering Congress's compelling interest in eradicating discrimination.

"The final inquiry under RFRA is whether there exist 'other means of achieving [the government's] desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *R.G.*, 884 F.3d at 593 (citing *Burwell*, 573 U.S. at 728). Even if (1) RFRA applied and (2) CRS could demonstrate substantial burden, the defense still fails because there is a compelling interest behind antidiscrimination laws and no less restrictive means of achieving that interest are available. *See Dole*, 899 F.2d at 1398 ("Against what is, at most, a limited burden to Shenandoah's free exercise rights, we must weigh the reasons for applying both the minimum wage and equal pay provisions of the FLSA to Roanoke Valley. These reasons must be compelling.").

##### a. The government has a compelling interest in eradicating discrimination based on sexual orientation.

It is well settled—in the Fourth Circuit and beyond—that the government has a compelling interest in eradicating discrimination with laws like Title VII and the EPA. *Dole*, 899 F.2d at 1398 (finding that Congress's purpose in supporting equal pay was an "interest[] of the highest order" (citation omitted)); *Rayburn*, 772 F.2d at 1168; *accord United States v. Burke*, 504 U.S. 229, 238 (1992) ("It is beyond question that discrimination in employment on the basis of sex, race, or any of the other classifications protected by Title VII is … an invidious practice

that causes grave harm to its victims."); *R.G.*, 884 F.3d at 590; *E.E.O.C. v. Miss. Coll.*, 626 F.2d 477, 488 (5th Cir. 1980). Such a widely-recognized interest "of the highest order"—eradicating discrimination and supporting equal rights and pay in the workforce—justifies even a substantial religious burden. *Dole*, 899 F.2d at 1396, 1398; *accord Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).

The prohibition against sex discrimination has been held "to override other constitutional rights." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625-30 (1984) (holding that even if admitting women would substantially burden Jaycees' members' First Amendment rights, those rights were outweighed by government's interest in eradicating sex discrimination). Nevertheless, based on a misreading of *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), and *Fulton*, 593 U.S. 522, CRS claims that "[t]he Supreme Court has never found a government interest in eradicating sexual orientation discrimination to override other constitutional rights." Appellant's Br. 37. Not so. Sexual orientation discrimination is discrimination on the basis of sex. *Bostock*, 590 U.S. at 683; *see also Fulton*, 593 U.S. at 542 (citation omitted) (stating that the City's interest "in the equal treatment of prospective foster parents … is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'"); *Masterpiece Cakeshop, Ltd. v. Col. C.R. Comm'n*, 584 U. S. 617, 631 (2018) ("Our society has come to the

recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts.”).

In any event, neither *Fulton* nor *303 Creative* addressed that issue. Instead, *Fulton* was decided in favor of the plaintiff because the defendant did not offer any “compelling reason why it has a particular interest in denying an exception to CSS while making them available to others[.]” 593 U.S. at 542. And *303 Creative* involved speech compelled by a public accommodations law, and did not conduct a complete burden analysis. 600 U.S. at 596.

CRS faults Doe for not offering a “a compelling reason” as to “why the government would have a ‘particular interest in denying an exception’ to [CRS] ‘while making them available to others.’” Appellant’s Br. 39 (quoting *Fulton*, 593 U.S. at 542). Again, CRS ignores that Doe cannot and is not required to stand in the shoes of the government. Nevertheless, relevant cases are instructive on the government’s interest.

***First***, concerning the harm to Doe, “[f]ailing to enforce Title VII” in an individual case “would be allowing a particular person … to suffer discrimination, and such an outcome is directly contrary to the … compelling interest in combating

discrimination in the workforce." *R.G.*, 884 F.3d at 591; *see also* (JA452) (executive order creating commission to study sexual orientation discrimination in Maryland because such discrimination, without recourse, causes "personal hardships such as economic loss, physical and emotional stress and illness, and the State suffers a grievous harm"). That is, the compelling interest in declining to afford CRS yet *another* exemption is avoiding the deprivation of dignity Doe experienced in his compensation for a non-ministerial position. *See Roberts*, 468 U.S. at 625 ("[Sex discrimination] both deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life."); *see also* (JA3853; JA3976, JA4273, JA4279-4285) (discussing individual harms Doe experienced).

***Second***, courts have articulated the harm that granting additional exemptions to large statutory schemes for religious organizations would cause to the government's compelling interests. For example, in *Lee*, the Supreme Court held that the Amish could not be granted a religious exemption from contributing to the social security system. 455 U.S. at 259. In addressing "whether accommodating the Amish belief will unduly interfere with fulfillment of the governmental interest," it explained: "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good." *Id.* at 259-60; *see also id.* at 261 ("Granting an exemption from social

security taxes to an employer operates to impose the employer's religious faith on the employees."). "Because many government policies incidentally burden religious practice, routinely exempting citizens from laws meant to apply to everyone would risk 'permit[ting] every citizen to become a law unto himself.'" *Spivack v. City of Philadelphia*, 109 F.4th 158, 166 (3d Cir. 2024) (quoting *Smith*, 494 U.S. at 879).

The same is true here. CRS is a multinational organization; it has chosen to base its business in a country that prioritizes equality in employment and must operate within the statutory system that is binding on employers of its size (religious and secular alike). Like in *Lee*, where Congress exempted the self-employed Amish from the social security tax, Congress *has* carved out exemptions from Title VII for religious employers—and CRS is and was welcome to exercise its right to that exemption and hire only co-religionists.

But "[u]nlike the situation presented in *Wisconsin v. Yoder*, it would be difficult to accommodate the comprehensive [statutory scheme ensuring equal rights of employees] with myriad exceptions flowing from a wide variety of religious beliefs." *Lee*, 455 U.S. at 259-60; *see also Adams v. Comm'r*, 170 F.3d 173, 180 (3d Cir. 1999) (relying on *Lee* to reject arguments that additional exemptions were required to the income tax system to accommodate litigant's religious exercise); *U.S. Dep't of Lab. v. Shenandoah Baptist Church*, 707 F. Supp.

