**No. 25-1569**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

JOHN DOE,

*Plaintiff-Appellee*,

v.

CATHOLIC RELIEF SERVICES,

*Defendant-Appellant*.

On Appeal from the
United States District Court for the District of Maryland
Case No. 1:20-cv-01815-JRR, Hon. Julie R. Rubin

# BRIEF OF RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS AS *AMICI CURIAE* SUPPORTING APPELLEE AND AFFIRMANCE

ADITI FRUITWALA
DANIEL MACH
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005

LOUISE MELLING
ARIJEET SENSHARMA
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

JENNY SAMUELS
ALEX J. LUCHENITSER
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7308
*samuels@au.org*
*luchenitser@au.org*

*Counsel for* Amici Curiae; full contact information is on signature page.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1569 Caption: Doe v. Catholic Relief Services

Pursuant to FRAP 26.1 and Local Rule 26.1,

Americans United for Separation of Church and State; American Civil Liberties Union; Bend the Arc: A Jewish Partnership for Justice;
(name of party/amicus)
Central Atlantic Conference United Church of Christ; DignityUSA; Global Justice Institute, Metropolitan Community Churches; Hindu American Foundation; Methodist Federation for Social Action; Sadhana: Coalition of Progressive Hindus; Society for Humanistic Judaism

who is Amici Curiae, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jenny Samuels Date: 1/9/26

Counsel for: Amici Curiae Religious and Civil-Rights Organizations



Print to PDF for Filing

## TABLE OF CONTENTS

**Page(s)**


Corporate Disclosure Statement .................... i

Table of Authorities .................... iv

Interests of the *Amici Curiae* .................... 1

Introduction .................... 2

Argument .................... 3

I. The church-autonomy doctrine does not bar Doe's Title VII or Equal Pay Act claims. .................... 3

  A. The church-autonomy doctrine does not prevent courts from adjudicating regular employment disputes involving non-ministerial employees. .................... 3

  B. The history of the First Amendment does not support expanding the church-autonomy doctrine to insulate religious entities from neutral, generally applicable legal obligations. .................... 8

  C. The church-autonomy doctrine does not preclude Doe's claims. .................... 11

II. The Religious Freedom Restoration Act does not apply in this case. .................... 13

Conclusion .................... 19

## TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Bell v. Presbyterian Church (U.S.A.)*,
126 F.3d 328 (4th Cir. 1997) ....................3, 6

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022) ....................3

*Billard v. Charlotte Cath. High Sch.*,
101 F.4th 316 (4th Cir. 2024)....................3, 18

*Bryce v. Episcopal Church*,
289 F.3d 648 (10th Cir. 2002) ....................4

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................13

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ....................8, 9

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ....................13, 16

*Donahoe v. Richards*,
38 Me. 379 (Me. 1854) ....................10

*EEOC v. Roman Cath. Diocese of Raleigh*,
213 F.3d 795 (4th Cir. 2000) ....................5

*Garrick v. Moody Bible Inst.*,
95 F.4th 1104 (7th Cir. 2024)....................4

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir. 2010) ....................17, 18

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006)....................17, 18

*Jones v. Wolf*,
443 U.S. 595 (1979) ....................4

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) ....................3

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ....14, 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ....5

*Lugar v. Edmonson Oil Co., Inc.*,
437 U.S. 922 (1982) ....16

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998) ....15

*NLRB v. Cath. Bishop of Chi.*,
440 U.S. 490 (1979) ....5

*O'Connell v. U.S. Conf. of Cath. Bishops*,
134 F.4th 1243 (D.C. Cir. 2025) ....3

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ....2, 3, 7

*Palmer v. Liberty Univ., Inc.*,
72 F.4th 52 (4th Cir. 2023) ....7

*Philips v. Gratz*,
2 Pen. & W. 412 (Pa. 1831) ....10

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
393 U.S. 440 (1969) ....4

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985) ....4–6

*Rubin v. United States*,
449 U.S. 424 (1981) ....13

*Rweyemamu v. Cote*,
520 F.3d 198 (2d Cir. 2008) ....18

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976) ....4, 11

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Sherbert v. Verner*,
374 U.S. 398 (1963) ....................17

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ....................16, 18

*Tomic v. Cath. Diocese of Peoria*,
442 F.3d 1036 (7th Cir. 2006) ....................18

