**No. 25-1569**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**JOHN DOE**,

*Plaintiff-Appellee*,

v.

**CATHOLIC RELIEF SERVICES**,

*Defendant-Appellant*.

On Appeal from a Final Judgment of the
United States District Court for the District of Maryland
Case No. 1:20-cv-01815, Hon. Julie R. Rubin

# ***AMICI CURIAE*** **BRIEF FOR METROPOLITAN WASHINGTON EMPLOYMENT LAWYERS ASSOCIATION AND NATIONAL EMPLOYMENT LAWYERS ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLEE JOHN DOE**

Carolyn L. Wheeler
Jessica Westerman
Susanna Barron
Katz Banks Kumin LLP
11 Dupont Circle, N.W.
Suite 600
Washington, D.C. 20036
(202) 299-1140
wheeler@katzbanks.com
westerman@katzbanks.com
barron@katzbanks.com

*Counsel for Amicus Curiae*
January 9, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.** *Parties and Amici Curiae*. All parties appearing before the District Court and in this Court are listed in the Appellants' Brief.

**B.** *Rulings Under Review.* References to the rulings at issue appear in the Appellants' Brief.

**C.** *Related Cases.* There are no related cases.

## RULE 29(a)(4)(A) STATEMENT OF *AMICI*

The National Employment Lawyers Association and the Metropolitan Washington Employment Lawyers Association are associations. They do not have any corporate parents. They do not have any stock, and therefore no publicly held company owns 10% or more of the stock of these *Amici Curiae*.[1]

## RULE 29(a)(4)(D) STATEMENT OF INTEREST OF *AMICI*

The Metropolitan Washington Employment Lawyers Association ("MWELA"), founded in 1991, is a professional association and is the local chapter of the National Employment Lawyers Association, a national organization of attorneys who specialize in employment law. MWELA conducts continuing legal education programs for its more than 400 members, including an annual day-

[1] In accordance with Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1, *Amici* state that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amici* or their members—contributed money that was intended to fund preparing or submitting the brief.

long conference which usually features one or more judges as speakers. MWELA also participates as *amicus curiae* in important cases in the District of Columbia, Maryland, and Virginia, the three jurisdictions in which its members primarily practice.

MWELA's members and their clients have an important interest in the proper interpretation of the meaning and scope of the exemptions from the Maryland Fair Employment Practices Act afforded to religious entities. MWELA members represent employees of all religions, races, colors, sexes, and national origins and believe that Maryland's statutory exemption from the protections against discrimination must be construed narrowly, in accordance with the legislature's intent to preserve the intended balance between the rights of religious employers to free expression of their religious beliefs and the rights of employees whose jobs do not further the religious or secular missions of their employers to be free from all forms of invidious discrimination.

The National Employment Lawyers Association ("NELA"), founded in 1985, is the largest bar association in the country focused on empowering workers' rights attorneys. NELA and its 69 circuit, state, and local affiliates have a membership of over 4,000 attorneys who are committed to protecting the rights of workers in employment, wage and hour, labor, and civil rights disputes. NELA attorneys litigate daily in every circuit, giving NELA a unique perspective on how

principles announced by courts in employment cases actually play out on the ground. Many NELA members represent employees who seek religious accommodations from their secular employers, as well as employees who work in non-ministerial positions for religious employers and have a strong interest in being protected from invidious discrimination rooted in the religious beliefs of their employers.

*Amici Curiae* file this brief with the consent of all parties.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ vi

BACKGROUND AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. Title VII Does Not Permit Sex Discrimination by Religious Employers. ........ 3

A. Section 702 Only Exempts Employment Decisions Based on Religion. ........ 3

B. CRS's Decision to Terminate Doe's Spousal Benefits was Because of Sex, Not Religion. ........ 6

II. The District Court Applied the MFEPA Religious Employer Exemption Consistently with *Doe III.* ........ 9

A. The District Court is Bound by the Maryland Supreme Court's Decision in *Doe III*. ........ 9

B. The District Court Applied the *Doe III* Test Correctly ........ 10

III. Title VII, MFEPA, and EPA are Neutral Laws of General Applicability. ........ 13

A. Title VII, MFEPA, and the EPA are Neutral. ........ 13

B. Title VII, MFEPA, and the EPA are Generally Applicable. ........ 14

1. The Statutes' Categorical Exemptions Treat Comparable Religious and Secular Activities the Same Way. ........ 15

2. MFEPA Does Not Permit Individualized Discretion. ........ 17

C. Title VII, MFEPA, and the EPA Satisfy Rational Basis Review and Would Satisfy Strict Scrutiny, If It Applied. ....................19

IV. CRS Has No Defense Under RFRA..................................................20

A. RFRA Applies Only if the Government is a Party to a Suit.....20

B. Even if RFRA Applies, CRS Cannot Sustain its Burden of Proving this Defense. ............................................................22

V. The Doctrine of Church Autonomy Does Not Protect CRS's Discrimination From Review. ..........................................................24

CONCLUSION ..................................................................................29

CERTIFICATE OF COMPLIANCE ....................................................30

CERTIFICATE OF SERVICE ...........................................................30

## TABLE OF AUTHORITIES

**Cases**

*Behrend v. San Francisco Zen Ctr., Inc.*,
108 F.4th 765 (9th Cir. 2024) ....................12

