**No. 25-1569**

═══════════════════════════════════

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

─────────────────

JOHN DOE,

*Plaintiff-Appellee,*

v.

CATHOLIC RELIEF SERVICES,

*Defendant-Appellant.*

─────────────────

On Appeal from the U.S. District Court for the District of Maryland,
Case No. 1:20-cv-01815-JRR, Hon. Julie R. Rubin

─────────────────

**AMICUS BRIEF OF LAMBDA LEGAL DEFENSE AND EDUCATION FUND,
INC. IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

─────────────────

Gregory R. Nevins
LAMBDA LEGAL DEFENSE & EDUCATION
   DEFENSE FUND, INC.
1 West Court Square
Suite 105
Decatur, GA 30030
gnevins@lambdalegal.org
(404) 897-1880

═══════════════════════════════════

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## **DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1569__    Caption: __Doe v. Catholic Relief Services__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Lambda Legal Defense and Education Fund, Inc.__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gregory Nevins _____     Date: ___January 9, 2026___

Counsel for: Amicus _____

- 2 -

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

INTEREST OF AMICUS ......................................................................2

ARGUMENT ........................................................................................3

I.     THE INTERPRETATION IN AMOS OF WHAT THE RELIGIOUS ENTITY EXCEPTION DOES IS BINDING...................................3

     A.     The Supreme Court Repeatedly Pronounced The Scope Of The Religious Entity Exception In Amos......................................3

     B.     The Interpretation of the REE in *Amos* Was a Legitimate Holding of the Supreme Court That Is Binding On All Lower Courts.. ....................................................................................6

          1. It Is Expected, That The Supreme Court, In Assessing The Constitutionality Of A Statute, Especially Under The Establishment Clause, Will Pronounce What The Statute Does.. .....................................................................................7

          2. The Amos Court Was Well Aware Of The Dispute Over The REE's Scope. ...................................................................9

          3. The Establishment Clause Implications Of A Broader REE Would Have Raised Grave Concerns Among Several Justices, If Not The Whole Court, Given Its Prior Case Law Involving Discrimination And First Amendment Freedoms.......13

          4. The Amos Opinions Definitively Refute The Notion That The Court Was Properly Limiting Its Description Of The REE's Scope To The Issues Presented...................................14

CONCLUSION...........................................................................................

CERTIFICATE OF COMPLIANCE.....................................................19

CERTIFICATE OF SERVICE ..............................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bob Jones University v. United States*,
  461 U.S. 574, 103 S.Ct. 2017 (1983) ................................................................14

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
  483 U.S. 327, 107 S.Ct. 2862 (1987) ..................................................................2

*Cutter v. Wilkerson*,
  544 U.S. 709 (2005) ............................................................................................8

*Cutter v. Wilkinson*,
  544 U.S. 709, 125 S. Ct. 2113 (2005) ................................................................4

*EEOC v. Fremont Christian Sch.*,
  781 F.2d 1362 (9th Cir. 1986) ............................................................................5

*EEOC v. Mississippi Coll.*,
  626 F.2d 477 (5th Cir. 1980) ..............................................................................5

*EEOC v. Pacific Press Pub. Ass'n.*,
  676 F.2d 1272 (9th Cir. 1982) ............................................................................5

*EEOC v. Southwestern Baptist Theological Seminary*,
  651 F.2d 277 (5th Cir. 1981) ..............................................................................5

*Estate of Thornton v. Caldor*,
  472 U.S. 703 (1985) ............................................................................................8

*Fletcher v. Alaska*,
  443 F. Supp. 3d 1024 (D. Alaska 2020) ............................................................1

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ..........................................................................1

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ...........................................................................1

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) ...........................................................................14

*Hively v. Ivy Tech Comm. Coll*,
  853 F.3d 339 (7th Cir. 2017) ............................................................1

*Lovelace v. Lee*,
  472 F.3d 174 (4th Cir. 2006) .............................................................9

*McClure v. Salvation Army*,
  460 F.2d 553 (5th Cir.) .....................................................................5

*Rayburn v. General Conf. of Seventh-Day Adventists*,
  772 F.2d 1164 (4th Cir. 1985) ..........................................................5

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) .........................................................................14

