In the United States Court of Appeals
for the Fourth Circuit

JOHN DOE,

*Plaintiff-Appellee,*

v.

CATHOLIC RELIEF SERVICES,

*Defendant-Appellant.*

On Appeal from the U.S. District Court
for the District of Maryland at Baltimore
No. 1:20-cv-01815-JRR
Hon. Julie R. Rubin

## BRIEF OF CURRENT AND FORMER EMPLOYEES OF CATHOLIC RELIEF SERVICES AS *AMICI CURIAE* SUPPORTING PLAINTIFF-APPELLEE

Robin B. Wagner
ROBIN B. WAGNER, PLLC
402 W. Liberty Street
Ann Arbor, MI 48103
robin@robinwagnerlaw.net
(734) 294-3035

Adam Farra
FARRA & WANG PLLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
afarra@farrawang.com
(202) 505-5990

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ...................... 1

SUMMARY OF ARGUMENT ................................................................... 7

ARGUMENT .......................................................................................... 8

  I.  Human Dignity Animates our Country's Civil Rights Statutes, Just as it is Central to the Work of Catholic Relief Services; Therefore, Mr. Doe's Claims of Employment Discrimination Against CRS Must be Upheld .................................................................................................. 8

    A.  *Amici* Object to the Conflict Between Their Employer's Treatment of Mr. Doe, Compared to How it Treats the Rest of Humanity .......................................................................................... 9

    B.  Denial of Equal Benefits to Mr. Doe Inflicts a Dignitary Harm, Ironically, In a Humanitarian Workplace .................................... 13

  II.  Our Country's Employment Discrimination Laws Must Protect Non-Ministerial Employees of Organizations Like Catholic Relief Services. .................................................................................................. 18

    A.  *Amici* are Non-Ministerial Employees who Oppose CRS's Discrimination Against Mr. Doe because of his Sex and also Fear the Employment Security of All CRS Employees for any Protected Characteristic .......................................................................... 19

    B.  A Religious Institution's Free Exercise and Establishment Rights Must Not Be Allowed to Subsume an Individual's Employment Rights. ................................................................... 23

CONCLUSION ..................................................................................... 28

CERTIFICATE OF COMPLIANCE ..................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright,*
    468 U.S. 737 (1984.......................................................................... 13

*Billard v. Charlotte Catholic High Sch.,*
    101 F.4th 316 (4th Cir. 2024) ....................................................... 33

*Bostock v. Clayton Cnty,*
    590 U.S. 644 (2020)............................................................... passim

*Hosanna-Tabor Evan. Luth. Church & Sch. v. EEOC,*
    565 U.S. 171, 188 (2012).................................................... 30, 31, 32

*Doe v Catholic Relief Servs.,*
    618 F. Supp. 3d 244 (2022)............................................................ 34

*Grimm v. Gloucester County School Board,*
    972 F.3d 586 (4th Cir. 2020)............................................. 20, 21, 22

*Kennedy v. St. Joseph's Ministries, Inc,*
    657 F.3d 182 (4th Cir. 2011)......................................................... 30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118, (2014).................................................................... 14

*Obergefell v. Hodge,*
    576 U.S. 642 (2015)................................................. 14, 17, 18, 19

*Our Lady of Guadalupe Sch. v. Morrissey-Ber,*
    591 U.S. 747 (2020)..................................................................... 31

*Preston v. Com. of Va. ex rel. New River Cmty.* ,
  31 F.3d 203 (4th Cir. 1994)................................................................ 23

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
  772 F.2d 1166 (4th Cir. 1985)........................................................ 30, 32

*Zinski v. Liberty Univ., Inc.,*
  777 F. Supp. 3d 601 (4th Cir. 2025) ............................................. 29, 33

**Statutes**

Section by Section Analysis of H.R. 1746, The Equal Employment
  Opportunity Act of 1972, 1972 Legis. Hist. 1845 ......................... 15

**Other Authorities**

118 Cong. Rec. 7167 ........................................................................... 15

H.R. Rep. No. 88-914 (1963) ............................................................. 16

# INTRODUCTION AND INTEREST OF *AMICI CURIAE*[1]

*Amicus Curiae*, current and former employees of Defendant-Appellant Catholic Relief Services, are individuals who have worked or currently work for CRS in positions that reflect the broad diversity of the CRS mission and operations. *Amici* have served or currently serve abroad in relief programs, provide logistical support to CRS's world-wide operations, and perform accounting and human resources functions for CRS at its headquarters and satellite offices across the United States. Some of these individuals identify as LGBTQ, but most do not. Many of these individuals have personal characteristics protected by Federal employment laws such as Title VII, the Age Discrimination Elimination Act, and the Americans with Disabilities Act. Most of these individuals have asked not to be identified by name or exact role at CRS because they fear that in the future they could be targeted for disparate treatment in the workplace based on their protected characteristics or harassed in their personal lives for having

---

[1] Permission to file this amicus brief has been granted by all parties. No party's counsel authored this brief in whole or in part, and no person or entity other than amici curiae and their counsel made a monetary contribution intended to fund the brief's preparation or submission. Further, per the Court's order of January 23, 2026, the exhibits have been removed.

supported Mr. Doe in his claims against Catholic Relief Services.