1450, 1460 (W.D. Va. 1989), *aff'd sub nom. Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) ("[T]he government has a 'great' interest in enforcing the minimum wage laws uniformly. The same can be said of uniformly enforcing the equal pay provisions."). Because the compelling interest in eradicating workplace discrimination based on sex "is of such a high order," CRS's religious beliefs "afford no basis" for permitting sex discrimination. *See Lee*, 455 U.S. at 258. Granting the type of additional exemptions CRS requests "would impede the Title VII objective of eliminating workplace discrimination[.]" *Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004). Accordingly, CRS fails to rebut the compelling interests at stake.

**b. There are no less restrictive alternatives to enforcing anti-discrimination laws, particularly where religious exemptions already exist.**

To date, no court has accepted any viable, less restrictive "alternatives" to Title VII or the EPA, and any effort to find one would be "futile because enforcing [such laws] is itself the least restrictive way" to further the government's interest in eradicating sex discrimination from the workplace. *R.G.* , 884 F.3d at 594; *accord Dole*, 899 F.2d at 1398 ("Congress has here created a comprehensive statute, and a less restrictive means of attaining its aims is not available."). This is particularly true because exceptions for religious organizations and ministerial employees—inapplicable here—already exist. *Redhead v. Conf. of Seventh-Day Adventists*, 440

F. Supp. 2d 211, 220 (E.D.N.Y 2006) (explaining that the judicially-crafted exceptions to Title VII protect against the First Amendment concerns addressed under a RFRA analysis); *Rayburn*, 772 F.2d at 1169 (accepting Title VII's tailoring because it is "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school").[14]

In this case, the harm CRS's discrimination caused Doe demonstrates why granting an additional exemption to CRS would not be a less restrictive alternative. CRS maintains that because it provided Doe a "technical increase,"[15] enforcement of Title VII is not "the least restrictive means" of advancing Doe's right to be free of discrimination. Appellant's Br. 38 (citing JA3361). But testimony of Doe and his therapist details the non-monetary harm that CRS's discrimination caused, demonstrating that the increase does not truly satisfy the compelling interest in

---

[14] By contrast, *Burwell* involved a different government interest concerning regulations under the Affordable Care Act. 573 U.S. at 688-89. The Court held that there were less restrictive ways for the government to promote its interest in "guaranteeing cost-free access to the four challenged contraceptive methods." *Id.* at 728 (finding plaintiff's proposed alternative "would certainly be less restrictive of the plaintiffs' religious liberty, and HHS has not shown … that this is not a viable alternative.").

[15] Yet CRS representatives expressly denied that the technical increase was related to Doe's termination of benefits, (JA945; JA4234-4236; JA3958-3962), and CRS's internal documents define it as a "salary adjustment." (JA4240). *See also, supra* n.3. CRS's Executive Vice President of Human Resources acknowledged that the additional funds would not cover all medical expenses. (JA926-927).

eradicating *the harms of discrimination*. (JA3853; JA3976, JA4025, JA4273, JA4279-4285). Indeed, CRS's "alternative" does nothing to address the "grave harm" caused by the "invidious practice" and "demeaning influence" of discrimination in employment, nor does it satisfy "the goals of human dignity and economic equality in employment" that Title VII and EPA intend. *Burke*, 504 U.S. at 238; *Christian v. Umpqua Bank*, 984 F.3d 801, 814 (9th Cir. 2020) (quoting *King v. Hillen*, 21 F.3d 1572, 1582 (Fed. Cir. 1994)); *R.G.* , 884 F.3d at 591.

In sum, the Supreme Court has declined to hold that RFRA can be used as a shield "to escape legal sanction" for discrimination in employment decisions. *See Burwell*, 573 U.S. at 733. This Court should too.

## IV. Title VII, EPA, and MFEPA Are Neutral and Generally Applicable Antidiscrimination Statutes that Do Not Violate CRS's First Amendment Rights.

The U.S. Supreme Court has declined to apply a strict scrutiny analysis to "neutral and generally applicable" laws that allegedly burden religion. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993).

CRS argues that enforcement of the antidiscrimination statutes at hand violates its First Amendment right to exercise of religion because these laws do not pass strict scrutiny. Appellant's Br. 49-56. To move this Court to a strict scrutiny analysis, CRS first argues that these antidiscrimination statutes are not "neutral and generally applicable" because each statute contains exemptions that "treat [a]

comparable secular activity more favorably than religious exercise." *Id.* at 50-53 (citing *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). Next, CRS argues that MFEPA is unconstitutional under *Fulton* because the Supreme Court of Maryland's multi-factor test is "a mechanism for individualized exemptions." *See* Appellant's Br. 53 (quoting *Fulton*, 593 U.S. at 533). Finally, CRS contends that, as with RFRA, enforcement of these statutes substantially burdens its religious exercise. Appellant's Br. 55. Each of these arguments fails.

***First***, the exemptions to Title VII, EPA, and MFEPA do not transform the laws into statutes that are not "neutral" or "generally applicable," nor does the Supreme Court of Maryland's religious exemption test under MFEPA create "a mechanism for individualized exemptions" comparable to those in *Fulton*. ***Second***, even if this Court were to find that the statutes were not neutral and generally applicable, the statutes satisfy strict scrutiny because they are the least restrictive means to serve the compelling government interest of eradicating workplace discrimination and do not substantially burden CRS's religious exercise.