*Watson v. Jones*,
80 U.S. (13 Wall.) 679 (1871) ....................11

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ....................17

**Statutes, Rules, and Regulations**

42 U.S.C. § 2000bb ....................17

42 U.S.C. § 2000bb-1(a) ....................14

42 U.S.C. § 2000bb-1(b) ....................14, 15, 17

42 U.S.C. § 2000bb-1(c) ....................15, 16

42 U.S.C. § 2000bb-2(1) ....................15, 16

42 U.S.C. § 2000bb-2(3) ....................14

S. Rep. No. 103-111 (1993) ....................17

**Other Authorities**

Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective*,
60 Geo. Wash. L. Rev. 915 (1992) ....................10

Marci A. Hamilton, *Religious Institutions, the No-Harm Doctrine, and the Public Good*,
2004 BYU L. Rev. 1099 ....................8

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Thomas Jefferson, *An Act for Establishing Religious Freedom* (Oct. 31, 1785), *in* The Founders' Constitution (Philip B. Kurland & Ralph Lerner, eds.), https://perma.cc/J9E2-6NK3 ................. 9

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ........................................................ 9

Ellis West, *The Case Against a Right to Religion-Based Exemptions*, 4 Notre Dame J.L. Ethics & Pub. Pol'y 591 (1990) .................................. 8

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* are religious and civil-rights organizations committed to ensuring the effective enforcement of our nation's antidiscrimination laws and protecting religious freedom under the First Amendment. *Amici* believe that the Constitution does not require that religious employers' right to select their ministers be extended to exempt religious employers from complying with all workplace laws that protect employees against discrimination based on sexual orientation or any other protected category.

The *amici* are:

- American Civil Liberties Union
- Americans United for Separation of Church and State
- Bend the Arc: A Jewish Partnership for Justice
- Central Atlantic Conference United Church of Christ
- DignityUSA
- Global Justice Institute, Metropolitan Community Churches
- Hindu American Foundation
- Methodist Federation for Social Action
- Sadhana: Coalition of Progressive Hindus
- Society for Humanistic Judaism

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

## INTRODUCTION

Appellant Catholic Relief Services ("CRS") wants to compensate Appellee John Doe, a non-ministerial employee, less than others because he is married to another man. According to CRS and Intervenor United States, the fact that federal and state laws clearly prohibit such discrimination is irrelevant. What matters, they say, is that CRS—or any other religious employer in a similar situation—has a religious justification for discriminating.

But the First Amendment "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Church autonomy is a narrow doctrine that prevents courts from intervening in disputes that resolve purely ecclesiastical matters, including those concerning a religious entity's choice of ministerial employees. It is not, as CRS and the United States claim, a free pass to discriminate against non-ministerial employees or to violate secular laws. Neither the history of the First Amendment nor the facts of this case justify application of the church-autonomy doctrine here.

Moreover, CRS and the United States' attempt to invoke the protections of the Religious Freedom Restoration Act ("RFRA") misconstrues the text and purpose of that law. RFRA prohibits the *government*, not private individuals like Doe, from substantially burdening religious exercise. As the

majority of circuits that have considered the question have held, RFRA has no application in private suits to enforce antidiscrimination laws. This Court should hold the same.

## ARGUMENT

### I. The church-autonomy doctrine does not bar Doe's Title VII or Equal Pay Act claims.

#### A. The church-autonomy doctrine does not prevent courts from adjudicating regular employment disputes involving non-ministerial employees.

Church autonomy is a narrow doctrine that prevents courts from adjudicating disputes involving "matters of church government" and issues "of faith and doctrine." *Our Lady of Guadalupe*, 591 U.S. at 737 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952)).[2] The ministerial exception—a branch of the church-autonomy doctrine—therefore "exempt[s] from legal process 'decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance.'" *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024) (quoting *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997)). Beyond

[2] As the United States correctly notes, the church-autonomy doctrine is an affirmative defense, not a jurisdictional bar. *See* USA Br. 22 n.5; *accord O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1258 (D.C. Cir. 2025); *Belya v. Kapral*, 45 F.4th 621, 633 (2d Cir. 2022).

the ministerial exception, the church-autonomy doctrine bars claims that would require courts to weigh in on "ecclesiastical discussions" about "church doctrine and policy," *Bryce v. Episcopal Church*, 289 F.3d 648, 658 (10th Cir. 2002), or otherwise "subject [the religious entity's] doctrine to judicial second-guessing," *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1113 (7th Cir. 2024). Simply put, courts may not "resolv[e] underlying controversies over religious doctrine." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

But that limitation is not without boundaries. The Supreme Court has made clear that not every dispute involving a religious organization "jeopardizes values protected by the First Amendment." *Id.* While the church-autonomy doctrine requires deference to religious authorities on "matters of ecclesiastical cognizance and polity," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 698 (1976), it does not insulate religious entities from the application of neutral, generally applicable laws "where no issue of doctrinal controversy is involved," *Jones v. Wolf*, 443 U.S. 595, 605 (1979). As this Court has rightly recognized, religious organizations "are not—and should not be—above the law." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985).