*Bell v. Presbyterian Church (U.S.A.)*,
126 F.3d 328 (4th Cir. 1997) ....................27

*Billard v. Charlotte Cath. High Sch.*,
101 F.4th 316 (4th Cir. 2024) ....................5

*Billard v. Charlotte Cath. High Sch.*,
No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ....................26

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ....................8

*Bostock v. Clayton Cnty., Georgia,*
590 U.S. 644 (2020) ....................2, 6

*Boyd v. Harding Acad. of Memphis, Inc.*,
88 F.3d 410 (6th Cir. 1996) ....................4

*Boyer-Liberto v. Fontainebleau Corp.,*
786 F.3d 264 (4th Cir. 2015) ....................19

*Bryce v. Episcopal Church in the Diocese of Colorado*,
289 F.3d 648 (10th Cir. 2002) ....................27

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................24

*Canaan Christian Church v. Montgomery County, Md.*,
29 F.4th 182 (4th Cir. 2022) .................... 13, 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*,
508 U.S. 520 (1993) ....................................................................................13

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
483 U.S. 327 (1987) ..................................................................... 7, 10, 28

*Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware*,
450 F.3d 130 (3d Cir. 2006) ........................................................................27

*Dennis v. Sparks*,
449 U.S. 24 (1980) ......................................................................................22

*Doe v. Cath. Relief Servs.*,
484 Md. 640 (Md. 2023) ............................................................... 9, 11, 14

*E.E.O.C. v. Pac. Press Pub. Ass'n*,
676 F.2d 1272 (9th Cir. 1982).......................................................................4

*E.E.O.C. v. R.G. & G.R. Funeral Homes*, *Inc.*,
884 F.3d 560 (6th Cir. 2018).......................................................................23

*E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*,
213 F.3d 795 (4th Cir. 2000).......................................................................28

*Fitzgerald v. Roncalli High Sch., Inc.*,
73 F.4th 529 (7th Cir. 2023)..........................................................................5

*Frappied v. Affinity Gaming Black Hawk, LLC*,
966 F.3d 1038 (10th Cir. 2020).....................................................................7

*Fulton v. City of Philadelphia, Pennsylvania*,
593 U.S. 522 (2021) ........................................................................... 17, 18

*Gaddy v. The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*,
148 F.4th 1202 (10th Cir. 2025),...................................................................27

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir. 2010) ....................20

*Griffin v. Wisconsin*,
483 U.S. 868 (1987) ....................9

*Groff v. DeJoy*,
600 U.S. 447 (2023) ....................18

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
480 U.S. 136 (1987) ....................28

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
565 U.S. 171 (2012) .................... 12, 20, 24

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*,
499 U.S. 187(1991) ....................8

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
344 U.S. 94 (1952) ....................24

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ....................14

*Listecki v. Official Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ....................20

*McClure v. Salvation Army*,
460 F.2d 553 (5th Cir. 1972) ....................4

*McFeeley v. Jackson St. Ent., LLC*,
825 F.3d 235 (4th Cir. 2016) ....................19

*McMahon v. World Vision Inc.*,
147 F.4th 959 (9th Cir. 2025) ....................12

*Molesworth v. Brandon*,
672 A.2d 608 (Md. 1996) ....................16

*NLRB v. The Catholic Bishop of Chicago*,
440 U.S. 490 (1979) ....................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020)....................27

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985).................... 4, 23, 25

*Rweyemamu v. Cote*,
520 F.3d 198 (2d Cir. 2008) ....................20

*See Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) ....................20

*Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*,
426 U.S. 696 (1976) ....................25

*Sherbert v. Verner*,
374 U.S. 398 (1963) ....................21

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
41 F.4th 931 (7th Cir. 2022)....................5

*Stephenson v. Pfizer, Inc.*,
641 F. App'x 214 (4th Cir. 2016)....................18

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ....................20

*Tandon v. Newsom*,
593 U.S. 61 (2021) .................... 16, 18

*United States v. Burke*,
504 U.S. 229 (1992) ....................23

*United States v. Scott*,
941 F.3d 677 (4th Cir. 2019) ....................................................................9

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ..................................................................................21

*Zinski v. Liberty Univ., Inc.*,
777 F. Supp. 3d 601 (W.D. Va. 2025).....................................................12

**Statutes**

42 U.S.C. § 2000bb(b)(1) ..........................................................................21

42 U.S.C. § 2000bb-1(b)(1)-(2) ...................................................................21

42 U.S.C. § 2000e(b) ..................................................................................15

42 U.S.C. § 2000e(b)(1)...............................................................................15

42 U.S.C. § 2000e(b)(2)...............................................................................15

42 U.S.C. § 2000e(j) ......................................................................................6

42 U.S.C. § 2000e-1(a) ..................................................................................4

42 U.S.C. § 2000e-1(c) ................................................................................15

42 U.S.C. § 2000e-2(a) ..................................................................................4

Md. Code, State Gov't § 20-601(d)(1)(i)....................................................15

Md. Code, State Gov't § 20-601(d)(3) .......................................................15

Md. Code, State Gov't § 20-605(a)(4)........................................................15

**Other Authorities**

Carl H. Esbeck, An Extended Essay on Church Autonomy,
22 Federalist Soc'y Rev. 244, 248 (2021) ........................................................ 26

H.B. 307/S.B. 205, 2001 Leg., 415th Sess. (Md. 2001) ........................................ 14

## BACKGROUND AND SUMMARY OF ARGUMENT

John Doe is a gay man in a legally recognized marriage with another man. (JA1115). Catholic Relief Services ("CRS") hired him in 2016 as a data analyst, and he held several technology-focused positions throughout his employment. (JA956, 1115-16). Doe initially received health insurance coverage for his spouse, but CRS terminated his coverage in October 2017, (JA925, 956, 1008-9), because it considered such benefits "to be contrary to its Catholic values" (JA957).