**Statutes**

42 U.S.C. 2000 ............................................................................. 3, 4, 18

## INTRODUCTION

Lambda Legal Defense and Education Fund, Inc.[1] is the nation's oldest and largest non-profit legal organization committed to achieving full recognition of the civil rights of LGBTQ people and people living with HIV through impact litigation, education, and public policy work.  As particularly appropriate here, Lambda Legal has been on the cutting edge of issues presented in this appeal as party counsel and/or amicus counsel:  arguing for Title VII coverage of sexual orientation and gender identity discrimination,[2] and arguing for proper, robust Title VII coverage of religious discrimination and for solicitous consideration of those requests for religious accommodation that do not harm others.[3]

---

[1] This brief was authored by the undersigned counsel with no contribution, substantively or financially, from anyone else, including any party or party counsel.  Fed.R.App.Proc 29(a)(4)(E).

[2] *Hively v. Ivy Tech Comm. Coll*, 853 F.3d 339 (7th Cir. 2017) (en banc) (sexual orientation, party counsel); *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (gender identity, party counsel); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020) (same).

[3] *Groff v. DeJoy*, 600 U.S. 447 (2023) (amici brief arguing that then-existing standard for requiring religious accommodation was insufficiently protective of employees' religious needs but also arguing that employers should be allowed to consider the harm to others from a requested accommodation); *EEOC v. Abercrombie & Fitch*, 565 U.S. 768 (2015) (amicus supporting Muslim woman worker denied employment for wearing hijab).

**INTEREST OF AMICUS**This Court is again faced[4] with the argument that, contrary to this Court's repeated rejection of the premise, the statutory exemption in Title VII for religious entity employers (hereafter the "Religious Entity Exception" or "REE") precludes all claims under Title VII, not merely claims of religious discrimination. No circuit has rejected a sex discrimination claim under the REE (or race, color, or national origin claim), and this Court should not become the first.

Those urging the expansive view of the REE have convinced a few individual judges that the better textualist reading of the REE is that it precludes all Title VII claims.  That view is mistaken, but more importantly, it is irrelevant.  The Supreme Court has told us what the REE does, *viz*., it "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 107 S.Ct. 2862 (1987).  Any change in the scope of the statute must come from an act of Congress or a superseding opinion from the Supreme Court.

It should be appreciated that, while this briefs centers on an Establishment Clause case from 1987, nothing herein depends on the ongoing validity of the result reached or the methodology employed.  This brief focuses on the interpretation of

---

[4] See *Billard v. Charlotte Catholic High Sch*., 101 F.4th 316 (4th Cir. 2024).

the statute that the Court announced, a judicial act that almost always takes place in assessing the statute's validity, and which is not affected by any change in the law regarding the substantive constitutional doctrine at issue.

## ARGUMENT

## I. THE INTERPRETATION IN *AMOS* OF WHAT THE RELIGIOUS ENTITY EXCEPTION DOES IS BINDING.

The Supreme Court moment for the Religious Entity Exemption in 42 U.S.C. 2000e-1(a) ("REE") came in the *Amos* case, in which the Court held that application of the REE to the nonprofit, secular activities of a religious entity did not violate the Establishment Clause. *Amos*, 483 U.S. at 330. The *Amos* Court sided with the existing judicial consensus that precludes only claims of religious discrimination. Like all lower courts, this Court is obligated to follow that interpretation.

### A. The Supreme Court Repeatedly Pronounced The Scope Of The Religious Entity Exception In *Amos*.

Literally the very first sentence of the Supreme Court's only ruling on 42 U.S.C. 2000e-1 reads: "Section 702 of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U. S. C. § 2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Amos,* 483 U.S. at 329. The Court, both the majority and concurring justices, would repeat this interpretation in nearly identical language throughout the opinions. The Court explained the history of the provision: that as originally enacted, "§ 702 exempted

3

only the religious activities of religious employers from the statutory proscription against religious discrimination in employment. The 1972 amendment extend[ed] the exemption to all activities of religious organizations . . ." *Id.*, at 332 n.9.[5] Justice Brennan concluded his concurrence by declaring that the employer "may avail itself of [the] exemption from Title VII's proscription on religious discrimination. *Id.* at 346 (Brennan concurring); *see also id.* at 340 (noting that "these cases present" the conflict between the employer's and employee's free exercise rights that are inherent in the "exemption from Title VII's proscription on religious discrimination."); *id.* at 349 (depicting the REE as lifting from religious entities "the burden of refraining from discriminating on the basis of religion."). The Supreme Court itself has recognized *Amos* as holding that the REE prohibits religious discrimination claims. *Cutter v. Wilkinson*, 544 U.S. 709, 724, 125 S. Ct. 2113 (2005) ("There, we upheld against an Establishment Clause challenge a provision exempting 'religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion.' *Amos*, 483 U.S. at 329."); *id.* at 719 (same).