The individuals whose together file this amicus brief describe themselves and provide their reasons for supporting Plaintiff-Appellee:

- J. Doe 2, a current 10-year employee of CRS in Global Programs, over age 40, states: "Per the law, he is entitled to the same rights. As on organization, we serve the vulnerable. Our employees should be extended the same care. Over 40 and one of the few women in leadership in my CP."

- J. Doe 3, a current 4-year employee of CRS serving as Advisor for Operations, over age 40, states: "No one person or organization can play God and give two people two different sets of resources based on their own Interpretation of the Bible, when neither person has enacted any suffering to another."

- Nathan Rawe, a past, 10-year employee of CRS in Supply Chain who is over age 40 states:

  As a member of the LGBTQIA+ community, there were times that were made very difficult for me at CRS. Discrimination is not a part of the definition of the Catholic faith in which I was raised and I expect CRS and particularly its leadership to be better and actually ensure the dignity of its staff. I certainly feel that I and others were denied that dignity.

- J. Doe 4, a past, 19-year employee of CRS with 19 years of experience in various roles, most recently in business and who is over the age of 40 states: "He is legally married. I believe really just organizations should have certain allowances are considerations, but they should not be allowed to ignore the law."

- Sarah Penniman-Morin, a past, 8-year employee of CRS who served as Senior Director for Global Supply Chain and is over age

40 states: "Equality of access to healthcare (and thus dignity) under CRS employment. Also, honoring commitments made to people recruited to work at CRS."

- J. Doe 5, a current, 9-year employee of CRS in Supply Chain, states:

   To know that human dignity is conditional in the eyes of an organization otherwise rooted in inclusivity and respect, especially for minority groups and various religious beliefs, is incompatible with how I experience upholding the mission of CRS. The supremacy of heteronormative relationships is traditional in the Catholic Church, yes, but not in US employment law. It feels like an active disrespect of the dignity of a vulnerable minority group. Throughout this process, been faced with my privilege in a hetero marriage, which has, in turn, catalyzed my duty to represent my fellow queers in speaking out against this clear discrimination and inequity. The fear that this could extend beyond sexual orientation discrimination and into other protected characteristics is worrying. [Redacted for identifying information about a protected characteristic]

- Mitchell Boutin, a past, 3.75 year employee of CRS in Business Development and Strategic Growth, is over 40 and not Catholic, and states: "I lived through the same situation with CRS while married to my same-sex partner from 2016 to when I decided to leave CRS in 2018."

- J. Doe 6, a current, 5-year employee of CRS in Evaluation, is not Catholic and states: "Human dignity, morals, US labor policy."

- J. Doe 7, a past, 6-year employee of CRS who worked in overseas programs and human resources, states:

   Worked in Programs in Africa/Central Asia, then at HQ with the Human Resources team. CRS started a diversity and equity team in 2020; [redacted for privilege]. Mr.

Doe's case against CRS matters to me because it was a core reason I chose to leave the agency. In my last position our mission was to uphold the dignity of each individual and create an inclusive, equitable culture. However, while we focused on multiple demographics, the LGBTQ+ community was not truly included. There were multiple listening sessions with contradictory language around how CRS supported LGBTQ+ colleagues, while at the same time had to adhere to Catholic Moral Teaching. The flip-flop from affirming non-discrimination to affirming discriminatory practices was hurtful. With international rules-based order and norms, the burden of proof lies with the oppressor, not the oppressed. Also, while the claim is that the institution of marriage in the Church is between a man and a woman, what do government/organizational benefits have to do with this scripture? While I fully believed in CRS's mission - it felt like I could not uphold the organization's vision when my own personal identity was contested, and could not truly create an inclusive culture when we couldn't even talk clearly about the LGBTQ+ community. I am non-Catholic and was a gay man in a work area that was mostly women.