### A. Title VII, EPA, and MFEPA are neutral and generally applicable, and no court has ever held otherwise.

#### 1. The relevant statutes are neutral.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (citing *Masterpiece Cakeshop*, 584 U.S. at 636-39; *Lukumi*, 508 U.S. at

533). "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop*, 584 U.S. at 639; *see also Spivack*, 109 F.4th at 167 ("The neutrality inquiry" is "focus[ed] on the purpose of or motivation behind a policy." (citations omitted)).

The statutes at issue are not intolerant of, do not infringe upon, and do not restrict practices *because of* their religious motivation or nature. They are readily distinguishable from laws that are impermissibly hostile towards religious activities. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (finding that an ordinance that treated schools and factories more favorably than places of worship, combined with statements indicating that the ordinance "target[ed] the 'ultra-Orthodox [Jewish] community,'" did not comply with First Amendment); *Lukumi*, 508 U.S. at 536-37 (holding that because the law included "[a] pattern of exemptions [that] parallel[ed] the pattern of narrow prohibitions," targeting religious rituals, the law was a religious "gerrymander").

Here, the laws in question make no such troubling distinctions. *Cf. Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 748 (4th Cir. 2024) ("To the extent the law has an effect of excluding religious students, it does so 'in spite of' and not

'because of' those students' religious reasons for forgoing public education. The law is neutral."). There is no evidence in the record or in decades of case precedent that shows any hostility towards religion in the historical background of these laws. To the contrary, the laws contain exemptions favoring religious organizations and were passed with an understanding that constitutional tests are a safeguard of religious organizations' First Amendment rights.

Notably, the Supreme Court evaluated the constitutionality of Title VII and its 1972 amendment broadening the religious exemption. Before 1972, § 702 "exempted only the *religious activitie*s of such employers from the statutory ban on religious discrimination." *Amos*, 483 U.S. at 335-36 (emphasis added). The Supreme Court did not suggest that the exemption would be insufficient under the Free Exercise Clause.

**2. The relevant statutes are generally applicable.**

"The general-applicability inquiry … focuses on the objective sweep of a policy: whom it covers, whom it exempts, and how it makes that distinction." *Spivack*, 109 F.4th at 167 (citing *Fulton*, 593 U.S. at 533-34). A law is not considered generally applicable only when it (1) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or (2) "invites the government to consider the particular reasons for a

person's conduct by providing a mechanism for individualized exemptions." *Kim*, 93 F.4th at 748 (quoting *Fulton*, 593 U.S. at 533-34).

**a. CRS and Intervenor misinterpret comparability under Tandon.**

The purpose of Title VII, EPA, and MFEPA is to protect individual employees from discrimination by employers. Because any exemption to the laws applies equally to secular and religious organizations and is justified by the need to ensure enforcement is feasible, they do not undermine that purpose, and are, therefore, generally applicable.

As a threshold principle, laws that "make[] no distinction between religious and secular" entities are generally applicable. *Kim*, 93 F.4th at 748 (rejecting challenge to law that "bars non-public-school students, religious and nonreligious alike, from choosing or serving as the student member"). As this Court has explained in interpreting *Tandon* and *Fulton*, to be generally-applicable, governments are not required to make all types of businesses subject to a law, but if they exclude a type of business, they must exclude both religious and secular organizations engaged in such business. *Id.* (citing *Carson ex rel. O.C. v. Makin*, 596 U.S. 767 (2022)).

All of the exemptions in Title VII, 42 U.S.C. § 2000e(b), MFEPA, Md. Code Ann., State Gov't § 20-601(d)(1), and EPA, 29 U.S.C. § 213(a), are generic exemptions that treat religious and comparable secular activity equally and do not

prohibit religious conduct while permitting secular conduct.[16] Title VII does not apply to organizations associated with Native American tribes, 42 U.S.C. § 2000e(b) , or to foreign employees, 42 U.S.C. § 2000e-1, regardless of whether the employer is religious or secular. A 14-person religious employer and a 14-person secular employer are equally exempted from Title VII and MFEPA, just as a 16-person religious employer and a 16-person secular employer are not. Similarly, an affiliate of the Catholic church could run "recreational establishments and camps," or a non-profit responsible for "the publication of small newspapers," and those entities would be exempt from the EPA. *Contra* Appellant's Br. 50, 52 (citing 29 U.S.C. § 213(a)(3), (8)). Thus, the statutes and their exemptions apply generally to all organizations and do *not* treat any "comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62.

Additionally, the narrow exemptions were created to ensure feasible implementation of the laws. For instance, Title VII's definition of employer excludes Native American tribes because they are sovereign governments. *See* 42 U.S.C. § 2000e(b); *Pink v. Modoc Indian Health Project, Inc.*, 157 F.3d 1185,

---

[16] Although EPA does not contain an express religious exemption, "[t]he absence of a religious exception to a law does not, on its own, establish non-neutrality such that a religious exception is constitutionally required." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 282 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021); *Spivack*, 109 F.4th at 168.

1188 (9th Cir. 1998). It exempts foreign employees, 42 U.S.C. § 2000e-1, because extraterritorial application of U.S. employment law to overseas employees creates complex questions of sovereignty and international conflict of laws and social customs, *see E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 255 (1991). Title VII's application to employers of 15 or more employees also supports practical enforcement of the statute. The limitation was put in place to address Congress' concern for "the burdens placed upon a small business forced to comply with federal regulations and defend against a Title VII suit," "the protection of intimate and personal relations existing in small businesses, potential effects on competition and the economy, and the constitutionality of Title VII under the Commerce Clause[.]" *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995); *see also Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 81 (3d Cir. 2003). And, as explained above, those burdens and protections impact secular and religious organizations alike.