CRS and the United States are therefore incorrect that employers get a free pass to discriminate—regardless of whether an employee is

ministerial—so long as the discrimination is motivated by "sincere religious beliefs." *See* CRS Br. 13–14; USA Br. 25.[3] "[T]here is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 706 n.1 (2020) (Kagan, J., concurring). And where, as here, "no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000). Religious entities, "[l]ike any other person or organization, . . . may be subject to" employment antidiscrimination laws. *Rayburn*, 772 F.2d at 1171.

The cases cited by CRS and the United States do not support their argument that regular employment disputes are off-limits under the church-autonomy doctrine. In *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501–03 (1979), the Supreme Court held that the National Labor Relations Board did not have jurisdiction over teachers in religious schools

[3] The United States attempts to invoke expressive association as "additional support for the conclusion that the church autonomy doctrine bars Doe's Title VII and Equal Pay Act claims." USA Br. 26. But CRS does not object to "associating" with Doe—it objects to compensating Doe the same as other employees. Freedom of association therefore has no bearing on this case.

due to the risk that collective bargaining would intrude on religious decisions involving curriculum and instruction. But the Court did not hold—and this Court has not interpreted it to mean—that any regulation of a religious institution's employment decisions would violate the First Amendment. To the contrary, *Rayburn* reaffirmed that religious employers' employment decisions involving non-ministerial employees "may be subject to Title VII scrutiny." 772 F.2d at 1171.

*Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997), similarly fails to support application of the church-autonomy doctrine to regular employment disputes. In *Bell*, this Court held that the First Amendment barred a lawsuit challenging a church's decision to end an outreach ministry program and terminate an ordained minister. *See id.* at 332–33. As this Court explained, "the dispute in this case is ecclesiastical"—its adjudication would require the court to assess religious decisions "relating to how and by whom [churches] spread their message and specifically their decision to select their outreach ministry." *Id.* at 331–32. But nothing in *Bell* suggests that its holding would extend to disputes involving non-ministerial employees that have nothing to do with a church's decisions about religious ministry.

Overall, CRS and the United States overlook a critical flaw in their argument: Their proposed expansion of the church-autonomy doctrine

would render the ministerial exception—which has been consistently reaffirmed by the Supreme Court, *see Our Lady of Guadalupe*, 591 U.S. at 746–47—entirely superfluous. If religious employers could exempt themselves from generally applicable employment laws simply by citing a religious justification, regardless of whether the affected employee serves in a ministerial role, there would be no need to engage in the fact-specific ministerial-exception analysis at all. But the Supreme Court has rejected this approach. Indeed, in *Hosanna-Tabor*, 565 U.S. at 194–95, the Court considered and rejected the argument that the ministerial exception's application depended on whether the employment decision was "made for a religious reason." It instead engaged in a detailed analysis—considering the plaintiff's title, training, and job duties, among other factors—before concluding that the plaintiff fell within the exception's scope. *Id.* at 190–92. The Supreme Court's ministerial exception jurisprudence belies the sweeping immunity now urged by CRS and the United States. *Cf. Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 71 (4th Cir. 2023) (Motz, J., concurring) ("[T]he ministerial exception is just that—an *exception*.").

### B. The history of the First Amendment does not support expanding the church-autonomy doctrine to insulate religious entities from neutral, generally applicable legal obligations.

The United States argues that "[t]he history of the First Amendment" supports its claim that religious employers are free to violate the law without consequence. USA Br. 30. That is incorrect. As legal scholars and historical sources confirm, the concept of "church autonomy" as a blanket exemption form civil law finds no support in the original understanding of the First Amendment.