Doe sued CRS claiming, *inter alia*, sex and sexual orientation discrimination under the Maryland Fair Employment Practices Act ("MFEPA"), Title VII, the federal Equal Pay Act, and retaliation. (JA957). The district court granted summary judgment for Doe on his federal claims (JA924-47), holding that his suit was not barred by the doctrine of church autonomy (JA929) nor by the Religious Freedom Restoration Act ("RFRA"), which the court held inapplicable in litigation between private parties (JA932-34). The court certified questions about the interpretation of MFEPA and MEPEWA to the Maryland Supreme Court (JA954), and after a bench trial, entered judgment for Doe on his state law claims. (JA1104).

CRS's arguments seeking to avoid liability for its discrimination in this case are unpersuasive efforts to rewrite the plain language of the statutory exemptions for religious employers in Title VII and the MFEPA, as well as the RFRA defense. Because those efforts fail, CRS claims the Constitution must protect it where

Congress and the Maryland legislature declined to permit it to discriminate against an individual because he is gay when his job does not involve advancement of CRS's core missions.

Title VII's plain language demonstrates that the exemptions for religious employers permit discrimination on the basis of religion, not sex. Under the controlling analysis in *Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644 (2020), CRS's discrimination in this case is based on sex, not religion.

The district court properly applied the multi-factor test adopted by the Maryland Supreme Court to identify individuals who perform "duties that directly further the core mission (or missions) of the religious entity" and thus are subject to MFEPA's exemption for religious employers. The district court correctly concluded that Doe's data analysis jobs did not remove him from the protections of MFEPA.

As the district court also concluded, Title VII, the EPA, and MFEPA all withstand Constitutional challenge because they are neutral laws evincing no motive to discriminate against religious entities, and they are generally applicable and do not permit individualized discretion in their application. Because these laws are neutral and generally applicable, they need only withstand rational basis review, which they do.

The district court properly held the RFRA defense inapplicable in this case because the government is not a party. Even if this defense applied, Doe could demonstrate that any burden on CRS's religious beliefs is justified because enforcement of Title VII is the least restrictive means to achieve the compelling national interest in eradicating invidious employment discrimination.

Finally, the district court correctly rejected CRS's contention that the doctrine of church autonomy must shield its discriminatory decision, because the church autonomy principle in employment cases is fully realized through the ministerial exception, which is not implicated in this case.

This Court should affirm the thoughtful and thorough decisions of the district court.

## ARGUMENT

### I. Title VII Does Not Permit Sex Discrimination by Religious Employers.

#### A. Section 702 Only Exempts Employment Decisions Based on Religion.

When Congress considered how to protect employees from invidious discrimination while also protecting the legitimate religious interests of religious employers, it struck a careful balance: it permitted religious entities to base their employment decisions on religion—nothing more, nothing less. Section 702 creates an exemption to Title VII for "a religious corporation, association,

educational institution, or society *with respect to the employment of individuals of a particular religion* to perform work connected with the carrying on . . . of its activities." 42 U.S.C. § 2000e-1(a) (emphasis added). This section thus authorizes certain religious entities to employ individuals *of a particular religion*, even though Title VII otherwise prohibits employment decisions based on religion. 42 U.S.C. § 2000e-2(a) (identifying religion as prohibited basis for discrimination).

This Court and every other federal circuit court that has considered the scope of Section 702 has interpreted that provision to exempt religious entities only from Title VII's prohibition against discrimination on the basis of religion. *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985) (holding Section 702 "applies to one particular reason for employment decision—that based upon religious preference"); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (permitting sex discrimination claim against religious school and holding Section 702 "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination"); *E.E.O.C. v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) (holding Section 702 did not preclude sex discrimination claim against religious entity); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) (holding "[t]he language and the legislative history of § 702 compel the conclusion that Congress did not intend that a religious

organization be exempted from liability for discriminating against its employees on the basis of race, color, sex or national origin").

No circuit court has adopted the interpretation that CRS proffers here. *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024) ("No federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations."). Indeed, the only support CRS finds for its strained interpretation of Title VII are two inapposite concurring opinions from the Seventh Circuit, the latter of which relies on the former, and both in cases decided on ministerial exception, rather than Section 702, grounds. CRS Br. at 23, citing *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945-47 (7th Cir. 2022) (Easterbrook, J., concurring) and *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534-37 (7th Cir. 2023) (Brennan, J., concurring) (citing *Starkey*).

This Court should not accept CRS's invitation to follow a new, uncharted path toward depriving employees of religious entities of all the Title VII protections that Congress intended.