The importance of *Amos*'s articulation of the REE's scope emanates from the fact that the issue of whether the triggering of the REE precludes all Title VII claims

---

[5] To clarify, while 42 U.S.C. 2000-1(a) does deal with religious educational entities, those entities also enjoy a specific and very differently worded exemption at 42 U.S.C. 2000-2(e)(2)(E). That exemption was not the subject of *Amos* and is not the subject of this brief, being inapplicable to the employer here.

or just religious discrimination claims was the subject of a half-dozen circuit cases prior to *Amos*:   *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896 (1972), the only reported case discussing the REE enacted in 1964, before the 1972 amendments, and five cases from the 1980's leading up to *Amos*: *EEOC v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980), *cert. denied*, 453 U.S. 912 (1981); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981), *cert. denied*, 456 U.S. 905 (1982); *EEOC v. Pacific Press Pub. Ass'n.*, 676 F.2d 1272 (9th Cir. 1982); *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985); *cert. denied*, 106 S.Ct. 3333 (1986); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986).  All of which ruled that only religious discrimination claims are precluded by the REE,[6] a consensus that persists to this

---

[6] This Court should not be distracted by the argument of REE expansionists that support for their position can be found in this passage from *EEOC v. Mississippi College*, and other cases citing it:

> [When a religious entity] presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, s 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination.

628 F.2d at 485.  The opinion later explains what was meant in its discussion of two different scenarios.  First, the court clarified that if the religious entity actually "applied its policy of preferring Baptists over non-Baptists in granting the faculty to Bailey rather than Summers, then s 702 exempts that decision from the application

day, as no circuit court has ruled that the REE precludes a claim of discrimination based on race, color, sex, or national origin.

### B. The Interpretation of the REE in *Amos* Was a Legitimate Holding of the Supreme Court That Is Binding On All Lower Courts.

Because the effect of *Amos*'s interpretation of the REE has not previously been considered in a meaningful way, it is difficult to anticipate what questions may be raised regarding this brief's arguments.   But here is an effort at answering possible queries:

Yes, it is not only legitimate, but usually essential in a case challenging a statute's validity under the Establishment Clause, for the Court to set forth a precedential interpretation of what the statute does.

Yes, the *Amos* Court was made fully aware of the issue of whether the REE precluded all Title VII claims or merely religious discrimination claims.

---

of Title VII." *Id*. at 486.   By contrast, the court later says that "the College's policy of hiring only men to teach courses in religion," although "clearly predicated upon religious beliefs . . . might not be protected by the exemption of s 702." *Id*. at 487. Therefore, the court let the investigation continue, noting that "the College would have an opportunity to litigate in a federal forum whether s 702 exempts or the first amendment protects that particular practice." *Id*.   Thus, it is not surprising that, a year after Mississippi College, the Fifth Circuit rejected a request that it "reconsider *McClure*'s holding that section 702 does not exempt religious organizations from liability for discrimination based on race, color, sex, or natural origin," saying that "this court has reaffirmed *McClure*'s validity [in] *E.E.O.C. v. Mississippi College*." *Sw. Baptist*, 651 F.2d at 282.

Yes, any Supreme Court, but especially the *Amos* Court would have been concerned with the Establishment Clause implications of a religious entity exemption that precluded race and sex discrimination claims, probably enough to affect its ruling, but definitely enough that the Establishment Clause claim would not have been rejected without discussing a preclusion of race and sex claims;

No, the Court's proclamation of the REE's scope cannot be attributed to the fact that only a religious discrimination claim was at issue and/or that the applicability of the REE to the claim was not disputed.