- J. Doe 8, a current, 5.5-year employee of CRS in International Development states:

For me, I do not work at CRS because they are Catholic, I work at CRS despite of their Catholic affiliation. I choose to work in international development, I went to graduate school to study international development after I served in the Peace Corps. I want to time I spend my working hours in a way that contribute to efforts to reducing income inequality. After I completed grad school, I applied to more than 40 jobs. CRS was the only organization to offer me a job. Like any organization, there are moral and ethical considerations to make in accepting employment. If I worked for the US government, would that mean that I supported every US policy or action? If I worked for a

corporation, would that mean I supported the stockholders earning money from my labor or high CEO pay?

CRS is my employer, that does not mean that I agree with every position or decision they make. Similarly, I do not agree with every position of the Catholic Church or USCCB.

* * *

I appreciated the organization's transparency and accepted the resulting moral conflict, recognizing that while our values did not fully align, I agreed with most of them. CRS' guiding principles are admirable (linked here) including that "every person has basic rights and responsibilities that flow from our human dignity and that belong to us as human beings regardless of any social or political structures." For me, this is the important part - that as staff we can all strive to work together to promote "integral human development" which ensures that people can reach their full potential in an atmosphere of peace, social justice and human dignity. (Below is a description of two online mandatory trainings I had to complete within a month of starting my employment at CRS.)

During my orientation they stressed that human dignity is an important aspect of CRS' and I agree with this. "Our belief in Human Dignity not only inspires us to help all people in need, but it also guides how we go about doing that . . .

* * *

I support human dignity as it was explained then, and how I have understood it with the colleagues I worked with at CRS over the past 5 years. As far as I can tell, it is the leadership of CRS, who are forced by the USCCB, to ignore the human dignity of people who identity as LGBTQ; it is not the position of staff members I know.

I consider my employment as serving the "poor and marginalized," not as serving the Catholic Church. Similar to the employee in the John Doe case, my position is also in tracking, counting, and learning from the projects to continue to improve impact for people overseas. I want this work to continue to improve the impact and work, and hope my small data crunching can contribute to that. I would not have accepted the position in CRS if I had to promote Catholic teachings explicitly, spread the faith, or attend church services regularly. I do not consider my employment as ministerial or a call to service, I consider my employment as trying to do the least harm and potentially do some good with the time and skills I can provide. I am proud to work in solidarity alongside anyone, regardless of their faith, gender identity, or spouse's identity - so long as we all agree to protect human dignity, increase resilience and equity in the world.

... [redacted for privilege]

- J. Doe 9, a current, 4-year employee of CRS working at HQ, states: "I strongly believe in the core values and mission of CRS. This includes striving to protect and promote human dignity in all cases - including those who work for CRS. One of a few men in a department of women."

- J. Doe 10, a past, 10-year employee of CRS who served as Head of Programs and Business Development with 10 years of experience, is non-white and states: "also experienced similar discrimination at CRS and was denied a promotion because of my relationship status with another person of the same gender at the time."

- J. Doe 11, a current, 6-year employee of CRS serving as Senior Manager, states:

    I am bi[sexual] and could easily be in the same situation if I were not in a straight passing relationship. Employers should not be able to discriminate based on sexual

orientation or gender identity of staff and their partners. I am bi and could easily be in the same situation if I were not in a straight passing relationship. Employers should not be able to discriminate based on sexual orientation or gender identity of staff and their partners.

- J. Doe 12, a past, 17-year female employee of CRS who held field and senior positions at HQ, is not Catholic, over age 40 and states: "I resigned from CRS because of the leadership's mistreatment of a fellow employee due to his sexual orientation."

## SUMMARY OF ARGUMENT

*Amici*, who are current and former employees of Defendant-Appellant Catholic Relief Services ("CRS"), submit this amicus brief to convey their unique concerns arising as individuals, who like Mr. Doe, occupy non-ministerial roles at CRS.

*Amici* make two fundamental arguments below. First, they explain the centrality of human dignity to the CRS mission, to their own work for CRS, and, equally, to the legal principles animating civil rights protections for LGBTQ individuals and all individuals with regard to employment discrimination. Second, they argue that non-ministerial employees like Mr. Doe and themselves are entitled to employment protections for their protected characteristics, be it age, race, religion, disability status, or sex, including LGBTQ status. These individuals see a grave danger in the arguments of Intervenor and

others that Title VII, and by logical extension, other federal statutes granting employees workplace protections, would cease to protect non-ministerial employees from discriminatory treatment in their workplaces.

As *amici* discuss below, the rights of LGBTQ individuals have been recognized over the past twenty years through the lens of human dignity. Dignitary harm is also an essential principle governing our federal laws protecting employees from workplace discrimination. Human dignity is also at the core of CRS's mission in serving vulnerable persons world-wide. And it is this same concern for human dignity that animates *amici* to file this brief and raise their voices in support of Mr. Doe's right to be treated with dignity and equality by CRS.