CRS focuses primarily on EPA's exemptions to argue it is not generally applicable but ignores the statutory scheme under which the federal anti-discrimination statutes operate. That is, EPA's exemptions[17] are phantoms when

[17] As CRS points out, EPA carves out exceptions for businesses like "oyster farms[] or hometown newspapers." Appellant's Br. 52. Those exceptions were not implemented with the passage of the EPA; rather, Congress passed EPA as an amendment to the Fair Labor Standards Act ("FLSA") to apply the prohibition of

operating in conjunction with Title VII. After the passage of the EPA, Congress amended Title VII in a way that ensured discriminatory practices were not insulated from "judicial redress," *i.e.*, even if an entity could be exempted under one statute, it could still be liable under the other. *See* 29 C.F.R. § 1620.27(a) ("In situations where the jurisdictional prerequisites of both the EPA and Title VII … are satisfied, any violation of [EPA] is also a violation of Title VII. However, Title VII covers types of wage discrimination not actionable under the EPA. Therefore, an act or practice of an employer or labor organization that is not a violation of the EPA may nevertheless be a violation of title VII."); *see generally Washington Cty. v. Gunther*, 452 U.S. 161 (1981).

Moreover, none of the exemptions undermine the aforementioned goal of the statutes like that in *Tandon*. In *Tandon,* the Supreme Court found that a COVID-focused ordinance was not neutral because "California treat[ed] some comparable secular activities more favorably than at-home religious exercise," by permitting a plethora of businesses to bring together more than three households at a time but limiting "at-home" worshipers to three households, without explaining why similar attendance would pose a greater risk to public health. 593 U.S. at 63; *see also*

---

wage discrimination based on sex to employers who were already covered by the FLSA wage requirements, such that it would not cover those employers already exempted by under the FLSA for various reasons. Ross, A., and McDermott, Jr., F., *The Equal Pay Act of 1963: A Decade of Enforcement*, Boston College Industrial and Commercial Law Review, Vol. 16, No. 1, at 8 (Nov. 1974).

*Cuomo*, 592 U.S. at 17-18 (holding that law was not generally applicable because it treated certain activities that contributed to the spread of COVID-19 more favorably than religious activities without any evidence that secular activities posed a lesser risk of transmission). Here, there is no such disparate treatment of comparable secular and religious activities that pose similar risks to the statutes' purpose.

*Doe v. San Diego Unified School District*, 19 F.4th 1173 (9th Cir. 2021), illustrates this point. There, a high school student and her parents challenged a school's vaccine mandate on First Amendment grounds. *Id.* at 1175-76. The plaintiffs argued that because the mandate included exemptions for medical conditions, it must *also* provide an exemption for religious grounds. *Id.* at 1176. The Ninth Circuit rejected that idea. The purpose of the mandate was to "protect[] student health and safety," and exempting certain individuals for medical purposes would, in those instances, actually avoid risks to students' health and safety. *Id.* at 1178. Therefore, the medical exemption was not inconsistent with the mandate's purpose. It further explained that if the number of students seeking a medical exemption was small and the number of students seeking a religious exemption was large, "then the medical exemption would not qualify as 'comparable' to the religious exemption in terms of the 'risk' each exemption poses to the government's asserted interests." *Id.* Accordingly, a religious exemption and a

medical exemption were not comparable, and therefore, the mandate did not run afoul of the First Amendment.

Similarly here, CRS's and Intervenor's arguments "omit[] the crucial modifier—'comparable'—from the analysis of whether a secular activity has been treated more favorably than a religious activity." *See Does 1-6 v. Mills*, 566 F. Supp. 3d 34, 47-48 (D. Me.), *aff'd* 16 F.4th 20 (1st Cir. 2021). CRS argues that because a secular nonprofit with seven employees is exempt from Title VII, so should a religious nonprofit with 8,000 employees. Appellant's Br. 52-53. That is not a proper analysis. *Spivack*, 109 F.4th at 176 ("Consistent with the Supreme Court's guidance, we have repeatedly held that a policy's general applicability turns on whether it treats *similar* religious and secular behavior similarly." (Emphasis added)); *see also Commonwealth v. Beshear*, 981 F.3d 505, 509-510 (6th Cir. 2020) (discussing comparable activities).

**b. The Supreme Court of Maryland's fact-intensive inquiry does not impact MFEPA's general applicability.**

CRS conflates a "fact-intensive inquiry" with a "mechanism for individualized exemptions" and argues that the Supreme Court of Maryland's totality-of-the-circumstances test for MFEPA's religious exemption is "not neutral and generally applicable." Appellant's Br. 53-54.

First, MFEPA's religious employer exemption is exclusively available to religious employers, unlike the "individualized exemptions" at issue in *Fulton*. 593

U.S. at 533-34 (citing "good cause" standard for exemptions to unemployment benefits at issue in *Sherbert*); *Smith*, 494 U.S. at 884 (noting that under *Sherbert*, a "system of individual exemptions" cannot exclude "cases of 'religious hardship' without compelling reason").

Moreover, laws are still generally applicable even if they include fact-intensive inquiries. For example, the ministerial exception requires "courts to take *all relevant circumstances* into account," is "highly fact-intensive," and turns on "a 'variety of factors' and 'all relevant circumstances,'" yet it still passes constitutional muster. *Our Lady*, 591 U.S. at 758 (emphasis added); *Billard*, 101 F.4th at 333. MFEPA's exemption is "broader" than the ministerial exception's language, *see Doe v. Cath. Relief Servs.*, 484 Md. 640, 671 (2023), and is thus generally applicable. *Accord Amos*, 483 U.S. at 330; *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004).