"Church autonomy—in the sense of an independent power to act outside the law—was not part of the Framers' intent [or] the framing generation's understanding." Marci A. Hamilton, *Religious Institutions, the No-Harm Doctrine, and the Public Good*, 2004 BYU L. Rev. 1099, 1156–57. Nor did the Founders view the Free Exercise Clause as a license to disregard lawful obligations. "[T]he 'free exercise of religion' mentioned in the first amendment was not originally understood to include a right to violate legitimate laws with impunity." Ellis West, *The Case Against a Right to Religion-Based Exemptions*, 4 Notre Dame J.L. Ethics & Pub. Pol'y 591, 623 (1990).

Rather, early Americans "regarded [religious] freedom as the right to do only what was not lawfully prohibited." *City of Boerne v. Flores*, 521 U.S.

507, 540 (1997) (Scalia, J., concurring in part) (internal quotation marks omitted). As Thomas Jefferson put it, while religious belief is a matter of personal conscience, it is "the rightful purpose[] of civil government[] for its officers to interfere when principles break out into overt acts against peace and good order." Thomas Jefferson, *An Act for Establishing Religious Freedom* (Oct. 31, 1785), *in* The Founders' Constitution (Philip B. Kurland & Ralph Lerner, eds.), https://perma.cc/J9E2-6NK3. Most founding-era state constitutional analogues to the Free Exercise Clause accordingly contained caveats reflecting this view that the right to religious freedom was not a license to violate the law. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1461–62 (1990).[4]

During the founding era, "[t]he assumption that religious liberty would not, or at least should not, affect civil authority over civil matters was so widely held that a general right of religious exemption rarely became the

[4] "Nine of the states limited the free exercise right to actions that were 'peaceable' or that would not disturb the 'peace' or 'safety' of the state," and, among those, "[f]our . . . also expressly disallowed acts of licentiousness or immorality; two forbade acts that would interfere with the religious practices of others; one forbade the 'civil injury or outward disturbance of others'; one added acts contrary to 'good order'; and one disallowed acts contrary to the 'happiness,' as well as the peace and safety, of society." McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. at 1461–62 (citing state free-exercise provisions).

basis for serious controversy." Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective*, 60 Geo. Wash. L. Rev. 915, 939 (1992). When conflicts did arise, courts routinely rejected claims for religious exemptions from secular law. For example, in *Philips v. Gratz*, 2 Pen. & W. 412, 416–17 (Pa. 1831), the Supreme Court of Pennsylvania acknowledged that while the "religious scruples of persons concerned with the administration of justice[] will receive all the indulgence that is compatible with the business of government," such respect "must not be suffered to interfere with the operations of that organ of the government which has more immediately to do with the protection of person[s]." Likewise, in *Donahoe v. Richards*, 38 Me. 379, 412 (Me. 1854), the Supreme Judicial Court of Maine affirmed that "society['s] . . . right to interfere on the principle of self-preservation" limits the right to free exercise of religion.

These early cases reflect the historical understanding that while religious belief is protected, it does not confer a categorical right to be exempt from civil law, particularly where the public interest and the rights of others are at stake. This Court should reject CRS and the United States' attempt to expand the church-autonomy doctrine far beyond what the First Amendment requires.

### C. The church-autonomy doctrine does not preclude Doe's claims.

Doe's claims do not implicate the church-autonomy doctrine. As CRS and the United States both concede, Doe was not a ministerial employee, and the ministerial exception is therefore irrelevant. *See* CRS Br. 22; USA Br. 22. And evaluating Doe's claims would not require a court to weigh in on any religious doctrinal dispute. Instead, the central question is straightforwardly secular: whether CRS revoked Doe's dependent's health insurance because of Doe's sexual orientation. Nothing in that question requires "extensive inquiry by civil courts into religious law and polity," *Milivojevich*, 426 U.S. at 709, or otherwise requires courts to take sides in "quintessentially religious controversies," *Hosanna-Tabor*, 565 U.S. at 187 (quoting *Milivojevich*, 426 U.S. at 720).

CRS seeks to reframe this case as a "theological controversy" to suggest that adjudication would impermissibly entangle the court in matters of religious doctrine. CRS Br. 4 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871)). But that characterization misstates the nature of the dispute. The religious questions raised by CRS have no bearing on Doe's legal claims, and nothing in this case requires a court to resolve or pass judgment on theological matters.