### B. CRS's Decision to Terminate Doe's Spousal Benefits was Because of Sex, Not Religion.

The central issue in this case is whether CRS's discrimination against Doe was based on religion and thus exempt or based on sex and thus prohibited. It is clear that Doe's sexual orientation, and thus his sex, was a but-for cause of CRS's termination of his spousal health benefits. *Bostock*, 590 at 656 (holding that "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation") (internal quotation marks omitted).

As the Supreme Court articulated in *Bostock*, "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* Here, CRS concedes it terminated Doe's spousal benefits because of its opposition to same-sex marriage. CRS Br. at 33. Since CRS would not have terminated Doe's spousal benefits if he were a woman married to a man, his sex was a but-for cause of his termination. As such, CRS engaged in prohibited discrimination on the basis of sex.

Contrary to CRS's insistence, the statutory definition of "religion" that encompasses "all aspects of religious observance and practice, as well as belief," does not change this causal analysis. CRS Br. at 20-21 (citing 42 U.S.C. § 2000e(j)). Even assuming Doe's marriage to a man rendered him non-compliant with some aspect of CRS's religious observance, practice, or belief, CRS's decision to terminate his spousal benefits because of his marriage to a man still

implicates Doe's sex. Sex thus remains a but-for cause of CRS's employment decision. *Cf. Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1046-49 (10th Cir. 2020) (applying *Bostock* analysis to find age-plus-sex discrimination claim cognizable under Title VII).

Critically for religious employers, analyzing whether sex (or any Title VII-protected trait) is a but-for cause of an employment decision does not affect the employer's ability to make employment decisions based on, for example, an individual's failure to adhere to religious practices like dietary restrictions, modes of dress and prayer, or other common religious tenets. *See, e.g.*, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 330 n.4 (1987) (holding § 702 precluded religious discrimination claim by Church employee who failed to qualify for temple recommend, which is issued "only to individuals who observe the Church's standards in such matters as regular church attendance, tithing, and abstinence from coffee, tea, alcohol, and tobacco"). Section 702 only prohibits religious entities from making employment decisions based on race, color, sex, or national origin—precisely as Congress intended.

The fact that CRS's decision to terminate Doe's spousal benefits was *motivated by* a sincerely held religious belief also does not change the *Bostock* analysis. An employer's motivation for discriminating on the basis of sex is irrelevant. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of*

*Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (holding absence of malevolent motive does not convert facially discriminatory policy into neutral policy). Indeed, the Supreme Court has long refused to allow religious entities to engage in prohibited discrimination even when their conduct is based on a sincerely held religious belief. *Bob Jones Univ. v. United States*, 461 U.S. 574, 602-04 (1983) (affirming denial of tax exemption for religious institution because of racially discriminatory admissions policy even though policy was based on sincerely held religious belief that Bible forbids interracial dating and marriage). This Court should not endorse CRS's admitted sex discrimination merely because it was motivated by religious belief.

If this Court were to agree with CRS that its decision to terminate Doe's spousal benefits was "because of religion" rather than "because of sex," and therefore exempt from Title VII, it will give religious employers license to discriminate not only on the basis of sex, but also on the basis of race, color, and national origin. Indeed, this case is no different from one in which a religious employer seeks to justify terminating a Black employee because of her race based on the employer's sincerely held religious belief that Black people should not work alongside people of other races. There is no principled way to distinguish that case from this one, and this Court should not attempt to do so.

## II. The District Court Applied the MFEPA Religious Employer Exemption Consistently with *Doe III.*

### A. The District Court is Bound by the Maryland Supreme Court's Decision in *Doe III*.

In *Doe v. Cath. Relief Servs.*, 484 Md. 640 (Md. 2023) ("*Doe III*"), the Maryland Supreme Court held that the "narrowest reasonable reading" of MFEPA's religious employer exemption limits that exemption to "employees who perform duties that directly further the core mission (or missions) of the religious entity." (JA986). CRS suggests in its brief that the Maryland Supreme Court's interpretation of this provision was incorrect, and that its narrow reading "is an artifact of the original exemption that was limited to religious exemptions only." CRS Br. at 41. This objection to the holding in *Doe III* is ultimately irrelevant, as this Court is bound by a state court's interpretation of a state law. *United States v. Scott*, 941 F.3d 677, 685 (4th Cir. 2019) ("Whether or not we would choose to interpret a similarly worded federal [provision] in [a similar] fashion, we are bound by the state court's interpretation") (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987)). Regardless, CRS's assertion that MFEPA's exemption must be interpreted as identical to Title VII's exemption is not supported by the legislative history of MFEPA. While the Maryland legislature may have, at one time, amended the MFEPA exemption to align with Section 702, it has since then evinced its intention to be *more* protective of workers than Title VII, including by

adding sexual orientation and gender identity as protected categories before they were protected under federal law.

CRS also argues the *Doe III* test renders the statute "constitutionally defective" by "discriminat[ing] between religious denominations that preferentially hire coreligionists at all levels of an organization." CRS Br. at 41. While the Supreme Court has held that an exemption to Title VII allowing religious organizations to hire only employees of the same religion is constitutionally *permissible*, it has not held that such an exemption is constitutionally *required*. *Amos*, 483 U.S. at 339 n.17 ("We have no occasion to pass on the argument of [religious employers] that the exemption to which they are entitled under § 702 is required by the Free Exercise Clause."). Therefore, the Maryland Supreme Court's reading of the MFEPA creates no constitutional problem which would warrant disregarding a state court's interpretation of a state statute.