1. **It Is Expected, That the Supreme Court, In Assessing the Constitutionality of a Statute, Especially Under the Establishment Clause, Will Pronounce What the Statute Does.**

As with most of the Supreme Court's assessments of a statute's constitutionality, an inquiry whether Congress's accommodation of religion comports with the Establishment Clause logically begins with setting forth what the statute does. Indeed, in her *Amos* concurrence, Justice O'Connor helpfully set forth the "necessary first step[s] in evaluating an Establishment Clause challenge to a government action lifting from religious organizations a generally applicable regulatory burden." *Amos*, 483 U.S. at 348 (O'Connor concurring). After first coming to terms with the need not to take literally the *Lemon* test's disdain of measures advancing religion, because all religious accommodations do that, the necessary second step is to "separate those benefits to religion that constitutionally

accommodate the free exercise of religion from those that provide unjustifiable awards of assistance to religious organizations." *Id*. Essentially, the inquiry is whether the accommodation has gone too far, because, as the Amos majority said, "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Id.* at 334-335 (citation omitted).

We see the importance of this exercise in the divergent results in *Estate of Thornton v. Caldor*, 472 U.S. 703 (1985) and *Cutter v. Wilkerson*, 544 U.S. 709 (2005), both involving statutes giving individuals seeking to exercise their religion the right to pursue an accommodation relaxing otherwise applicable rules. Key to the outcomes was setting forth what the statute in each case actually did. In *Caldor*, the explication of the Connecticut law's operation was the authoritative interpretation given it by its state supreme court, while in *Cutter*, the Court performed its traditional function of interpreting laws enacted by Congress. Connecticut's law privileged just one religious practice – Sabbath observance – and "arm[ed] Sabbath observers with an absolute and unqualified right not to work on" their religion's Sabbath, resulting in an "unyielding weighting in favor of Sabbath observers over all other interests." *Cutter*, 544 U.S. at 722, quoting *Caldor* 472 U.S. at 709. By contrast, Section 3 of the Religious Land Use and Institutionalized Persons Act gave all institutionalized adherents the right to seek accommodation for their observances and practices. And instead of the "interests of the adherent always

win" approach of the Connecticut statute, the *Cutter* Court expressed confidence that courts' application of the statute would not "elevate accommodation of religious observances over an institution's need to maintain order and safety" because "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, e.g., 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch)" and "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 722-23 (citing Joint Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin.News 1993, pp. 1892, 1899, 1900)).   This circuit, and every other circuit applying RLUIPA, has interpreted the statute in line with *Cutter*'s expectations about consideration of institutional interests and deference to officials.  E.g. *Lovelace v. Lee*, 472 F.3d 174, 189-91 (4th Cir. 2006). The lower courts' fealty to *Cutter* underscores what should be two obvious points: First, irrespective of whether the interpretation appears in an Establishment Clause case or any other case not depicted as a statutory interpretation case, what the Supreme Court say a federal statute does is what the statute does, unless and until the law or its interpretation is changed by Congress or the Supreme Court.  Second, the first point is true, irrespective of any criticism that could be made against the

Court's reasoning and/or methodology, including that it is unsupported by, and even contradicted by the text of the statute.

### 2. The *Amos* Court was well aware of the dispute over the REE's scope.

The *Amos* Court was well aware of the issue over whether the REE exempts religious entities from Title VII's prohibition against discrimination in employment on the basis of religion or from all of Title VII's prohibitions.  First off, of the six cases that make up the pre-*Amos* consensus that the REE precluded only claims of religious discriminations, certiorari was sought in all four of the cases from the Fourth and Fifth Circuits.  Additionally, all six cases were cited by Appellee Amos and amici labor unions, amici women's groups, each supporting the maximum coverage of workers under Title VII by endorsing the pre-*Amos* consensus limiting the REE's scope to religious discrimination claims, and arguing against the validity of the REE, even so limited.  *See Brief for the Appellees*, (*"Amos"*)  1987 WL 864785  at **8-9, Feb. 23 1987 (arguing that the development of the ministerial exception was necessary "[s]ince the applicability to religious employers of Title VII's bar against race, sex and national origin discrimination is unqualified under the statute."); see also *Brief of the AFL-CIO et al., as Amici Curiae in Support of Appellees*, (*Amos*),  1987 WL 864784 (Feb. 23 1987);  *Amici Brief of the Women's Legal Defense Fund, et al.,* (*Amos*),   1987 WL 864786 (Feb. 23 1987).