## ARGUMENT

### I. Human Dignity Animates our Country's Civil Rights Statutes, Just as it is Central to the Work of Catholic Relief Services; Therefore, Mr. Doe's Claims of Employment Discrimination Against CRS Must be Upheld

Catholic Relief Services ("CRS") describes itself first as a global humanitarian organization committed to assisting "the poor and vulnerable overseas," responding to humanitarian emergencies,

combating disease and poverty, and fostering "peaceful and just societies." Catholic Relief Servs., "Our Mission Statement" available at https://www.crs.org/about-us/mission-statement (last visited Jan. 8, 2026). Its mission statement repeatedly emphasizes services, solidarity, and the "**dignity of the human person**," and expressly affirms that CRS assists people "on the basis of need, not creed, race or nationality." *Id.* (emphasis added). CRS employs language to describe its faith and mission that is aspirational and inclusive: "we put our faith into action to help the world's poorest," and "we will not stop until **all of God's children** can fulfill their God-given potential." *Id.*

## A. *Amici* Object to the Conflict Between Their Employer's Treatment of Mr. Doe, Compared to How it Treats the Rest of Humanity

A disturbing conflict has arisen here because CRS publicly and emphatically commits to universal human dignity and serving all people without regard to creed, but it has tied full employment benefits for its own employees—the ones who carry out its mission—to a rigid and specific perspective on family or identity. Title VII's requirement to treat LGBTQ individuals equally, first recognized in *Bostock v. Clayton Cnty*, 590 U.S. 644 (2020), does not weaken the organization's moral

mission. Instead, it guarantees that the dignity the organization advocates for externally is also respected and upheld within the organization itself.

*Amici*, who are secular professionals currently or previously employed by CRS as data analysts, logistics professionals, human resources experts, and other operational staff, chose to work for CRS because of its mission to "[advocate] for our marginalized sisters and brothers while uplifting the dignity of the human person." *CRS Mission,* cit. *supra;* see "About Amici," *supra*, and discussion, *infra*. For *amici*, the CRS mission statement communicates that their work will aid in humanitarian efforts without regard for any human being's individual characteristics, protected by law or otherwise. They derive great meaning from their participation in a mission defined by service to others and grounded in universal principles of human dignity and need-based assistance. See discussion, *infra*.

*Amici* find that CRS's exclusion of colleagues from tangible benefits because of their LGBTQ status is intolerable, conditional belonging that conflicts with CRS's core mission. *Amici* work or worked for CRS because of its mission, yet they are deeply troubled by their

employer's failure to treat one of their own with the same dignity they afford all the rest of humanity. Nathan Rawe states:

> As a member of the LGBTQIA+ community, there were times that were made very difficult for me at CRS. Discrimination is not a part of the definition of the Catholic faith in which I was raised and I expect CRS and particularly its leadership to be better and actually ensure the dignity of its staff. I certainly feel that I and others were denied that dignity.[2]

Mr. Rowe's experience is not isolated. Other CRS employees similarly describe the denial of equal treatment as incompatible with both the organization's stated mission and their own understanding of dignity in the workplace:

> While I fully believed in CRS's mission - it felt like I could not uphold the organization's vision when my own personal identity was contested and could not truly create an inclusive culture when we couldn't even talk clearly about the LGBTQ+ community. I am non-Catholic and was a gay man in [the] department . . . . Statement of J. Doe 7, *supra.*

Treating LGBTQ employees as second class not only betrays CRS's mission of "[assisting] people on the basis of need, not creed, race or nationality", CRS Mission, cit. *supra*, it also violates the employees' dignitary interests as established by federal law. Dignitary harm is not abstract. It affects economic security, family stability, and an

---

[2] See "About *Amici*," *supra.*

employee's sense of equal standing within the organization. In an institution dedicated to "uplifting the dignity of the human person," *id.*, the disparate treatment of Mr. Doe carries a particular weight. "To know that human dignity is conditional in the eyes of an organization otherwise rooted in inclusivity and respect, especially for minority groups and various religious beliefs, is incompatible with how I experience upholding the mission of CRS." J. Doe #5, *supra*.

Among the *amici*, a defining characteristic is their shared conviction that a grave injustice was committed against Mr. Doe. J. Doe #2 states: "Per the law, he is entitled to the same rights. As [an] organization, we serve the vulnerable. Our employees should be extended the same care." Sarah Penniman-Morin, who does not identify as LGBTQ and worked for over eight years at CRS, explains that as a non-Catholic woman and former senior director at CRS, John Doe's case was important to her because of "[e]quality of access to healthcare (and thus dignity) under CRS employment. Also, honoring commitments made to people recruited to work at CRS."