Finally, the Supreme Court of Maryland's interpretation of MFEPA's religious exemption is distinguishable from the "mechanism for individualized exemptions" in *Fulton*. The "mechanism" in *Fulton* "permit[ted] exceptions … at the 'sole discretion'" of the government entity and it was the "inclusion of a formal system of *entirely discretionary exceptions* … [that] render[ed] the contractual non-discrimination requirement not generally applicable." 593 U.S. at 523, 536 (emphasis added). The exemptions themselves were issued "by the Commissioner

or the Commissioner's designee, in his/her sole discretion." *Id.* at 535. Accordingly, the City's failure to present a "compelling reason why it ha[d] a particular interest in denying an exception to [plaintiff] while making them available to others" was determinative. *Id.* at 542; *see also McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142 (W.D. Wash. 2023), *overturned on other grounds* 147 F.4th 959 (9th Cir. 2024) (holding that the religious exemptions for Title VII and state anti-discrimination law are generally applicable because, unlike *Fulton*, the exemptions are "categorical" and "do not invite 'the government to decide which reasons for not complying with the [law] are worthy of solicitude'").

Unlike MFEPA, the "exemptions" in *Fulton* were not a standardized part of a state-wide statutory scheme applicable to all employers and enforced by the courts. MFEPA's religious exemption, like the ministerial exemption, does not grant the government similar discretionary authority. *See, e.g.*, *Kim*, 93 F.4th at 748 (holding law generally applicable because "[i]t [did] not vest school administrators with authority to allow some non-public-school students to vote"); *Mills*, 16 F.4th at 30 (distinguishing *Fulton* and applying rational basis scrutiny because the law at issue did not have a "mechanism for individualized exemptions" of the kind at issue in *Fulton*); *Doe*, 484 Md. at 673 (offering "guidance to courts that are called upon to analyze the applicability of the exemption"); *accord Smith*, 494 U.S. at

884. Requiring courts to perform a fact-intensive inquiry, as they frequently do, does not mean the inquiry lacks general applicability.

### B. Even under a strict scrutiny analysis, CRS cannot establish a substantial burden on religious exercise.

Even if the Court held that the relevant antidiscrimination statutes were not neutral and generally applicable, each nonetheless survives strict scrutiny because their enforcement is the least restrictive means of achieving the government's compelling interest in eradicating sex discrimination. *See Rayburn*, 772 F.2d at 1169; *Tandon*, 593 U.S. at 64-65 ("[S]trict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" (quoting *Lukumi*, 508 U.S. at 546)). Indeed, the statutes here are constitutionally permissible for the same reasons RFRA (unavailable to CRS here) would not excuse CRS's discriminatory conduct. *See supra*, Arg. § III.B.2; *Gonzales*, 546 U.S. at 429-30 (acknowledging similarities in strict scrutiny analysis under First Amendment and RFRA).

## V. The District Court Correctly Applied the Supreme Court of Maryland's Test to Find MFEPA's Religious Exemption Inapplicable.

### A. The district court correctly concluded that all of Doe's positions were "one or more steps removed from" effecting CRS's core mission.

In *Doe v. Catholic Relief Services*, the Supreme Court of Maryland created a judicially workable, multi-factor test akin to the ministerial exemption and held that MFEPA's religious employer exemption only applies when an employee's

"duties [] directly further the core mission(s)—religious or secular, or both—of the religious entity." 484 Md. at 673. The court identified five factors for assessing whether the exemption applies. *Id.* at 673-75.

First, an employee's duties and an entity's core mission is "a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." *Id.* at 673. Second, duties directly furthering an entity's core mission are "duties that are not one or more steps removed from taking the actions that effect the goals of the entity." *Id.* "Third, the size of the religious entity may be relevant." *Id.* at 674 ("A 30-person religious non-profit may well have fewer employees whose work does not directly further the core mission(s) of the entity than an organization with a 300-person staff."). Fourth, a court shall consider the fact that religious entities "may have both religious and secular core missions." *Id.* Finally, a "court may consider, among other things: the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated." *Id.*

The district court found (and CRS does not dispute) that CRS's core mission is to serve the poor and vulnerable overseas. (JA1108); Appellant's Br. 43. CRS accomplishes this mission by providing humanitarian service programs worldwide—including agriculture programming to promote "'small landholder agriculturists'" and emergency supports providing housing, water, shelter, etc., to

local communities. (JA1110-1111). CRS works with local partners within the countries receiving services and relies on its employees working in those countries to determine what services a community needs. (JA1109-1110).

CRS uses Gateway to store and manage project-level data and information relevant to funding these programs, such as compliance data for fundraising projects and donor relationship management. (JA1114). When it comes to the "action that effects" CRS's goals, CRS's Board of Directors serves as "the ultimate decisionmaker" based, in part, on recommendations from executive leadership regarding "CRS strategy and budget." (JA1124, JA1108).

The totality of circumstances supports the district court's finding that Doe did not "directly further" CRS's core mission. Across his Gateway positions, Doe's duties included: training other CRS employees on how to use the Pipeline and Project application; assisting with requests for modification and expansion of the application—including liaising between IT and CRS business owners in addressing those requests; working with IT to improve the application's functionality; and helping troubleshoot data integration amongst different CRS systems. (JA1124-1126). In his MEAL roles, Doe's duties involved receiving data from different MEAL leads and compiling that data into a quantitative portion of the quarterly report required by and provided to donors; providing troubleshooting support for

an employee he supervised; and administering support for monthly webinars. (JA1126-1127).

In all of these roles, Doe did not directly "serve the poor and vulnerable overseas." (JA1108). Contrary to CRS's assertion, Appellant's Br. 44, the district court examined the roles and positions that *do* effect CRS's mission, compared those duties with what Doe actually *did*, and appropriately concluded that while "Gateway is an important tool used by CRS," (JA1123), "Doe's Gateway Team duties and responsibilities were sufficiently apart from effectuating CRS goals (and core mission) such that his Gateway job activities and responsibilities were far attenuated from … CRS goals or missions." (JA1124); *see also* (JA1126-1127) (explaining Doe's roles on the MEAL team "focused on aiding CRS in its collection and reporting of data," but did not "directly further or effectuate a CRS mission").