For example, whether CRS's benefits plan is "supported by authoritative Catholic teaching," CRS Br. 17, is completely irrelevant to the question of whether CRS violated neutral, generally applicable antidiscrimination laws. Accepting CRS's view that its decision to revoke Doe's spousal benefits was an accurate reflection of Catholic doctrine would not change the analysis, or the outcome, under the antidiscrimination statutes at issue here. The legal question before the court concerns compliance with federal employment protections, not the validity or orthodoxy of CRS's religious views.

Similarly, CRS's argument that religious doctrinal issues would be introduced by a substantial-burden assessment, *see* CRS Br. 19, misstates the legal issues at play. As an initial matter, no court will have to determine whether CRS's religious exercise is substantially burdened because RFRA does not apply in suits between private parties, as discussed *infra* Part II, and the antidiscrimination statutes invoked by Doe are neutral and generally applicable.[5] But even assuming arguendo that a substantial-burden analysis were required, it would not compel the court to evaluate or endorse CRS's interpretation of Catholic doctrine. Rather, the relevant

[5] This is also why CRS's critique of Doe's expert witness, *see* CRS Br. 19, is a moot point—the district court did not consider that testimony because it did not reach the issue of substantial burden. JA946.

question is whether the law forces the claimant to "engage in conduct that seriously violates their [sincere] religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014). If CRS were correct that such an inquiry is barred by the church-autonomy doctrine, then courts could never adjudicate *any* Free Exercise or RFRA claims, because they always require a substantial-burden analysis. CRS's reasoning, and its absurd implications, should be dismissed by this Court.

## II. The Religious Freedom Restoration Act does not apply in this case.

RFRA does not apply in suits between private parties. The plain text of RFRA—consistent with the Act's history and objectives—makes clear that RFRA applies only when the government is a party to the underlying lawsuit. Because Doe, not the government, brought this lawsuit to enforce his rights under Title VII and the Equal Pay Act, CRS cannot use RFRA as a defense.

It is a "cardinal canon" of statutory construction "that courts must presume that a legislature says in a statute what it means." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

The plain text of RFRA requires that the government be a party for its provisions to be available as an affirmative defense. First, the statute only applies when the "[*g*]*overnment* . . . substantially burden[s] a person's exercise of religion." 42 U.S.C. § 2000bb-1(a) (emphasis added). RFRA says nothing of burdens imposed by private individuals like Doe. Second, RFRA puts the onus on the government to "demonstrate[] that application of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at § 2000bb-1(b). The "burdens of going forward with the evidence and of persuasion" under RFRA belong to the government, and thus plainly cannot be met where it is a private party suing to enforce the law. *Id.* at § 2000bb-2(3). And "[a] private party cannot step into the shoes of the 'government' and demonstrate a compelling governmental interest and . . . the least restrictive means of furthering that compelling governmental interest because the statute explicitly says that the 'government' must make this showing." *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015).

Finally, the relief that RFRA provides "is clearly and unequivocally limited to that from the 'government.'" *Id.* at 737. RFRA allows "[a] person whose religious exercise has been burdened in violation of this section [to] assert that violation as a claim or defense in a judicial proceeding and obtain

appropriate relief *against a government*." 42 U.S.C. § 2000bb-1(c) (emphasis added). RFRA defines "government" to include "a branch, department, agency, instrumentality, [or] official (or other person acting under color of law) of the United States . . . ." *Id.* at § 2000bb-2(1). Private parties are notably absent from that list.

The United States, seeking an end-run around RFRA's plain meaning, argues that RFRA does apply to private-party suits because "[t]he Judiciary is a 'branch' of government." USA Br. 18. Under this theory, when a court adjudicates a case and applies federal law in a way that burdens religion, the judiciary itself is the actor burdening religious exercise. But this interpretation stretches RFRA beyond its intended scope and conflicts with established principles of statutory construction.

It is an "established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998). If the term "government" in RFRA includes the judiciary in one provision, then it must be construed the same way elsewhere in the statute. That reading produces untenable results. For example, Section 2000bb-1(b) imposes the burden of persuasion on the "government." If "government" includes the judiciary, the logical consequence would be that the judiciary itself bears the burden of producing evidence in litigation—a

proposition that defies both common sense and procedural norms. Similarly, Section 2000bb-1(c) permits courts to grant "appropriate relief against a government." Under the United States' interpretation, this would suggest that a court could be compelled to issue relief against itself, a conclusion that is legally incoherent and unsupported by RFRA.