### B. The District Court Applied the *Doe III* Test Correctly.

The decisive factor in the district court's application of the *Doe III* test was its determination that Doe's duties were "one or more steps removed from the actions that effect CRS goals," and therefore did not "'directly' further the core mission of a religious entity," as would be necessary for CRS to claim a religious exemption under MFEPA. (JA1127-28). In arguing the district court misapplied this test, CRS focuses on the *Doe III* court's hypothetical comparison between a

janitor and an executive director at a religious charity and conclusion that the latter's work would directly further the core mission of that religious entity, whereas the former's work would further it only indirectly. CRS extrapolates from this example to suggest the *Doe III* court intended to limit the category of employees subject to the MFEPA exemption to "entry-level, lower-paid employees" such as janitors and mailroom clerks, and not to "a highly paid professional with a graduate degree who would be challenging to replace," such as Doe, and that the conclusion reached by the district court therefore was incorrect. CRS Br. at 43-45. *Doe III* created no such distinction.

It may well be that for some religious employers, the extent to which an employee's work is directly connected to the organization's mission(s) is strongly correlated with that employee's education, qualifications, and pay. But these factors may not determine whether the MFEPA exemption applies—indeed, *Doe III* does not even identify them as considerations relevant to that inquiry. (JA994-95). The fact that the *Doe III* court compared an entry-level position at a hypothetical religious employer that would be covered by the exemption to an executive-level position at the same organization that would not be covered does not mean that the fact-specific *Doe III* analysis dictate the same result at a different organization under different circumstances. This is illustrated by cases involving the ministerial exception under Title VII—another fact-intensive, multi-factor

inquiry in the employment context which requires an analysis similar to the one in *Doe III*, but focuses exclusively on the employee's position in relation to the religious and spiritual functions of the employer.

In *Zinski v. Liberty Univ., Inc.*, 777 F. Supp. 3d 601, 638 (W.D. Va. 2025), the district court found that the plaintiff was not a minister because her low-level position "involved strictly technological and administrative duties." In contrast, in *McMahon v. World Vision Inc*., 147 F.4th 959, 967 (9th Cir. 2025), the Ninth Circuit found an employee in an entry-level position requiring only a high school diploma or GED, who was paid close to minimum wage, was a minister for purposes of the ministerial exception to Title VII. *See also Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 770 (9th Cir. 2024) (apprentice whose primary duties included "maintenance, kitchen, and guest services" was a minister). While the ministerial exception differs from the MFEPA exception in important ways, it is similar in that it requires analyzing an employee's duties in relation to the mission and activities of a religious employer. *See Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 192 (2012) (applicability of ministerial exception depends on whether duties of employee in question "reflected a role in conveying the [religious entity's] message and carrying out its mission").

## III. Title VII, MFEPA, and EPA are Neutral Laws of General Applicability.

CRS argues that if the statutes' exemptions do not shield its conduct, the statutes themselves fail the tests of neutrality and general applicability. CRS is wrong. The statutes at issue here are neutral laws of general applicability and, as such, are subject only to rational basis review, which requires only that the laws be rationally related to a legitimate governmental interest. *Canaan Christian Church v. Montgomery County, Md.*, 29 F.4th 182, 199 (4th Cir. 2022). Even assuming they trigger strict scrutiny, which they do not, they are narrowly tailored to satisfy the government's compelling interest in eliminating discrimination in employment, including employment by religious entities.

### A. Title VII, MFEPA, and the EPA are Neutral.

A law is not neutral if the object of the law is to "infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.,* 508 U.S. 520, 533 (1993). None of the statutes at issue here do so.

For example, with respect to MFEPA, there is no evidence that the Maryland General Assembly intended to restrict religious employers' religious practices when it enacted the exemption at issue. To the contrary: when the Maryland General Assembly amended MFEPA in 2001 to add sexual orientation to the religious exemption, the Maryland Commission on Human Relations ("MCHR")

testified that the proposed legislation would not "force faith-based organizations to extend jobs to those who do not live in accordance with their religious beliefs"—by, for example, requiring them to not discriminate against gay job applicants. H.B. 307/S.B. 205, 2001 Leg., 415th Sess. (Md. 2001) (testimony of MCHR); (JA990) (citing MCHR testimony). Although the legislative history of the 2001 amendment is "sparse," it tends to suggest the amendment's goal was to *protect* CRS's and others' religious practices, not restrict them. (JA990).

The legislative history of Title VII and the EPA likewise are bereft of any indication that Congress intended to restrict employers' religious practices; CRS does not argue, and this Court should not find, otherwise.

**B. Title VII, MFEPA, and the EPA are Generally Applicable.**

A law is not generally applicable if it "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022). None of the statutes at issue violates these requirements.

#### 1. The Statutes' Categorical Exemptions Treat Comparable Religious and Secular Activities the Same Way.

The statutes' categorical exemptions do not undermine their general applicability because they treat comparable secular and religious activities the same way.