What may be more surprising is that the Latter-Day Saints Appellants also cited multiple cases from the pre-*Amos* consensus in their brief and agreeing that the REE was limited to religious discrimination claims.  See *Brief for Appellants* in 86-179, 1987 WL 864776   at *38, n.40 ("Section 702 is also carefully tailored to the problem of religious preference hiring because Congress rejected Senator Ervin's broader amendment in 1972 that would have exempted religious institutions from Title VII's prohibition against employment discrimination based on race, sex, color or national origin.").  And several amici religious groups joined forces with the Mormon Church's endorsement of the limited scope of the REE, with the Christian Legal Society making the rather blunt and straightforward point that Congress was very likely acceding to a public view that race and sex discrimination by religious groups was simply intolerable:

> "Congress has created no exception on behalf of religious organizations from Title VII's prohibitions on race and sex discrimination in employment. . . . Obviously, Congress has judged that its interest in preventing religious discrimination by religious organizations is less compelling than its interest in preventing race and sex discrimination.. . . The congressional judgment to exempt religious organizations from the religious antidiscrimination regulations of Title VII is fully harmonious with the religious freedom provisions of the First Amendment."

*Brief Amicus Curiae of Christian Legal Society, et al., in Support of Appellants*, (*Amos*) Nos. 86-179, 86-40, Jan. 5, 1987, 1987 WL 864773 at **26-27; see also *Brief of the American Jewish Congress as Amicus Curiae in Support of Appellants*,

(*Amos*), 1987 WL 864772 at *17, Jan. 5, 1987 ("§702 does not grant them absolution from the sex-bias prohibition of Title VII. Rather, Congress precisely targeted the exemption to the type of discrimination regarded by the public as within the prerogative of a religious institution-- religious discrimination-- and banned other forms of discrimination, reaffirming that religious institutions are not wholly above the law."); *Brief Amicus Curiae of the American Association of Presidents of Independent Colleges and Universities, et al*, (*Amos*), 1987 WL 864778 at *9, Jan. 5, 1987 ("Amici readily acknowledge that under the 1972 amendments to the Civil Rights Act there is no statutory ground for a religious employer to assert that it is immune from Title VII litigation if it engages in forbidden racial discrimination."); *see also id.* at **9-10 (same concession regarding no immunity for sex discrimination).

Additionally, the brief on behalf of several women's groups set forth the significant threat to equal employment opportunity for women if religious entities were exempt from sex discrimination claims when they "impose religious criteria" that are sex-based. *Amici Brief of the Women's Legal Defense Fund, et al.*, (*Amos*), 1987 WL 864786 at **44-48. The brief pointed to actual actions taken by religious employers that plainly would be actionable sex discrimination unless exempted, specifically:

> ➤ "fire new mothers on a religiously-based assertion that a mother of young children should not work outside the home"

> ➤ deny "benefits to married female employees" or pay women less for the same work, based on the head of household status afforded the husband biblically;

> ➤ hire only males to teach religion courses, or paying women less.

*Id.*

In short, the *Amos* Court was clearly made aware of the dispute over the scope of the REE, the judicial consensus that the REE precludes only religious discrimination claims, and the wide support across the spectrum that the judicial consensus enjoyed.

### 3. The Establishment Clause Implications of a Broader REE Would Have Raised Grave Concerns Among Several Justices, If Not the Whole Court, Given Its Prior Case Law Involving Discrimination and First Amendment Freedoms.

Given the extensive attention in the *Amos* opinions to exempting for-profit activities, when that was not at issue, it is inconceivable that the Court would not have acknowledged the Establishment Clause implications of exempting religious entities from all Title VII proscriptions if the Court thought that there was such an exemption in the REE. All but one member of the *Amos* Court was a member of the Court in 1983 and 1984, when the Court held in a series of cases that the government

13

could pass laws against or otherwise penalize race or sex discrimination even if the discriminating party claimed a First Amendment freedom to act as it did. *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *Bob Jones University v. United States*, 461 U.S. 574, 603–604, 103 S.Ct. 2017 (1983). Moreover, as discussed previously, the *Caldor* Court held that the statute violated the Establishment Clause, primarily because it gave adherents carte blanche to act according to their religious principles, without any consideration of the effect on others' interests. Given *Caldor*, the Court at least would have had to explain (if it could) why the Court was suddenly subordinating the interests of racial minorities, women, and indeed all of society in the eradication of race and sex discrimination, when the Court has so recently held otherwise. See *Roberts,* 468 U.S. at 623 ("We are persuaded that Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms."); *Bob Jones Univ*., 461 U.S. at 603–04 ("the Government has a fundamental, overriding interest in eradicating racial discrimination in education . . . That governmental interest substantially outweighs

14

whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs.").