The primary factor that unites these individuals is not merely their association with CRS, past or present, but their shared motivation

to work for an organization whose mission centers on promoting human dignity. The same principles that drew them to CRS are those that have led them to support John Doe in his anti-discrimination case because of the dignitary harm CRS has caused Mr. Doe.

### B. Denial of Equal Benefits to Mr. Doe Inflicts a Dignitary Harm, Ironically, In a Humanitarian Workplace.

Dignitary harm and stigmatic injury are the intangible injuries to a person's dignity, reputation, or sense of self-worth that, while not resulting in physical or monetary damage, can constitute a concrete injury. *Allen v. Wright*, 468 U.S. 737, 738 (1984) ("Such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct."), abr. on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, (2014).

The denial of spousal benefits based on sexual orientation does more than withhold compensation; it communicates that certain families are incompatible with full workplace inclusion. *See Obergefell v. Hodges,* 576 U.S. 644, 662 (2015) ("DOMA, the Court held, impermissibly disparaged those same-sex couples 'who wanted to affirm

their commitment to one another before their children, their family, their friends, and their community'"). Thus, LGBTQ employees suffer dignitary injury when they are expected to contribute their labor but are not entitled to equal recognition of their full personhood.

Indeed, Title VII reflects Congress's judgment that employment practices—even by employers that are religious institutions—that assign unequal status to workers, particularly through compensation, benefits, or terms of employment, inflict a harm that extends beyond material deprivation: "[church-affiliated] organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin." Section by Section Analysis of H.R. 1746, The Equal Employment Opportunity Act of 1972, 1972 Legis. Hist. 1845; 118 Cong. Rec. 7167.

Practices that condition access to core employment benefits on sex-based distinctions necessarily communicate unequal status. This result is antithetical to Title VII's core purpose of ensuring equal treatment in employment. *Bostock v. Clayton Cty.*, 590 U.S. 644, 661-65 (2020). *See also* H.R. Rep. No. 88-914, at 26 (1963). In *Bostock,* the Court rejected efforts to recharacterize such discrimination as

something other than sex-based, emphasizing that liability turns on whether sex was a but-for cause of adverse action. *Id.* at 660-61.

*Bostock* thus reflects Congress's determination that equal participation in employment is a matter of individual dignity, not employer discretion. In so holding, *Bostock* confirmed that employment practices singling out LGBTQ employees for unequal treatment violate the statute's core command, regardless of an employer's motivation. *Id.* at 664.

*Obergefell,* 576 U.S. 644, illustrates how the Court has understood the systematic exclusion of LGBTQ people from legally recognized family institutions harms an individual's dignity, autonomy, and equal standing:

> Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. In addition these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs.

*Id.* at 676 (internal citations omitted). Having situated dignity and autonomy as protected liberty interests, the Court applied those principles to the institution of marriage itself. In doing so, it

emphasized that marriage is not merely a legal status, but a rite of expression, intimacy, and personal fulfillment equally available to same-sex couples:

> The nature of marriage is that, through its enduring bond, two persons together can find other freedoms, such as expression, intimacy, and spirituality. This is true for all persons, whatever their sexual orientation. There is dignity in the bond between two men or two women who seek to marry and in their autonomy to make such profound choices. *Cf. Loving*, 87 S.Ct. 1817 ("[T]he freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State").

*Id.* at 644 (internal citations omitted). The Court further explained the social and legal marginalization of LGBTQ individuals through denial of marriage rights carried profound dignitary consequences:

> It would misunderstand these men and women to say they disrespect the idea of marriage. Their plea is that they do respect it, respect it so deeply that they seek to find its fulfillment for themselves. Their hope is not to be condemned to live in loneliness, excluded from one of civilization's oldest institutions. They ask for **equal dignity** in the eyes of the law. The Constitution grants them that right."

*Id.* at 681 (emphasis added).

Thus, legal recognition is inseparable from dignity, and when the law recognizes family relationships, it affirms both personal worth and equal standing. These principles confirm that withholding recognition

from same-sex families operates not merely as a denial of benefits, but as a denial of equal dignity itself.

Similarly, this Court's holding in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), further highlights the profound importance of protecting LGBTQ individuals from dignitary harm. "The **stigma** of being forced to use a separate restroom is likewise sufficient to constitute harm under Title IX, as it 'invite[s] more scrutiny and attention' from other students, '**very publicly brand[ing]** all transgender students with a scarlet "T".'" *Id.* at 617-18. (emphasis added) (quoting Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 530 (3d Cir. 2018)). The Court explained that such policies do not merely deny access to a benefit but also stigmatize trans individuals and mark them as unworthy of equal respect and recognition. *Id.* at 611. "The policy bears an eerie similarity to **stigmatic discrimination** in the separate-but-equal context—which produces deeply corrosive, irreversible harm across a human life." *Id.* at 626 (Wynn J. conc.) (emphasis added).