CRS claims the district court erred by considering tasks Doe did *not* perform. Appellant's Br. 44. Not so. As described above, in considering the totality of circumstances, the district court compared precisely what Doe *did* against duties that, under the circumstances, directly effectuated CRS's core mission. (JA1122-1128). It is within the province of the factfinder to determine what duties further CRS's core mission and what duties do not. *See Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998) (explaining federal courts interpreting the

law of a state's highest court must give "appropriate effect to all its implications"). In other words, the totality of the pertinent circumstances involves consideration of duties that directly effectuate a religious entity's core mission, regardless of who performed them. *Accord Doe*, 484 Md. at 674 n.20 ("Courts must analyze the activities of a religious entity in determining the core mission(s) of the entity for the purpose of applying the exemption.")

CRS's argument that Doe is more akin to the hypothetical executive director than the janitor in the Supreme Court of Maryland's example, *see Doe*, 484 Md. at 673-74, would require a rigid, constrained, and incorrect application of the test. Although Doe's duties may have improved Gateway's functionality, "Gateway is only as good as the information that goes into it." (JA1123). Indeed, like the hypothetical janitor, Doe's duties were "materially indistinguishable from those performed by individuals at secular organizations" and involved creating and maintaining a "clean environment" within Gateway so that executive leadership could focus on the duties that effect CRS's mission. *Doe*, 484 Md. at 673-74.

Discontent with the district court's application of the law, CRS seeks a second bite at the apple and asks this Court to "certify" a question of law to the Supreme Court of Maryland that would require the Supreme Court to revisit the district court's factual findings. Appellant's Br. 48-49. This court should decline to do so. *See* Md. Code Ann., Cts. & Jud. Proc. § 12-605(a) (permitting certification

only on "a question of law"). Whether MFEPA's exemption "extend[s] to an employee whose work makes a nonprofit 'much more efficient,' 'drastically improve[s]' the nonprofit's fundraising efforts, and supplies information that is 'required by most donors,' despite that the employee may not be a policymaker or a fieldworker," Appellant's Br. 48-49, is exactly the type of "detailed, interstitial question" that is not "readily resolved by reference to general legal principles and standards alone," *Buford*, 532 U.S. at 65-66. CRS made the very arguments embedded in its question to the district court, the district court rejected them, and there is no issue of law for the Supreme Court to resolve. *See U.S. Bank N. A. v. Village at Lakeridge, LLC*, 583 U.S. 387, 396-97 (2018) (explaining that a test that "compel[s] [courts] to marshal and weigh evidence" and to "consider[] [case specific tasks] as a whole, balance[] them one against another" warrants deference to the trial court).

CRS argues that the Maryland General Assembly could not have intended to exempt a MFEPA claim by "an employee … pass[ing] out bags of rice in Cambodia" but allow a claim by "a Baltimore-based middle manager with an advanced degree." Appellant's Br. 47-48. But that is precisely why the Supreme Court of Maryland crafted "a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances," *Doe*, 484 Md. at 673, *i.e.*, to implement the legislature's intent and give MFEPA's exemption language "its narrowest

reasonable reading," *id.* at 721; *accord Landholt v. Corley*, 149 F.4th 486, 490 (4th Cir. 2025) ("When a state's highest court interprets a statute, we are 'bound by the state court's interpretation, and must assume that the statute says what the state courts say it says.'"); *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 703 (2010) (noting "in the context of answering certified questions, this Court's decisions on questions of state law are controlling").

### B. Exempting CRS from MFEPA would violate Article 36 of the Maryland Declaration of Rights as applied to Doe.

Article 36 of the Maryland Declaration of Rights limits free religious exercise in instances where a religious practice "injure[s] the natural" and "civil ... rights" of others. Although Article 36 "guarantee[s] an absolute freedom to believe," it also allows for "a somewhat circumscribed freedom to act upon those beliefs." Dan Friedman, *The Maryland State Constitution* at 71 (Oxford Univ. Press, 1st ed. 2011); *accord Craig v. State*, 220 Md. 590, 599 (1959) ("While a person's freedom to *believe* is absolute, his freedom to *act* is not."); *McMillan v. State*, 258 Md. 147, 152 (1970); *Snyder v. Holy Cross Hosps.*, 30 Md. App. 317, 326-27 (1976). A court may abridge religious practices under Article 36 when an interest in protecting a competing right is sufficiently compelling. *See McMillan*, 258 Md. at 152 (citing *Sherbert*, 374 U.S. 398; *Braunfeld v. Brown*, 366 U.S. 599 (1961); *Thomas v. Collins*, 323 U.S. 516 (1945)).

As explained *supra* Arg. § III.B.2, the eradication of sex discrimination, coupled with Doe's constitutional right to his sexual orientation and marriage, are sufficiently compelling interests. *See also Obergefell v. Hodges*, 576 U.S. 644, 681 (2015) ("The Court, in this decision, holds same-sex couples may exercise the fundamental right to marry in all States."); *Davis v. Ermold*, 223 L. Ed. 2d 213, 2025 WL 3132017 (U.S. Nov. 10, 2025) (denying petition to consider overturning that constitutional right).