The United States further contends that a private individual suing to vindicate federal statutory rights is "acting under color of law." USA Br. 18. But while RFRA's definition of "government" includes a "person acting under color of law," 42 U.S.C. § 2000bb-2(1), that phrase cannot be read so broadly as to encompass all private litigants seeking relief under federal statutes. It is well-established that "[a]ction by a private party pursuant to [a] statute, without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.'" *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (quoting *Lugar v. Edmonson Oil Co., Inc.*, 437 U.S. 922, 939 (1982)). Neither the United States nor CRS have identified "something more" that would transform Doe's private suit into state action.

Because the text of RFRA is unambiguous, the Court can stop its analysis here. *See Conn. Nat'l Bank*, 503 U.S. at 253–54. Nevertheless, interpreting RFRA as applying only in cases where the government is a party aligns with both the statute's purpose and legislative history. RFRA

was enacted in response to the Supreme Court's holding in *Employment Division v. Smith* that religiously neutral, generally applicable laws are presumptively valid. 42 U.S.C. § 2000bb(a)(4), (b)(1). Dissatisfied with the Court's ruling, Congress passed RFRA to reinstate the "the compelling interest test" from *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963). S. Rep. No. 103-111, at 3 (1993); *see* 42 U.S.C. § 2000bb-1(b). In doing so, Congress sought to fulfill the Framers' promise of a nation where citizens could practice their religion "free from Government interference" and "Government actions singling out religious activities for special burdens." S. Rep. No. 103-111, at 4. Notably, "[a]ll of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party." *Hankins v. Lyght*, 441 F.3d 96, 115 n.9 (2d Cir. 2006) (Sotomayor, J., dissenting). "The lack of even a single example of a RFRA claim or defense in a suit between private parties in these Reports tends to confirm what is evident from the plain language of the statute: It was not intended to apply to suits between private parties." *Id.* RFRA was passed only to shield individuals from "government actions." S. Rep. No. 103-111, at 8.

Consistent with the plain meaning of the text and legislative history, the Sixth, Seventh, and Ninth Circuits have held that RFRA does not apply in suits between private parties. *See Gen. Conf. Corp. of Seventh-Day*

*Adventists v. McGill*, 617 F.3d 402, 411–12 (6th Cir. 2010); *Listecki*, 780 F.3d at 736*; Sutton*, 192 F.3d at 835–43. As this Court recently noted, "the great weight of court authority" supports the conclusion "that RFRA does not apply to suits between private parties." *Billard*, 101 F.4th at 324.

Only the Second Circuit has diverged from this prevailing interpretation, suggesting in *Hankins v. Lyght* that RFRA might apply to private-party disputes—over the strong dissent of then-Judge Sotomayor. *See Hankins*, 441 F.3d at 103 (majority opinion); *id.* at 114–15 (Sotomayor, J., dissenting). And the *Hankins* decision has been roundly criticized, including by a later Second Circuit panel, which declared that it "d[id] not understand" how RFRA's language could possibly be read to apply to suits between private parties. *Rweyemamu v. Cote*, 520 F.3d 198, 203 & n.2 (2d Cir. 2008). The Seventh Circuit has likewise described the reasoning of *Hankins* as "unsound." *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006).

CRS and the United States contend that it would be "bizarre" and "anomalous" for Congress to constrain the government but not private citizens. CRS Br. 29; USA Br. 14. But such a distinction is not unusual. To the contrary, it reflects a fundamental feature of our legal system—and of the Constitution itself. Because the government uniquely has the legal authority to enact laws and enforce them, Congress routinely legislates to

constrain governmental power without regulating private conduct in the same way. Like the First Amendment, RFRA is concerned with limiting how the government—not a private individual—burdens religious exercise. The statute thus targets the unique capacity of the state to coerce, regulate, and penalize, rather than the actions of private citizens acting on their own behalf.

RFRA does not apply to suits between private parties. The Court should reject CRS and the United States' attempt to invoke RFRA here.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Jenny Samuels*

JENNY SAMUELS
ALEX J. LUCHENITSER
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-7308
*samuels@au.org*
*luchenitser@au.org*

ADITI FRUITWALA
DANIEL MACH
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 457-0800
*afruitwala@aclu.org*
*dmach@aclu.org*

LOUISE MELLING
ARIJEET SENSHARMA
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
*lmelling@aclu.org*
*cl_asensharma@aclu.org*

*Counsel for* Amici Curiae

January 9, 2026

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and 29(a)(5) because it contains 4,082 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

/s/ *Jenny Samuels*