MFEPA's exemptions for small employers, Md. Code, State Gov't § 20-601(d)(1)(i); bona fide private membership clubs, Md. Code, State Gov't § 20-601(d)(3); and employers observing the terms of a bona fide seniority system or employee benefit plan, Md. Code, State Gov't § 20-605(a)(4), apply equally to both secular and religious entities. Likewise do Title VII's exemptions for small employers, 42 U.S.C. § 2000e(b); businesses owned by Indian tribes, 42 U.S.C. § 2000e(b)(1); bona fide private membership clubs, 42 U.S.C. § 2000e(b)(2); and foreign persons operating businesses in the United States, 42 U.S.C. § 2000e-1(c), apply equally to secular and religious entities. The EPA inherited the myriad industry-specific exemptions to the Fair Labor Standards Act of 1938 ("FLSA"), and those exemptions also apply to secular and religious entities alike. As such, the categorical exemptions in all three statutes treat comparable religious and secular activities the same way.

CRS argues its employment decisions are "comparable" to employment decisions made by the secular entities covered by the statutes' categorical exemptions, and therefore must be treated the same way—that is, as exempt—because "[t]he government does not have a stronger or more particularized interest in rooting out discrimination by religious employers versus, for example, small businesses, oyster farms, or hometown newspapers." CRS Br. 52 (referring to certain industry-specific exemptions under the EPA). But this argument ignores the legislative balancing performed by Congress and the Maryland legislature when they enacted the relevant categorical exemptions, including the many legitimate reasons why Congress and the Maryland General Assembly would seek to categorically exempt certain (religious and secular) employers, but not CRS.

Whether religious and secular activities are comparable "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The statutes' categorical exemptions further governmental interests that are not implicated by the statutes' application to CRS. For example, the Maryland General Assembly limited MFEPA's small employer exception to employers with fewer than 15 employees in part to avoid overburdening administrative agencies, which would have experienced a massive workload increase if MFEPA were expanded to cover those employers. *Molesworth v. Brandon*, 672 A.2d 608, 614 (Md. 1996) (relying on legislative

history of Title VII to interpret MFEPA employer size exemption). Applying MFEPA and Title VII to employment decisions by CRS, one of a much smaller number of Maryland employers with 15 or more employees, poses no such risk of administrative overburden and therefore need not be treated the same way as employment decisions by (secular or religious) small employers. As the district court correctly concluded, employment decisions by "CRS's 'obviously secular counterpart'—a large, secular nonprofit—[are] subject to identical treatment under MFEPA." (JA1133-34). That is, neither of them is exempt.

For these reasons, the relevant statutes' categorical exemptions do not "prohibit religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 534 (2021). This Court should not entertain CRS's notion that the statutes' categorical exemptions render them constitutionally suspect.

#### 2. MFEPA Does Not Permit Individualized Discretion.

CRS argues MFEPA is also constitutionally suspect because the *Doe III* test provides a "mechanism for individualized exemptions" that undermines its general applicability. CRS Br. 53, citing *Fulton*, 593 U.S. at 533. This is not so.

In *Fulton*, the City of Philadelphia's foster care contract included "a formal system of entirely discretionary exceptions" that rendered it not generally

applicable. *Fulton*, 593 U.S. at 535-36. Specifically, the contract prohibited foster care agencies from rejecting prospective foster parents based upon their sexual orientation "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." *Id.* at 535. This scheme permitted the City to grant *ad hoc* exceptions to its non-discrimination requirement based upon an agency's *motivation* for rejecting prospective foster parents based upon their sexual orientation. For example, the Commissioner could grant an exception to an agency that rejected gay prospective foster parents for secular reasons but refuse to grant the same exception to an agency that rejected gay prospective foster parents for religious reasons. This would have resulted in the City's treating comparable and secular and religious activities differently, in violation of the Free Exercise clause. *Tandon*, 593 U.S. at 62.

The *Doe III* test carries no such risk. The *Doe III* test is an objective, "fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." (JA944). This kind of inquiry is indeed "common as dishwater" in employment jurisprudence under both federal and Maryland law. (JA1135); *see, e.g., Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (Title VII religious accommodation test is context-specific and takes into account "all relevant factors"); *Stephenson v. Pfizer, Inc.*, 641 F. App'x 214, 220 (4th Cir. 2016) (identifying the "essential functions of a job" under Americans with Disabilities Act entails "factual inquiry

that is guided by several . . . factors"); *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016) ("economic realities" under FLSA "turns on six factors," all of which are "part of the totality of circumstances presented"); *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 277 (4th Cir. 2015) (sufficiency of Title VII hostile work environment determined "by looking at all the circumstances"). The *Doe III* test, by requiring consideration of several factors, does not thereby create an impermissible "mechanism for individualized exemptions" and, as such, is Constitutionally permissible.

### C. Title VII, MFEPA, and the EPA Satisfy Rational Basis Review and Would Satisfy Strict Scrutiny, If It Applied.

Since Title VII, MFEPA, and EPA are neutral laws of general applicability, they are subject only to rational basis review. *Canaan Christian Church*, 29 F.4th at 199. The district court correctly concluded that MFEPA is rationally related to a legitimate government interest, (JA1136), and both Title VII and EPA also are rationally related to the same government interest in eliminating discrimination, including sex discrimination, in employment.

Even if this Court finds the relevant statutes are not neutral or are not generally applicable, which it should not, for the reasons explained *infra* Section V, all three statutes satisfy strict scrutiny review.