**4. The *Amos* opinions definitively refute the notion that the Court was properly limiting its description of the REE's scope to the issues presented.**

There simply is not a plausible scenario whereby the Court, or at least a bloc thereof, was not concerned with the Establishment Clause implications of exempting religious employers from race and sex claims, except the scenario posited in this brief - - that it was clear that the REE did not purport to exempt race and claims in the first place.    Those believing that the preclusion of race and sex claims posed significant Establishment Clause problems not covered in the ruling would not have felt confident that they could remain silent about those problems, and live to fight another day, on the grounds that the *Amos* case concerned only a religion discrimination claim.  We know that, because that exact scenario did happen with respect to the exemption of a religious entity's for-profit ventures.    Nobody contended that the workplace at issue, the Deseret Gymnasium, was a for-profit entity, and yet the four concurring justices did not hold their fire regarding their concerns about the Establishment Clause problems posed by exempting for-profit ventures.  It became a *cause celebre* of the four concurring justices to limit the holding so that it **explicitly**

did not reach the question of whether the REE's application to for-profit activities of a religious entity could violate the Establishment Clause. See *Amos*, 483 U.S. at 340 (Brennan concurring) ("I write separately to emphasize that my concurrence in the judgment rests on the fact that these cases involve a challenge to the application of § 702's categorical exemption to the activities of a nonprofit organization."); *id.* at 346 (Blackmun, concurring) ("surely, the "question of the constitutionality of the § 702 exemption as applied to for-profit activities of religious organizations remains open,"); *id.* at 346 (O'Connor concurring) (expressing displeasure that the majority opinion failed to elucidate the problems that its rationale posed in the situation of a religious entity's for-profit ventures).

Their efforts eventually resulted in the majority acceding to their entreaty to limit the holding. The Court thus resolved the issue by depicting the scope of the REE and the reach of its opinion as follows:

> 42 U. S. C. § 2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion. The question presented is whether **applying the § 702 exemption to the secular nonprofit activities** of religious organizations violates the Establishment Clause of the First Amendment."

483 U.S. at 329-30 (emphasis added). Note that the first sentence is like the statutory language in that it does not distinguish between for profit and nonprofit activities of a religious organization. Of course, the fact that the statute makes no distinction logically means that both are covered. So in a hypothetical situation in which the

16

Court arrived at the conclusion that the REE precludes all Title VII claims, but was

not prepared to address whether that broad exemption raised separate Establishment

Clause problems, we would expect the opinion to begin with language like:

> 42 U. S. C. § 2000e-1, exempts religious organizations from Title VII's prohibitions against discrimination in employment. The question presented is whether **applying the § 702 exemption to exempt the secular nonprofit activities of religious organizations from claims of religious discrimination** violates the Establishment Clause of the First Amendment." *Id.,* at 329-30.

Alternatively, if the Court believed there was an issue about both the scope of

the REE and also the validity of the REE if it did preclude all claims, the opinion

likely would have included a disclaimer in the text or a footnote to the effect that

"We are ruling today only on the validity of the statute's undisputed preclusion of

claims like the one before us –a religious discrimination claims challenging the

employment decision of a religious entity.   We express no view as to whether the

statute has a broader preclusive effect, and if it does, whether that affects its validity

under the Establishment Clause."  Of course, no such qualifications are in the *Amos*

ruling.

The bottom line is that, given the Court's demonstrated transparency about its

conclusions and reservations about the scope of the REE and the reach of its opinion,

its pronouncement that the REE "exempts religious organizations from Title VII's

prohibition against discrimination in employment on the basis of religion" is a straightforward and complete description of the REE's scope.

Respectfully Submitted,

/s/ Gregory R. Nevins
_____

Gregory R. Nevins
LAMBDA LEGAL DEFENSE & EDUCATION
        DEFENSE FUND, INC.
1 West Court Square
Suite 105
Decatur, GA 30030
gnevins@lambdalegal.org
(404) 897-1880

Dated: January 9, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 39(a)(5) because it contains 4175 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman, 14-point font, a proportionally spaced typeface.

/s/ Gregory R. Nevins

Gregory R. Nevins

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Gregory R. Nevins

Gregory R. Nevins