Importantly, the *Grimm* Court rejected arguments that administrative concerns or moral objections could justify the imposition of such exclusion. *Id.* at 612-13. "In these administrators' experiences,

'showing respect for each student's gender identity **supports the dignity and worth of all students** by affording them equal opportunities to participate and learn.'" *Id.* at 614 (internal citations omitted) (emphasis added). Although *Grimm* arose in the educational context of Title IX, its reasoning was still guided by Title VII principles. *See, e.g. Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994).

As Courts have recognized the rights of LGBTQ individuals through a succession of decisions over the past twenty years, they have done so through the lens of human dignity. Dignitary harm is also an essential principle governing our federal laws protecting employees from workplace discrimination. And human dignity is also at the core of CRS's mission in serving vulnerable persons world-wide. Finally, it is this same concern for human dignity that animates *amici* to file this brief and raise their voices in support of Mr. Doe's right to be treated with dignity and equality by CRS.

## II.  Our Country's Employment Discrimination Laws Must Protect Non-Ministerial Employees of Organizations Like Catholic Relief Services.

*Amici* urge this honorable Court to hold that employees like Mr.

Doe and themselves, who perform functions that have no bearing on the religious activities of the Catholic Church or of CRS, deserve the full protections of Title VII. To hold otherwise would have the right of their employer, CRS, to religious autonomy swallow whole their employment-discrimination protections.

## A. *Amici* are Non-Ministerial Employees who Oppose CRS's Discrimination Against Mr. Doe because of his Sex and also Fear the Employment Security of All CRS Employees for any Protected Characteristic

All 14 *amici* are non-ministerial employees, past and current, of Catholic Relief Services. Their roles and responsibilities include global programs, advisor for operations, supply chain management, business support, human resources, program evaluation, international development, and field work. See Ex. 1, Attachment A. Many of them are part of a group of nearly 200 CRS employees who signed a letter of support for Mr. Doe in August of 2022. See *id.*, Attachment B. This letter welcomed an earlier ruling of the lower court that CRS's denial of spousal insurance to their colleague was discriminatory. *Id.* They wrote:

> We celebrate the diversity of our CRS team, composed of employees of different faith and secular traditions who work together towards our shared mission to serve the most vulnerable overseas and assist Catholics to live out their faith in solidarity with these communities in need.

CRS' Catholic identity is at the heart of our mission and guiding principles. This identity does not preclude the fair and equitable treatment of employees. On the contrary, our identity puts us firmly on the side of antidiscrimination. Our guiding principles, drawn from the tradition of Scripture and Catholic social teaching, affirm the sacredness and dignity of the person, community, and solidarity. *Id.*

These CRS employees spoke from a deep commitment to universal human dignity and sought the same from their employer, CRS.

*Amici* have stated the following regarding their support for Mr. Doe against CRS's discriminatory conduct:

"Per the law, he is entitled to the same rights. As on [sic] organization, we serve the vulnerable. Our employees should be extended the same care." J. Doe 2, Ex. 1, Attachment A at 1.

"No one person or organization can play God and give two people two different sets of resources based on their own Interpretation of the Bible, when neither person has enacted any suffering to another." J. Doe 3, *Id.*

"As a member of the LGBTQIA+ community, there were times that were made very difficult for me at CRS. Discrimination is not a part of the definition of the Catholic faith in which I was raised and I expect CRS and particularly its leadership to be better and actually ensure the dignity of its staff. I certainly feel that I and others were denied that dignity." Nathan Rawe, *Id.*

"He is legally married. I believe really just organizations should have certain allowances are [sic] considerations, but they should not be allowed to ignore the law." J. Doe 4, *Id.*

"He is legally married. I believe really just organizations should have certain allowances are considerations, but they should not be allowed to ignore the law." Sarah Penniman-Morin, *Id.*

"He is legally married. I believe really just organizations should have certain allowances are considerations, but they should not be allowed to ignore the law." J. Doe 5, *Id.*

"I lived through the same situation with CRS while married to my same-sex partner from 2016 to when I decided to leave CRS in 2018." Mitchell Boutin, *Id.* at 2.