Applying MFEPA's religious exemption would elevate CRS's free exercise rights by "infring[ing] the ... natural ... or civil" rights of Doe. *Archdiocese of Wash. v. Moersen*, 399 Md. 637, 640-41 (2007) ("Article 36 of the Maryland Declaration of Rights[] does not provide 'a constitutional right to ignore neutral laws of general applicability,' even when such laws have, as an incidental effect, the burdening of a particular religious activity[.]"); *accord Snyder*, 30 Md. App. at 330-31 ("Practice in pursuit of the exercise of religion is not entirely free from government regulation."). Accordingly, this Court should uphold the district court's undisputed factual findings and its application of the Supreme Court of Maryland's religious exemption test under MFEPA.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: January 2, 2026

Respectfully submitted,

*/s/ Eve L. Hill*

Eve L. Hill, Esq. (Bar No. 19938)
Lauren DiMartino, Esq. (Bar No. 22046)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
ldimartino@browngold.com

Shannon C. Leary, Esq. (Bar No. 18396)
James A. Hill, Esq. (Bar No. 21718)
GILBERT EMPLOYMENT LAW, P.C.
1100 Wayne Ave, Suite 900
Silver Spring, Maryland 20910
Tel: (301) 608-0880
Fax: (301) 608-0881
Sleary-efile@gelawyer.com
Jhill-efile@gelawyer.com

Anthony J. May, Esq. (Bar No. 20301)
NUSINOV SMITH LLP
2800 Quarry Lake Drive, Suite 160
Baltimore, Maryland 21209
Tel: (410) 554-3600
Fax: (410) 554-3636
amay@nusinovsmith.com

*Counsel for Plaintiff-Appellee John Doe*

## REQUEST FOR ORAL ARGUMENT

Because this case presents important issues concerning the breath and scope of longstanding civil rights laws, Plaintiff-Appellee requests that the Court hear oral argument.

*/s/ Eve L. Hill*

Eve L. Hill, Esq.
Lauren DiMartino, Esq.
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
ldimartino@browngold.com

Shannon C. Leary, Esq.
James A. Hill, Esq.
GILBERT EMPLOYMENT LAW, P.C.
1100 Wayne Ave, Suite 900
Silver Spring, Maryland 20910
Tel: (301) 608-0880
Fax: (301) 608-0881
Sleary-efile@gelawyer.com
Jhill@gelawyer.com

Anthony J. May, Esq.
NUSINOV SMITH LLP
2800 Quarry Lake Drive, Suite 160
Baltimore, Maryland 21209
Tel: (410) 554-3600
Fax: (410) 554-3636
amay@nusinovsmith.com

*Counsel for Plaintiff-Appellee John Doe*

**CERTIFICATE OF COMPLIANCE**
**WITH LENGTH AND TYPEFACE LIMITATIONS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) & (e), and the Court's Order filed December 23, 2025, Dkt. No. 92, because:

   This brief contains 16,968 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

   This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Eve L. Hill*
Eve L. Hill

## CERTIFICATE OF SERVICE

I certify that on January 2, 2026, the foregoing Brief of Plaintiff-Appellee John Doe was served on counsel of record for Defendant-Appellant Catholic Relief Services and Intervenors U.S. Department of Justice and Office of the Attorney General of Maryland through the CM/ECF system.

*/s/ Eve L. Hill*
Eve L. Hill

## STATUTORY ADDENDUM

Pursuant to Federal Rule of Appellate Procedure 28(f), the following Addendum contains the citation and verbatim text of all pertinent constitutional provisions, statutes, ordinances, rules, and regulations that were not already included in Appellant's Addendum.

## STATUTORY ADDENDUM

28 U.S.C. § 2403 .......... Add. 001

29 U.S.C. § 1620.27 .......... Add. 002

42 U.S.C. § 2000bb-2 .......... Add. 003

42 U.S.C. § 3613 .......... Add. 004

52 U.S.C. § 20510 .......... Add. 007

29 C.F.R. § 1620.27 .......... Add. 009

Md. Code Ann., Cts. & Jud. Proc. § 12-605 .......... Add. 010

Md. Const., Art. 36 .......... Add. 011

United States Code Annotated
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
Part VI. Particular Proceedings
Chapter 161. United States as Party Generally (Refs & Annos)

28 U.S.C.A. § 2403

# § 2403. Intervention by United States or a State; constitutional question

Currentness

**(a)** In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

**(b)** In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

* * * * * * * * * *

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 29. Labor
Subtitle B. Regulations Relating to Labor
Chapter XIV. Equal Employment Opportunity Commission
Part 1620. The Equal Pay Act (Refs & Annos)

29 C.F.R. § 1620.27

# § 1620.27 Relationship to the Equal Pay Act of title VII of the Civil Rights Act.

Currentness

(a) In situations where the jurisdictional prerequisites of both the EPA and title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 200e et seq., are satisfied, any violation of the Equal Pay Act is also a violation of title VII. However, title VII covers types of wage discrimination not actionable under the EPA. Therefore, an act or practice of an employer or labor organization that is not a violation of the EPA may nevertheless be a violation of title VII.

(b) Recovery for the same period of time may be had under both the EPA and title VII so long as the same individual does not receive duplicative relief for the same wrong. Relief is computed to give each individual the highest benefit which entitlement under either statute would provide. (e.g., liquidated damages may be available under the EPA but not under title VII.) Relief for the same individual may be computed under one statute for one or more periods of the violation and under the other statute for other periods of the violation.

(c) The right to equal pay under the Equal Pay Act has no relationship to whether the employee is in the lower paying job as a result of discrimination in violation of title VII. Under the EPA a prima facie violation is established upon a showing that an employer pays different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort and responsibility, and which are performed under similar working conditions. Thus, the availability of a remedy under title VII which would entitle the lower paid employee to be hired into, or to transfer to, the higher paid job does not defeat the right of each person employed on the lower paid job to the same wages as are paid to a member of the opposite sex who receives higher pay for equal work.