## IV. CRS Has No Defense Under RFRA.

### A. RFRA Applies Only if the Government is a Party to a Suit.

The statutory protections of RFRA cannot be invoked in this case because, as the district court correctly held, RFRA is inapplicable in cases between private parties. This is the view of the majority of courts of appeals that have considered the question. *See*, *e.g.*, *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736-37 (7th Cir. 2015) (statutory text is clear that if government is not a party, no one can provide appropriate relief); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) ("The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party."); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837-43 (9th Cir. 1999) (same). Only the Second Circuit has held otherwise. *See Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). The Second Circuit subsequently expressed doubts about its own reasoning, noting that the text makes it plain that "*the government*" has to justify any burden. *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) (emphasis in original), *abrogated on other grounds by Hosanna-Tabor*, 565 U.S. 171 (holding ministerial exception is not jurisdictional bar). The *Rweyemamu* Court did not decide the issue of RFRA's applicability because the defendant waived the issue. *Rweyemamu*, 520 F.3d. at 204.

The view of the majority of courts is compelled by the plain language of the statute, and CRS's argument that this plain reading is at odds with Congress's purpose is unavailing. RFRA's purpose is specific—it was crafted to "restore the compelling interest test" enunciated in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) "and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). RFRA precludes the government from substantially burdening exercise of religion even through a statute of general applicability unless the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1)-(2).

Since it is the government that must prove both its compelling interest and that it has used the least restrictive means to further it, the language and purpose of the statute are entirely congruent. The United States' argument that the "government" is involved in this litigation because an act of Congress is at issue and because a federal court has jurisdiction over the case, and both Congress and the judiciary are branches of the government, is both novel and impossible to reconcile with the language of the statute. The statute requires the government to "demonstrate," *i.e.*, prove, its interest and the efficacy of its chosen means of

effectuating that purpose, so some agent of the government must be a party to the litigation to fulfill that role.

The United States' further insistence that a private litigant suing under a federal statute is acting under color of law is contrary to law and logic. The "color of law" doctrine identifies individuals whose conduct can be attributable to the government for purposes of constitutional constraints, and is used in civil rights litigation to identify private individuals who act in concert with state officials to violate others' constitutional rights. In such cases they are considered state actors. Private individuals who are defendants in civil actions are not state actors for purposes of a Section 1983 suit unless they have jointly engaged with state officials in a challenged action. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980). Private individuals who are plaintiffs in civil actions cannot be viewed as state actors under any circumstances. *Id.* (resorting to court does not mean a party has acted "under color of law").

### B. Even if RFRA Applies, CRS Cannot Sustain its Burden of Proving this Defense.

Even if RFRA applied in this case, CRS could not prevail on its defense that Title VII as applied here would substantially burden its religion or that any such burden is not in furtherance of a compelling governmental interest or achieved through the least restrictive means. CRS's asserted burden is that compliance with Title VII's prohibition of sex discrimination compels it to tolerate or condone

Doe's same sex marriage. But as the Sixth Circuit held in a similar context, "as a matter of law, tolerating [an individual's] understanding of her sex and gender identity is not tantamount to supporting it." *E.E.O.C. v. R.G. & G.R. Funeral Homes*, *Inc.*, 884 F.3d 560, 588 (6th Cir. 2018) (holding that allowing a transgender woman to wear attire at odds with employer's religious beliefs about attire appropriate to each gender "is not a substantial burden under RFRA"), *aff'd on other grounds sub nom Bostock*, 590 U.S. 644.

Even if providing benefits on a non-discriminatory basis to Doe and his spouse were considered a substantial burden on CRS's sincere religious beliefs, the government (or, here, Doe in the government's place) can readily demonstrate a compelling government interest in enforcing the law against sex discrimination in employment. The Supreme Court has recognized the government's compelling interest in combating discrimination: "[I]t is beyond question that discrimination in employment on the basis of sex . . . is, as . . . this Court consistently has held, an invidious practice that causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992); *see R.G. & G.R. Funeral Homes*, 884 F.3d at 591 (allowing particular person to suffer discrimination is "directly contrary to the [government's] compelling interest in combating discrimination in the workforce"); *Rayburn*, 772 F.2d at 1169 ("Title VII is an interest of the highest order").

Doe can also demonstrate that the Title VII enforcement regime is the least restrictive means to achieve the goal of eradicating workplace discrimination. As the Supreme Court observed in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014), "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal." The same must be said of the prohibitions on sex discrimination: there is no less restrictive means to enforce Title VII's ban on sex discrimination than through enforcement actions such as the instant suit Doe has brought against CRS.

## V. The Doctrine of Church Autonomy Does Not Protect CRS's Discrimination From Review.

The doctrine of church autonomy—rooted in the First Amendment's Religion Clauses—protects religious organizations from governmental interference only in matters of internal governance, ministerial selection, and theological doctrine. *See*, *e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952). Contrary to CRS's argument that Doe's case should be dismissed for lack of subject matter jurisdiction on this basis, CRS Br. at 20, the principle of church autonomy does not deprive courts of jurisdiction to decide whether an employee asserting a claim under discrimination laws is entitled to relief. *See Hosanna-Tabor*, 565 U.S. at 195 n.4 (holding that the ministerial exception, which is an aspect of the church autonomy doctrine, is an affirmative

defense to an otherwise cognizable claim). Likewise, the more general church autonomy doctrine operates as an affirmative defense to an otherwise cognizable claim. The district court properly applied this Court's decision in *Rayburn*, 772 F.2d at 1171, and held this defense did not bar Doe's claims based on its understanding of the nature of his claims, his job duties at CRS, and the possibility of resolving his claims without delving into matters of faith or doctrine. (JA929).