"Mr. Doe's case against CRS matters to me because it was a core reason I chose to leave the agency. In my last position our mission was to uphold the dignity of each individual and create an inclusive, equitable culture. However, while we focused on multiple demographics, the LGBTQ+ community was not truly included. . . . The flip-flop from affirming non-discrimination to affirming discriminatory practices was hurtful. . . . Also, while the claim is that the institution of marriage in the Church is between a man and a woman, what do government/organizational benefits have to do with this scripture? While I fully believed in CRS's mission - it felt like I could not uphold the organization's vision when my own personal identity was contested, and could not truly create an inclusive culture when we couldn't even talk clearly about the LGBTQ+ community." J. Doe 7, *Id.* at 2-3.

"I consider my employment as serving the 'poor and marginalized,' not as serving the Catholic Church. Similar to the employee in the John Doe case, my position is also in tracking, counting, and learning from the projects to continue to improve impact for people overseas. I want this work to continue to improve the impact and work, and hope my small data crunching can contribute to that. I would not have accepted the position in CRS if I had to

promote Catholic teachings explicitly, spread the faith, or attend church services regularly. I do not consider my employment as ministerial or a call to service. . ." J. Doe 8, *Id.* at 5-6.

"I strongly believe in the core values and mission of CRS. This includes striving to protect and promote human dignity in all cases - including those who work for CRS." J. Doe 9, *Id.* at 7.

"I also experienced similar discrimination at CRS and was denied a promotion because of my relationship status with another person of the same gender at the time." J. Doe 10, *Id.* at 7.

"I am bi and could easily be in the same situation if I were not in a straight passing relationship. Employers should not be able to discriminate based on sexual orientation or gender identity of staff and their partners." J. Doe 11, *Id.*

"I am bi and could easily be in the same situation if I were not in a straight passing relationship. Employers should not be able to discriminate based on sexual orientation or gender identity of staff and their partners." J. Doe 12, *Id.*

The throughline of these statements is a desire to have CRS treat its own non-ministerial employees as it treats all human beings around the world—fairly and without regard for any personal or individual characteristics.

Indeed, these *amici* have individual characteristics that are protected by federal employment discrimination laws, including age, religion, sex and sexual orientation, and disability status. They have

expressed concerns that a ruling in favor of CRS could imperil their own employment security, as well as those of other CRS employees. As one individual explained regarding a protected characteristic they do not feel safe sharing in this brief, "[t]he fear that this could extend beyond sexual orientation discrimination and into other protected characteristics is worrying." J. Doe 5, *Id.* at 2.

Simply put, when an employee plays no ministerial role, there is no basis to remove from that employee the protections of our federal employment discrimination laws.

## B. A Religious Institution's Free Exercise and Establishment Rights Must Not Be Allowed to Subsume an Individual's Employment Rights.

Intervenor takes the extreme position that CRS's First Amendment rights demand complete religious autonomy with no interference or scrutiny from secular authority regarding its employment decisions. (Doc. 77, P. 36.) This is not a reasoned or reasonable approach to an important concern in our society over how to balance religious freedoms against essential and long-standing public policies such as workplace discrimination protections. After all, "[a]llegedly sincere beliefs may also be feigned or covers for abusive or

false positions, jeopardizing the interests of others." M. Minow, "Walls or Bridges: Law's Role in Conflicts over Religion and Equal Treatment" 48 B.Y.U. L. Rev. 1581, 1583 n.9 (2023).

It is well understood that Title VII's exceptions for religious organizations do not exempt them from "Title VII's provisions barring discrimination on the basis of race, gender, or national origin." *Zinski v. Liberty Univ., Inc.*, 777 F. Supp. 3d 601, 614 (4th Cir. 2025) (quoting *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011)). See also *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985). It is also well understood that beyond the statutory language of Title VII, the "ministerial exception" further limits the enforcement of otherwise applicable employment discrimination laws over "the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evan. Luth. Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (applying the ministerial exception to a schoolteacher with ADA claims).

Importantly, the ministerial exception is neither "limited to the head of a religious congregation," nor is it so all-encompassing that every employee of a religious congregation is covered by its reach. *Id.* at

190. The exception focuses on "a church's independence on matters "of faith and doctrine" when it comes to selecting, supervising, or removing "a minister without interference by secular authorities." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). These are rights grounded in the First Amendment's Establishment and Free Exercise clauses. *Id.*

The "ministerial exception" is a nuanced and balanced method to weigh "all the circumstances" of an individual's employment factor for determining whether a ministerial exception applies, and thus whether the religious institution's First Amendment rights outweigh the individual employee's statutory rights. *Hosanna-Tabor*, 565 U.S. at 188. The factors for evaluating the application of the exception to an employee include whether 1) the employee holds the title of "minister, with a role distinct from that of most of its members"; 2) the position "reflected a significant degree of religious training followed by a formal process of commissioning";3) the employee holds themselves "out as a minister of the Church by accepting the formal call to religious service, according to its terms," and by claiming certain tax benefits; and 4) the employee's "job duties reflected a role in conveying the Church's

message and carrying out its mission." *Morrissey-Berru*, 591 U.S. at 750 (citing *Hosanna-Tabor*, 565 U.S. at 191-92 (internal quotations omitted)). No one factor is "essential." *Id.*