* * * * * * * * * *

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Proposed Legislation
United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 21B. Religious Freedom Restoration

42 U.S.C.A. § 2000bb-2

§ 2000bb-2. Definitions

Effective: September 22, 2000
Currentness

As used in this chapter--

**(1)** the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

**(2)** the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

**(3)** the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

**(4)** the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

* * * * * * * * * *

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 45. Fair Housing (Refs & Annos)

Subchapter I. Generally (Refs & Annos)

42 U.S.C.A. § 3613

# § 3613. Enforcement by private persons

Currentness

**(a) Civil action**

**(1)(A)** An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

**(B)** The computation of such 2-year period shall not include any time during which an administrative proceeding under this subchapter was pending with respect to a complaint or charge under this subchapter based upon such discriminatory housing practice. This subparagraph does not apply to actions arising from a breach of a conciliation agreement.

**(2)** An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint, but if the Secretary or a State or local agency has obtained a conciliation agreement with the consent of an aggrieved person, no action may be filed under this subsection by such aggrieved person with respect to the alleged discriminatory housing practice which forms the basis for such complaint except for the purpose of enforcing the terms of such an agreement.

**(3)** An aggrieved person may not commence a civil action under this subsection with respect to an alleged discriminatory housing practice which forms the basis of a charge issued by the Secretary if an administrative law judge has commenced a hearing on the record under this subchapter with respect to such charge.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(b) Appointment of attorney by court**

Upon application by a person alleging a discriminatory housing practice or a person against whom such a practice is alleged, the court may--

**(1)** appoint an attorney for such person; or

**(2)** authorize the commencement or continuation of a civil action under subsection (a) without the payment of fees, costs, or security, if in the opinion of the court such person is financially unable to bear the costs of such action.

**(c) Relief which may be granted**

**(1)** In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

**(2)** In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person.

**(d) Effect on certain sales, encumbrances, and rentals**

Relief granted under this section shall not affect any contract, sale, encumbrance, or lease consummated before the granting of such relief and involving a bona fide purchaser, encumbrancer, or tenant, without actual notice of the filing of a complaint with the Secretary or civil action under this subchapter.

**(e) Intervention by Attorney General**

Upon timely application, the Attorney General may intervene in such civil action, if the Attorney General certifies that the case is of general public importance. Upon such intervention the Attorney General may obtain such relief as would be available to the

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Attorney General under section 3614(e) of this title in a civil action to which such section applies.

* * * * * * * * * *

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
Title 52. Voting and Elections (Refs & Annos)
Subtitle II. Voting Assistance and Election Administration (Refs & Annos)
Chapter 205. National Voter Registration

52 U.S.C.A. § 20510
Formerly cited as 42 USCA § 1973gg-9

# § 20510. Civil enforcement and private right of action

Currentness

**(a) Attorney General**

The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter.

**(b) Private right of action**

**(1)** A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

**(2)** If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

**(3)** If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

**(c) Attorney's fees**


© 2025 Thomson Reuters. No claim to original U.S. Government Works.

In a civil action under this section, the court may allow the prevailing party (other than the United States) reasonable attorney fees, including litigation expenses, and costs.

**(d) Relation to other laws**

**(1)** The rights and remedies established by this section are in addition to all other rights and remedies provided by law, and neither the rights and remedies established by this section nor any other provision of this chapter shall supersede, restrict, or limit the application of the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.).[1]

**(2)** Nothing in this chapter authorizes or requires conduct that is prohibited by the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.).[1]

Footnotes

1 Redesignated as 52 U.S.C.A. § 10301 et seq.

* * * * * * * * * *

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 29. Labor
Subtitle B. Regulations Relating to Labor
Chapter XIV. Equal Employment Opportunity Commission
Part 1620. The Equal Pay Act (Refs & Annos)
29 C.F.R. § 1620.27

# § 1620.27 Relationship to the Equal Pay Act of title VII of the Civil Rights Act.

Currentness

(a) In situations where the jurisdictional prerequisites of both the EPA and title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 200e et seq., are satisfied, any violation of the Equal Pay Act is also a violation of title VII. However, title VII covers types of wage discrimination not actionable under the EPA. Therefore, an act or practice of an employer or labor organization that is not a violation of the EPA may nevertheless be a violation of title VII.

(b) Recovery for the same period of time may be had under both the EPA and title VII so long as the same individual does not receive duplicative relief for the same wrong. Relief is computed to give each individual the highest benefit which entitlement under either statute would provide. (e.g., liquidated damages may be available under the EPA but not under title VII.) Relief for the same individual may be computed under one statute for one or more periods of the violation and under the other statute for other periods of the violation.

(c) The right to equal pay under the Equal Pay Act has no relationship to whether the employee is in the lower paying job as a result of discrimination in violation of title VII. Under the EPA a prima facie violation is established upon a showing that an employer pays different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort and responsibility, and which are performed under similar working conditions. Thus, the availability of a remedy under title VII which would entitle the lower paid employee to be hired into, or to transfer to, the higher paid job does not defeat the right of each person employed on the lower paid job to the same wages as are paid to a member of the opposite sex who receives higher pay for equal work.

* * * * * * * * * *

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

West's Annotated Code of Maryland
Courts and Judicial Proceedings
Title 12. Appeals, Certiorari and Certifications of Questions (Refs & Annos)
Subtitle 6. Certification of Questions of Law (Refs & Annos)

MD Code, Courts and Judicial Proceedings, § 12-605

# § 12-605. Issuance of certification order

Effective: December 14, 2022

Currentness

(a) The court certifying a question of law to the Supreme Court of Maryland of this State shall issue a certification order and forward it to the Supreme Court of Maryland of this State.

(b) Before responding to a certified question, the Supreme Court of Maryland of this State may require the certifying court to deliver all or part of its record to the Supreme Court of Maryland of this State.

* * * * * * * * * *

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

MD Constitution, Declaration of Rights, Art. 36
Article 36. Freedom of religion

That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief, provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.
Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.
Nothing in this article shall constitute an establishment of religion.

* * * * * * * * * *