The church autonomy doctrine arose in a line of cases prohibiting secular courts from deciding issues involving church disputes over property, polity, and church administration. *See Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*, 426 U.S. 696, 710 (1976). This principle of abstention from deciding church disputes requires that courts avoid controversies over religious doctrine. As noted in the United States' brief, in *NLRB v. The Catholic Bishop of Chicago*, 440 U.S. 490, 502-03 (1979), the Supreme Court held the NLRB could not exercise jurisdiction over church-operated schools because of the risk of infringement of First Amendment rights in the Board's evaluation of the scope of mandatory subjects of collective bargaining in such schools. This holding has no relevance to the current dispute under Title VII, where the statute already provides the necessary exemption to avoid any such infringement. To the extent the statutory exemption is insufficiently protective of religious exercise, the ministerial exception fills that gap.

In the arena of employment law, the church autonomy doctrine is encapsulated in the ministerial exception. Commentators and courts agree that the church autonomy doctrine is applied in employment discrimination cases only through the ministerial exception, which shields from judicial scrutiny all decisions about "the hiring, training, supervising, promoting, and removing of clergy, worship leaders, and other employees with explicitly religious functions as well as policy leaders." Carl H. Esbeck, An Extended Essay on Church Autonomy, 22 Federalist Soc'y Rev. 244, 248 (2021); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, *14 (W.D.N.C. Sept. 3, 2021) ("In the context of employment, the church autonomy doctrine is limited only to employees who perform spiritual functions that qualify for the ministerial exception."), *rev'd and remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024) (reversing determination that Billard was not a minister for purposes of ministerial exception, but citing with approval the district court's statement about the scope of the church autonomy doctrine). The reason courts analyze employment claims under the standards governing the ministerial exception is straightforward: the ministerial exception fully implements the core principle of church autonomy by shielding religious employers' decisions about their ministerial staff from judicial scrutiny.

None of the cases cited by CRS or the United States apply a broader or more general definition of church autonomy in an employment discrimination case. For

example, *Gaddy v. The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202 (10th Cir. 2025), cited by CRS, involved a fraud case brought by church members against the church and had nothing to do with employment discrimination. The cases cited by the United States that decided employment disputes all involved ministers and thus provide no support for the broader application of church autonomy the government advocates in this case. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware*, 450 F.3d 130 (3d Cir. 2006) (sex discrimination by Catholic school teacher[2]); *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331-32 (4th Cir. 1997) (ordained minister's contract dispute with his church was an ecclesiastical dispute); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) (minister's hostile work environment claim based on comments made during discussions of church doctrine barred). In short, there is no authority for the broader application of the church autonomy doctrine to the employment action challenged in this case.

Employment decisions about positions like Doe's data analysis jobs that do not connect at all with the performance of spiritual functions are not shielded by the ministerial exception, and the church autonomy doctrine should not be distorted to exempt such decisions from scrutiny. Such an interpretation would not

---

[2] The teacher in *Curay-Cramer* would be viewed as a minister under *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753-54 (2020).

serve the Constitutional purpose of keeping government out of the core business of churches. As this Court has held, "Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer." *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000). If this Court were to expand the church autonomy doctrine as CRS and the United States advocate, it would risk creating an impermissible establishment of religion, prohibited by the First Amendment.

As the Supreme Court observed in *Amos*, the Establishment clause requires "benevolent neutrality" that will permit free religious exercise, but "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" 483 U.S. at 334-35 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145 (1987)). That point would be reached under the unparalleled freedom to discriminate CRS seeks in this case. Here, CRS seeks to transform a Constitutional barrier erected to prevent government intrusion into the internal governance of religious entities into a weapon that would destroy the rights of employees of religious institutions to be free from sex discrimination, even when their jobs do not involve promulgation of religious principles or doctrines. This Court should not permit it to do so.

## CONCLUSION

CRS's arguments for its right to violate Title VII's and MFEPA's guarantees of equal employment opportunity are a thinly disguised effort to turn the statutory and constitutional shields protecting religious exercise into swords that would cut down the rights of all workers to be free from invidious discrimination. We respectfully urge the Court to affirm the well-reasoned decisions of the district court.

Respectfully submitted,

/s/ *Carolyn L. Wheeler*

Carolyn L. Wheeler
Jessica Westerman
Susanna Barron
Katz Banks Kumin LLP
11 Dupont Circle, N.W.
Suite 600
Washington, D.C. 20036
(202) 299-1140
wheeler@katzbanks.com
westerman@katzbanks.com
Barron@katzbanks.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) in that, according to the word-count function of the word-processing system used to generate the brief (Microsoft Word), the brief contains 6374 words, exclusive of the portions exempted by Rule 32(f).

*/s/ Carolyn L. Wheeler*

Carolyn L. Wheeler

**CERTIFICATE OF SERVICE**

I certify that on this date, September 9, 2025, the foregoing Amici Curiae Brief has been served upon counsel of record via the Court's CM/ECF system.

*/s/ Carolyn L. Wheeler*

Carolyn L. Wheeler