These factors protect employees who play no ministerial role from discriminatory treatment based on their sex, race, national origin, age, or disability status. Without this limited carve out, any employee regardless of their role or title would lack workplace protections, while the First Amendment's religious protections would instead grant any organization claiming a religious affiliation carte blanche to ignore employees' rights with impunity.

Rather, there can and must be thoughtful limiting factors to a religious employer's actions. As this Court has explained,

> The ministerial exception does not protect the church alone; it also confines the state and its civil courts to their proper roles. *See Rayburn*, 772 F.2d at 1171. The exception operates structurally, in other words, to "categorically prohibit[] federal and state governments from becoming involved in religious leadership disputes." *Conlon* [v. *Intervarsity Christian Fellowship/USA*], 777 F.3d [829,] 836 [(6th Cir. 2015)].

*Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024). The but-for causation standard announced in *Bostock* also clarifies the lines to be drawn in understanding when discrimination by

a religious institutional is actionable:

> Under this standard, a statutory violation occurs if discrimination operates on the basis of any protected class except religion; and discrimination triggering other protected classes—sex, race, national origin—cannot be converted into religious discrimination by claiming a religious motivation. (*Bostock*, in other words, draws the line that Congress only sketched.)

*Zinski*, 777 F. Supp. 3d at 631. As the *Zinski* Court explained regarding its finding of sex discrimination against a religious university for terminating a transgender IT apprentice:

> This case—and the law it implicates—points to the delicate balance between two competing and laudable objectives: eradicating discrimination in employment, on the one hand, and affording religious institutions the freedom to cultivate a workforce that conforms to its doctrinal principles, on the other. We find that our holding today—that religious institutions cannot discriminate on the basis of sex, even if motivated by religion—most appropriately maintains this balance.

*Id.* at 632.

Plaintiff-Appellee is a secular employee performing non-ministerial work for Catholic Relief Services—just like *amici*—and he was denied spousal health-insurance benefits solely because his lawful same-sex marriage did not conform to CRS's religious views. *Doe v Catholic Relief Servs.*, 618 F. Supp. 3d 244 (2022). This case does not involve regulation of religious belief, expression, or employee conduct,

but the administration of a standardized employee benefits program tied to lawful marital status. *See id.* That denial did not arise from any religious function performed by the employee, nor from any effort to shape doctrine, worship, or faith formation. *Id.* Instead, it flowed from the administration of a standardized employee-benefits program, precisely the kind of secular employment practice Title VII regulates. *Id.* Treating an employee's sexual orientation or marital relationship as disqualifying for equal employment benefits constitutes discrimination "because of sex," and inflicts a concrete injury to that employee's rights to equal treatment in the workplace. *Bostock,* 590 U.S. at 661-65. As in *Bostock*, the asserted moral or religious motivation for the policy does not alter the character of the harm: the employee is marked as ineligible for full participation in the workplace because of who he is.

## CONCLUSION

CRS is not being asked to alter its religious beliefs or abandon its faith-based mission—one that exalts the dignity of all people. Indeed, *amici* cite the CRS mission as central to their work and affinity to the organization. CRS is only being asked to comply with Title VII's neutral requirement that employees be treated with equal respect—*and*

*dignity*—in the terms and conditions of employment. Denying non-ministerial employees benefits because of their same-sex marriages, imposes a concrete dignitary and material harm that is forbidden by federal law. That harm subjected Mr. Doe to unequal standing in the workplace, prohibiting him from fully benefiting from their employment despite their contribution to CRS's humanitarian mission. Supreme Court and Fourth Circuit precedent make clear that although religious expression is deeply protected, it is not boundless. Further, Plaintiff's claim of relief only reinforces CRS's moral commitment that it publicly proclaims, that respecting religious liberty and providing for another's needs are not competing imperatives.

Respectfully submitted,

Robin B. Wagner
ROBIN B. WAGNER, PLLC
402 W. Liberty Street
Ann Arbor, MI 48103
robin@robinwagnerlaw.net
(734) 294-3035

// s // Adam Farra
Adam Farra
FARRA & WANG PLLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
afarra@farrawang.com
(202) 505-5990

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,448 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Robin B. Wagner*

Dated: January 26, 2026